Nos. 21-1196, 21-1324

IN THE

# United States Court of Appeals

FOR THE TENTH CIRCUIT

▶▶◀◀

COMPAÑÍA DE INVERSIONES MERCANTILES, S.A.,

*Petitioner-Appellee*,

v.

GRUPO CEMENTOS DE CHIHUAHUA S.A.B. DE C.V.,

AND GCC LATINOAMÉRICA, S.A. DE C.V.,

*Respondents-Appellants.*

▶▶◀◀

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO (DENVER), DOCKET NO. 1:15-CV-02120-JLK
(HONORABLE JOHN L. KANE, JUNIOR, SENIOR U.S. DISTRICT JUDGE)

**RESPONDENTS-APPELLANTS' PETITION FOR PANEL REHEARING
OR REHEARING *EN BANC***

Juan P. Morillo
Derek L. Shaffer
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000
juanmorillo@quinnemanuel.com

David M. Cooper
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000
davidcooper@quinnemanuel.com

*Counsel for Appellants*

## **<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF COUNSEL PURSUANT TO FRAP 35(b) ................................. 1

PRELIMINARY STATEMENT ........................................................................ 2

FACTUAL STATEMENT .............................................................................. 3

ARGUMENT ............................................................................................... 7

I.     THE PANEL MAJORITY DEFIES WELL-ESTABLISHED LAW IN
       HOLDING THAT THE DISTRICT COURT COULD DISREGARD
       THE RULING OF THE HIGHEST COURT OF A FOREIGN
       COUNTRY CONCERNING AN ARBITRATION IN THAT
       COUNTRY CONDUCTED UNDER ITS LAWS ...................................... 7

       A.     The Majority's New Legal Standard Conflicts With The
              Supreme Court's And This Court's Precedents On Comity ................. 7

       B.     The Majority's New Legal Standard Conflicts With Other
              Circuits' Precedents On Deference To Foreign Court Decisions
              Vacating Foreign Arbitration Awards ................................................. 10

       C.     The Majority's Departure From Well-Established Law Will
              Create Problematic Forum Shopping And Warrants En Banc
              Review ............................................................................................. 15

CONCLUSION .......................................................................................... 17

CERTIFICATE OF COMPLIANCE WITH RULES 32 AND 35 ......................... 19

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Cases**

*Baker Marine (Nig.) Ltd. v. Chevron (Nig.), Ltd.*,
  191 F.3d 194 (2d Cir. 1999) ...............................................................................15

*Baker v. Gen. Motors Corp.*,
  522 U.S. 222 (1998) ..............................................................................................9

*In re Chromalloy Aeroservices*,
  939 F. Supp. 907 (D.D.C. 1996).........................................................................14

*Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua,*
  *S.A.B. de C.V.*,
  970 F.3d 1269 (10th Cir. 2020) ............................................................ 3, 4, 5, 15

*Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v.*
  *Pemex-Exploración y Producción*,
  832 F.3d 92 (2d Cir. 2016) ..................................................................... 12, 13, 14

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
  40 F.4th 56 (2d Cir. 2022) ..................................................................................13

*Getma Int'l v. Republic of Guinea*,
  862 F.3d 45 (D.C. Cir. 2017)..............................................................................11

*Goldgroup Resources v. DynaResource de Mexico, S.A. de C.V.*,
  994 F.3d 1181 (10th Cir. 2021) ..................................................................... 1, 10

*Hetronic Int'l, Inc. v. Hetronic Germany GmbH*,
  10 F.4th 1016 (10th Cir. 2021)..................................................................... 1, 8, 9

*Hilton v. Guyot*,
  159 U.S. 113 (1895) .................................................................................... 1, 8, 9

*Soc'y of Lloyd's v. Reinhart*,
  402 F.3d 982 (10th Cir. 2005)...............................................................................8

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
  487 F.3d 928 (D.C. Cir. 2007)............................................................... 10, 11, 14

*Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's*
  *Democratic Republic*,
  864 F.3d 172 (2d Cir. 2017) ........................................................... 11, 13, 14, 16

**Rules and Regulations**

Fed. R. Civ. P. 60(b)(5).............................................................................. 6, 11

**Additional Authorities**

Restatement (Second) of Conflict of Laws § 98 (1971) ............................................8

Restatement (Second) of Conflict of Laws § 117 (1971) .........................................12

Restatement (Fourth) of the Foreign Relations Law of the United States § 484 (2018)....................................................................................................................12

## STATEMENT OF COUNSEL PURSUANT TO FRAP 35(b)

Based on a reasoned and studied professional judgment, I believe that the panel decision is contrary to decisions of the U.S. Supreme Court and this Court, *see Hilton v. Guyot*, 159 U.S. 113, 202 (1895); *Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 10 F.4th 1016 (10th Cir. 2021); *Goldgroup Resources v. DynaResource de Mexico, S.A. de C.V.*, 994 F.3d 1181 (10th Cir. 2021), and consideration by the full court is necessary to secure and maintain uniformity of decisions in this Court.

In addition, I believe this appeal involves a question of exceptional importance, *i.e.*, whether U.S. courts can disregard the judgment of the highest court of Bolivia in vacating a Bolivian arbitration award under Bolivian law.

/s/ David M. Cooper

1

## PRELIMINARY STATEMENT

Appellants Grupo Cementos de Chihuahua, S.A.B. de C.V. and GCC Latinoamérica, S.A. de C.V. ("GCC"), Mexican companies, and Appellee Compañía de Inversiones Mercantiles S.A. ("CIMSA"), a Bolivian company, agreed to a Bolivian arbitration applying Bolivian law; accordingly, an arbitration between the parties took place in Bolivia under Bolivian law. The highest Bolivian court vacated the damages portion of the award and remanded for a new arbitration on damages. A panel majority of this Court (Matheson, J., and Holmes, C.J., with Rossman, J., dissenting) nonetheless holds that GCC must pay an award that no longer exists under the law of the country chosen by the parties, merely because the Bolivian court issued its final decision a few weeks after this Court affirmed the district court's judgment of confirmation.

While international arbitration awards generally should be enforced, enforcement of *this* award, which is undisputedly a nullity under Bolivian law, violates settled legal rules and norms that carry import far beyond this case. In particular, the panel's holding unsettles a straightforward international framework for enforcing international arbitration awards, defies well-established principles of comity, and creates a stark split between circuits. The Supreme Court has held that comity requires deference to a foreign court applying its own law absent extraordinary circumstances, while this Court has held that a foreign court's

2

judgment must be treated no differently from that of a sister state.  Yet the majority disregards these principles, even though foreign court rulings on foreign arbitration awards are entitled to *still greater* deference under the New York Convention.

As Judge Rossman explains in dissent, there is now a direct conflict between the majority opinion, which affords broad discretion to disregard the Bolivian court's ruling based on a generic policy interest in finality, and on-point precedents of the D.C. and Second Circuits, which hold that a foreign judgment vacating a foreign arbitration award governed by that country's own law *must* be respected *unless* it is repugnant to fundamental notions of justice.

For these reasons, GCC respectfully requests panel or *en banc* rehearing.

## FACTUAL STATEMENT

**1.**  GCC are Mexican corporations and CIMSA is a Bolivian corporation. *Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua, S.A.B. de C.V.*, 970 F.3d 1269, 1275 (10th Cir. 2020) ("*CIMSA*").  In 2005, GCC and CIMSA entered into a contract, which stated that all disputes arising thereunder would be subject to arbitration in Bolivia under Bolivian law.  *Id.* at 1277-78. CIMSA brought arbitration proceedings against GCC in Bolivia, alleging breach of contract.  *Id.* at 1278.  In 2013, the arbitral tribunal issued a Merits Award finding

GCC liable to CIMSA. *Id.* In April 2015, the arbitral tribunal issued a Damages Award of US$36,139,223 plus interest. Aplt. App. Vol. 1 at 138, 141.[1]

**2.** In September 2015, after obtaining leave from the arbitral tribunal, GCC filed a request for annulment of the Damages Award in the Commercial Court in Bolivia. *Id.* Vol. 2 at 386.[2] In October 2015, the Commercial Court issued an order ("Damages Annulment Order") annulling the Damages Award because the arbitral tribunal had impaired GCC's right to due process and right to a defense. *CIMSA*, 970 F.3d at 1280. CIMSA challenged the Damages Annulment Order in two *amparos* (effectively, appeals) to Departmental Courts of Justice, which were rejected. Aplt. App. Vol. 2 at 384. Both *amparos* were submitted for review by the highest court (the "PCT"). *Id.* at 384-85. In November 2016, the First Chamber of the PCT confirmed rejection of the CIMSA's first *amparo*. *Id.* at 384. In December 2016, the Third Chamber of the PCT revoked the order that had rejected CIMSA's second *amparo*, and remanded to the Commercial Court to reassess GCC's challenge in light of its reasoning. *Id.* at 385.

**3.** After denying a stay that would allow the Bolivian courts to decide the pending proceedings, the district court confirmed the award. *See id.* Vol. 3 at 646.

---

[1]    All appendix citations refer to the Case 21-1196 Appendix.

[2]    GCC also challenged the Merits Award in the Bolivian courts. This Court examined those proceedings in the prior appeal, *see CIMSA*, 970 F.3d at 1296-1300, and they are no longer at issue.

In August 2020, this Court affirmed, while acknowledging that the PCT "arguably state[d] or implie[d]" that the Merits Award had been set aside, that CIMSA's contrary view was not "seamless," and that the Bolivian courts' reasoning was difficult to follow for "American jurists and litigants." *CIMSA*, 970 F.3d at 1297. This Court also held that the district court could enter judgment to confirm the arbitration award even though GCC's "annulment proceedings" of the Damages Award were still "pending in Bolivian courts." *Id.* at 1298.

**4.** In May 2019, GCC filed two motions called *quejas* to force compliance with the decision on CIMSA's first *amparo*, which had left the Damages Annulment Order in effect. Aplt. App. Vol. 4 at 719. The Third Civil Chamber denied the motions, and GCC appealed to the PCT. *Id.* On October 29, 2020, the Fourth Chamber of the PCT informed the parties that it had granted GCC's appeal, that the December 2016 PCT Order (that had purported to vacate the Damages Annulment Order) was the "product of a deceit or procedural fraud caused by [CIMSA]," and that the Damages Annulment Order was still in effect and should be enforced. *Id.* at 721, 725. On November 5, 2020, the Commercial Court received the 2020 PCT Order and issued a final order confirming that its Damages Annulment Order "is valid" and remains binding. *Id.* at 729. The court accordingly ordered the arbitral tribunal "to issue a new arbitration damages award." *Id.* At this point, CIMSA's legal challenges in Bolivia have failed and ended. *See id.* at 946.

5

**5.** Fifteen days after the Commercial Court's final order, GCC moved to vacate the district court's judgment under Fed. R. Civ. P. 60(b)(5). Aplt. App. Vol. 3 at 654, 663-64. The district court denied GCC's motion to vacate. While questioning the Bolivian courts' rulings, it conceded that it did "not consider the 2020 orders themselves to be 'repugnant to fundamental notions of what is decent and just' in the United States." Aplt. App. Vol. 5 at 1214-15 & n.7 (citation omitted). Nonetheless, the court denied Rule 60(b)(5) relief based predominantly on interests in finality. *Id.* at 1218-19.

**6.** On appeal, the panel majority affirmed over a 54-page dissent by Judge Rossman. The majority holds (Op. 33) that a "district court may decline to enforce a primary jurisdiction's annulment order if the order itself is repugnant *or* if enforcing that order would offend public policy." After recognizing (Op. 40) that the Bolivian order itself was *not* repugnant, the majority then determines (Op. 47-51) that enforcing the order would offend U.S. public policy favoring finality.

Judge Rossman vigorously dissented, observing that the "district court mistakenly declined to extend comity to the 2020 PCT Order after concluding the order was not 'repugnant,' as CIMSA had argued. This error alone compels reversal." Dissent 6. The district court "elevated its own conception of United States public policy and procedural values over a treaty that demands international comity and speaks in terms of mutual obligation." Dissent 15. "The majority also sets out

a new legal rule under the New York Convention, concluding a court in the secondary jurisdiction may decline comity to a primary jurisdiction's annulment order if the order *itself* is repugnant *or* if its *enforcement* would offend public policy," which "creates a circuit split and moves this court out of line globally with signatory countries."  Dissent 8.  "[O]ur sister circuits have addressed the precise substantive question at issue in this case and have determined the *foreign judgment* to be the operative focus of potential repugnancy.  The question isn't new; the majority's answer is."  Dissent 53-54; *see also* Dissent 24-26.  The dissent further notes that "[t]he parties here agreed to arbitrate under Bolivian, not U.S., law.  The majority's decision to affirm frustrates that choice by nullifying an undisputedly competent Bolivian tribunal's decision and injures the standardizing impulse behind the Convention."  Dissent 48-49.  The result is "this circuit becoming a haven for parties to enforce now-null awards from around the world."  Dissent 49.

## ARGUMENT

I.  **THE PANEL MAJORITY DEFIES WELL-ESTABLISHED LAW IN HOLDING THAT THE DISTRICT COURT COULD DISREGARD THE RULING OF THE HIGHEST COURT OF A FOREIGN COUNTRY CONCERNING AN ARBITRATION IN THAT COUNTRY CONDUCTED UNDER ITS LAWS**

### A.    The Majority's New Legal Standard Conflicts With The Supreme Court's And This Court's Precedents On Comity

The Supreme Court and this Court have held repeatedly that foreign court judgments must be recognized absent a violation of due process or other

7

extraordinary circumstances.   "[T]he principles of comity *require* recognition of a foreign judgment if:

> (1) there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction,
>
> (2) conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant,
>
> (3) under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries,
>
> (4) there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or
>
> (5) no other special reason exists indicating why the comity of this nation should not allow it full effect.

*Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 999 (10th Cir. 2005) (emphasis added; quoting *Hilton*, 159 U.S. at 202); *see also* Dissent 35-37.   Indeed, "valid '[j]udgments rendered in a foreign nation ... will be accorded *the same degree of recognition to which sister State judgments are entitled*.'"   *Hetronic*, 10 F.4th at 1049 (emphasis added; quoting Restatement (Second) of Conflict of Laws § 98 cmt. b (1971)).

The majority opinion breaks from this uniform precedent.   Notably, the panel majority does not mention the *Hilton* factors.   Instead, it holds that a foreign judgment can be rejected based solely on a discretionary "balanc[ing]" of competing policy interests.   *See* Op. 21 ("When a primary jurisdiction has annulled an arbitral

award, a secondary jurisdiction must balance comity to the foreign annulment order against its country's public policy."); *see also id.* 40.  Such discretionary balancing contradicts *Hilton*, which requires recognition absent due-process concerns in the foreign state, or some "special reason" not to extend comity, which neither the majority nor the district court purported to find.

The majority's approach further conflicts with *Hetronic*, as a sister state judgment could not be denied recognition on such nebulous grounds.  Rather, for sister state judgments, "the full faith and credit obligation is exacting" and "support[s] no roving 'public policy exception' to the full faith and credit due to judgments."  *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 233 (1998) (emphasis removed).  While resting on public policy, the majority in no way suggests that the high bar for denying recognition to a state court judgment would be satisfied here. It follows from the majority's holding either that (contra *Hetronic*) valid foreign judgments will not be afforded the same respect as sister state judgments, or else that (contra *Baker*) sister state judgments can be ignored based on a district court's balancing of policy interests.  Neither result is permissible under settled law. Especially given that the majority did not even mention *Hetronic*, rehearing is well warranted to restore clarity and harmony to this Court's precedent.

Whatever deference is owed to an ordinary foreign judgment, the New York Convention demands, if anything, even greater deference to a foreign judgment

vacating a foreign arbitration award.  Article V(1)(e) of the New York "Convention specifically contemplates that a court in the country in which, or under the law of which, an arbitration award is made is free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief."  *Goldgroup*, 994 F.3d at 1189 (quotation marks and citations omitted).  The country where the arbitration took place (and whose law applies) thus has plenary authority to decide when an award should be set aside.  There is no discernible reason why this Court should afford less respect to foreign vacatur judgments as compared to other foreign judgments under comity rules—which is what the majority has done.

> ### B.   The Majority's New Legal Standard Conflicts With Other Circuits' Precedents On Deference To Foreign Court Decisions Vacating Foreign Arbitration Awards

As Judge Rossman explains, the panel opinion conflicts with other circuit decisions addressing precisely the same issue of the deference owed to a foreign judgment vacating a foreign arbitration award.

*First*, while the majority cites (Op. 28-29) the D.C. Circuit for a supposed public-policy gloss on the Convention, the majority disregards the D.C. Circuit's strict limits on that exception.  "It takes much more than a mere assertion that the judgment of the primary State 'offends the public policy' of the secondary State to overcome a defense raised under Article V(1)(e)."  *TermoRio S.A. E.S.P. v.*

*Electranta S.P.*, 487 F.3d 928, 937 (D.C. Cir. 2007).  A "foreign judgment is unenforceable as against public policy ***to the extent that it*** [the judgment] ***is repugnant*** to fundamental notions of what is decent and just in the United States." *Id.* (emphasis added; quotation marks and citations omitted); *see Getma Int'l v. Republic of Guinea*, 862 F.3d 45, 48 (D.C. Cir. 2017) ("We will enforce an annulled award only if the ***annulment*** is 'repugnant to fundamental notions of what is decent and just' in the United States.  Getma has not satisfied that demanding burden.") (emphasis added; internal citations omitted).  In contrast, the majority holds (Op. 45) that "a court may refuse to enforce an annulment order if doing so would violate public policy."  This test contradicts *TermoRio*'s clear holding that generic notions of public policy are insufficient, where the judgment itself is not repugnant.  And the majority concedes (Op. 40) that the foreign judgment here is not so repugnant.

*Second*, the Second Circuit has applied the same standard, specifically in the identical Rule 60(b)(5) posture, to ensure that "public policy" does not become a catch-all excuse to disregard for foreign judgments.  As the Second Circuit explained, "a foreign judgment is unenforceable as against public policy ***to the extent that it is repugnant*** to fundamental notions of what is decent and just in the United States."  *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172, 184 (2d Cir. 2017) (quotation marks and citations omitted; emphasis added).  In contrast, the majority's free-floating, public-

11

policy exception extends to cases where the foreign judgment is not repugnant to fundamental notions of justice.

The majority attempts (Op. 23-29) to reconcile this conflict by reading into other circuits' cases an additional basis to ignore the foreign judgment if *enforcement* of the foreign judgment is repugnant.  But the "repugnant" test comes from the Restatement, which states expressly that the public-policy exception applies *only* where "where the original claim is repugnant to fundamental notions of what is decent and just in the State where enforcement is sought."  Restatement (Second) of Conflict of Laws § 117, cmt. c (1971); *see* Restatement (Fourth) of the Foreign Relations Law of the United States § 484(c) (2018) (exception applies where "the judgment or the claim … is repugnant").  And that is the language the courts above used; none modified this language to analyze the equities of *enforcement*, quite apart from "the original claim."  *See* Dissent 6.  Even CIMSA did not endorse the majority's reading of D.C. and Second Circuit precedents in the district court.  *See* Dissent 26 n.17.

The majority picks out (Op. 33) a few quotes discussing how "giving effect" to the foreign judgments would violate public policy, but fails to note the animating concern in those instances—namely, that ***the foreign judgment itself was illegitimate***.  *See Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92, 111 (2d Cir. 2016)

("*Pemex*") ("[T]he nullification of the award [*i.e.*, the Mexican annulment order] offends basic standards of justice in the United States."). *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56 (2d Cir. 2022), said this explicitly: "*Pemex* teaches that a district court should enforce an award that was set aside in the primary jurisdiction … ***only if the judgment setting aside the award can be properly characterized as 'repugnant*** to fundamental notions of what is decent and just' in the United States, in which case reliance on the judgment would be contrary to U.S. public policy." *Id.* at 73 (emphasis added; quoting *Pemex*, 832 F.3d at 106).

Ultimately, the majority's creation of a two-part test—"(1) whether the annulment is repugnant to U.S. public policy or (2) whether giving effect to the annulment would undermine U.S. public policy," Op. 40—finds no support in the case law. As Judge Rossman explains, "[t]o the extent the foreign judgment is repugnant as against United States public policy, therefore, it obviously would be repugnant to enforce it here," but "*Pemex* and *Thai-Lao* did *not* do what the district court and majority do here: find the foreign judgment itself was not violative of this country's public policy *but still refuse to enforce it*." Dissent 29, 31.

Nor is the resulting circuit split confined to niceties of doctrinal formulation. The majority's bottom-line result here is the opposite of what the D.C. and Second Circuit have reached and would reach on these facts. In crediting foreign annulment

decisions, those circuits have repeatedly stressed that "[t]he annulment of an arbitral award in the primary jurisdiction should [] be given significant weight," *Thai-Lao*, 864 F.3d at 186, and that the public-policy exception is narrowly limited, "infrequently met," and applies "[o]nly in clear-cut cases." *TermoRio*, 487 F.3d at 938 (quotation marks and citations omitted). Only two cases have *ever* held this test satisfied, and only where it was necessary to protect a U.S. party (or its subsidiary) from a foreign country's judgment favoring its own government in a blatantly improper manner. *See Pemex*, 832 F.3d at 108-11; *In re Chromalloy Aeroservices*, 939 F. Supp. 907, 908 (D.D.C. 1996); *see also* Dissent 50 n.25.

Far from recognizing this categorical presumption favoring a foreign judgment, the majority holds (Op. 57-58) that district courts have vast, free-floating discretion to balance public-policy interests as they may perceive them, ostensibly without limitation. This effectuates an extraordinary shift in the law—from a foreign judgment being respected unless clear impropriety is found to infect the foreign judicial process, to a foreign judgment being disregarded whenever a U.S. district court sees fit. *See* Dissent 33-34. "This is an extraordinary grant of discretionary power to district courts, unsupported by the Convention—which sought to circumscribe such open-ended discretion—or cases interpreting it." Dissent 25-26.

14

**C.    The Majority's Departure From Well-Established Law Will Create Problematic Forum Shopping And Warrants En Banc Review**

Absent rehearing, this circuit will become the most permissive forum in the world for enforcing foreign arbitral awards that foreign courts have vacated, thereby inviting forum shopping.  Again, the majority's test for disregarding a foreign judgment will be far more lenient than the test operative in other circuits—and the same is true relative to courts around the world.  *See* Dissent 19.  Any party prevailing in a foreign arbitration that fears annulment will have incentive to race to district courts in this circuit, obtain a judgment confirming the award before the foreign court acts, and then claim that the U.S. judgment is final such that the foreign court's judgment can be ignored.  Such a dynamic is inimical to the Convention, which expressly endeavors to discourage parties from bringing "enforcement actions from country to country until a court is found, if any, which grants the enforcement." *Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194, 197 n.2 (2d Cir. 1999) (quotation marks and citation omitted); *see* Dissent 17-18, 54.

This case exemplifies the forum-shopping problem.  Lacking any Colorado jurisdictional link (or U.S. property to levy), CIMSA relied on nationwide contacts to claim personal jurisdiction, which even then posed a "close question" under due process standards. *CIMSA*, 970 F.3d at 1287.  CIMSA, a Bolivian company, brought this enforcement action in the United States *after* GCC sought annulment in Bolivia. *Id.* at 1278, 1280.  The district court declined to stay enforcement pending resolution

of the Bolivian litigation, confirmed the award, and then found that the "finality" interest in its own enforcement of a Bolivian award outweighed Bolivia's plenary authority, even though the annulment came only weeks after this Court's mandate affirming the district court judgment. Dissent 2. "[E]veryone knew set-aside proceedings were pending in Bolivia" throughout the U.S. litigation. Dissent 15 n.8. If finality interests can outweigh comity here, they always can.

The majority also invites conflict with other countries confronted with conflicting judgments. Here, a Mexican court respected the Bolivian highest court's plenary authority and prohibited GCC from turning over property in Mexico to satisfy the judgment; the majority holds that GCC, Mexican companies, must disobey that court order. Op. 66-87. Thus, even though Bolivian and Mexican proceedings began *before* U.S. proceedings, even though the parties are Bolivian and Mexican parties who agreed to an arbitration in Bolivia, and even though Bolivian law applies to the arbitration and Mexican law applies to the turnover, the district court's assertion of finality trumps all.

The district court further supported its decision by criticizing the Bolivian courts, the conduct of GCC in the Bolivian courts (including GCC's efforts to annul the awards, which the arbitral panel and the Bolivian courts both recognized as legitimate), and GCC for simply making arguments in the U.S. courts. *See* Aplt. App. Vol. 5 at 1218-19; *cf. Thai-Lao*, 864 F.3d at 187 (characterizing objections to

16

a delayed annulment action as "an unavailing attempt by Petitioners to challenge the merits of the Malaysian set-aside judgment"); Dissent 47 n.24, 52-53 (noting criticism of GCC for engaging in what is simply "*lawyering*" and how the district court's improper aspersions on the Bolivian courts "might explain" its refusal to give them deference). If this is enough to disregard a foreign judgment, then any such judgment can be disregarded on the most rudimentary, commonplace grounds.

Nor does the majority's approach bode well for the reverse situation, where a U.S. court vacates a U.S. arbitration award under U.S. law, and a party nonetheless asks a foreign court to ignore the U.S. judgment. International norms and frameworks flow both ways, and U.S. courts cannot expect their judgments to receive better treatment from foreign courts than foreign courts receive when the tables are turned. Larger international considerations afford all the more basis for *en banc* review.

## **CONCLUSION**

The petition should be granted, and this Court should grant panel or *en banc* rehearing.

Dated:  January 24, 2023                    Respectfully submitted,

                                            /s/ David M. Cooper
Juan P. Morillo                             David M. Cooper
Derek L. Shaffer                            QUINN EMANUEL URQUHART
QUINN EMANUEL URQUHART                           & SULLIVAN, LLP
& SULLIVAN, LLP                             51 Madison Avenue, 22nd Floor
1300 I Street, NW, Suite 900                New York, NY 10010
Washington, DC 20005                        (212) 849-7000
(202) 538-8000                              davidcooper@quinnemanuel.com
juanmorillo@quinnemanuel.com

                        *Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE WITH RULES 32 AND 35</u>

This brief complies with the type-volume limitation of Rule 35 of the Federal Rules of Appellate Procedure ("FRAP") because this brief contains 3,900 words, excluding the parts of the brief exempt by FRAP 32(f).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

<u>/s/ David M. Cooper</u>

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 25.5</u>

Pursuant to Tenth Circuit Rule 25.5, the undersigned counsel certifies that there are no required privacy redactions.


Dated:  January 24, 2023                     <u>/s/ David M. Cooper</u>
                                             David M. Cooper

## **CERTIFICATE REGARDING PAPER COPIES**

Pursuant to Tenth Circuit Rule 27.2, the undersigned counsel certifies that there are no paper copies required for this petition.


Dated:  January 24, 2023                    /s/ David M. Cooper
                                            David M. Cooper

## <u>CERTIFICATE REGARDING VIRUS SCANNING</u>

The undersigned counsel certifies that the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

Dated:  January 24, 2023                        <u>/s/ David M. Cooper</u>
                                               David M. Cooper

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 24, 2023, I served the foregoing petition on counsel for all parties via CM/ECF.

Dated:  January 24, 2023

/s/ David M. Cooper
David M. Cooper
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

# ADDENDUM

FILED
United States Court of Appeals
Tenth Circuit

January 10, 2023

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

COMPAÑÍA DE INVERSIONES
MERCANTILES S.A.,

      Petitioner - Appellee,

v.

GRUPO CEMENTOS DE CHIHUAHUA
S.A.B. DE C.V.; GCC
LATINOAMERICA, S.A. DE C.V.,

      Respondents - Appellants.

No. 21-1196

_____

COMPAÑÍA DE INVERSIONES
MERCANTILES S.A.,

      Petitioner - Appellee,

v.

GRUPO CEMENTOS DE CHIHUAHUA
S.A.B. DE C.V.; GCC
LATINOAMERICA, S.A. DE C.V.,

      Respondents - Appellants.

No. 21-1324

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CV-02120-JLK)**

_____

David M. Cooper, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York
(Alex H. Loomis, Quinn Emanuel Urquhart & Sullivan, LLP, Boston, Massachusetts;

Juan P. Morillo, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, D. C.; David G. Palmer, Greenberg Traurig LLP, Denver, Colorado; and Daniel Pulecio-Boek, Greenberg Traurig, LLP, Washington, D. C., with him on the briefs) for Respondents – Appellants.

Eliot Lauer (Gabriel Hertzberg, Juan O. Perla, Sylvi Sareva with him on the briefs) Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, New York for Petitioner – Appellee.

_____

Before **HOLMES**, Chief Judge, **MATHESON**, and **ROSSMAN**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

A Bolivian arbitration tribunal awarded $36 million in damages to Compañía de Inversiones Mercantiles S.A. ("CIMSA") against Grupo Cementos de Chihuahua S.A.B. de C.V. ("GCC"). GCC fought the award in the Bolivian courts, losing before a chamber of Bolivia's highest constitutional court in 2016.[1] In 2019, CIMSA obtained an order from the U.S. District Court for the District of Colorado confirming the award. In 2020, GCC convinced a different chamber of Bolivia's highest constitutional court to invalidate its prior decision, and a Bolivian trial judge subsequently annulled the award. GCC then moved the U.S. district court to vacate the confirmation order. The district court (1) denied GCC's motion and (2) ordered GCC to turn over assets located in Mexico to satisfy the award. GCC brought

---

[1] As we discuss below, Bolivia's highest constitutional court is comprised of groups of judges, known as "chambers." 21-1196, App., Vol. IV at 879 n.2; 21-1196, App., Vol. V at 1056-57, 1201 n.1.

separate appeals from these two rulings.  Exercising jurisdiction under 28 U.S.C.

§ 1291, we affirm in both appeals.

## I.  BACKGROUND

### A.  *Shareholder Agreement to Arbitration – 2005-2015*[2]

### 1.  **The Parties' Shareholder Agreement – 2005**

In 2005, GCC, a set of related Mexican companies, sought to acquire an

interest in Bolivia's largest cement company, Sociedad Boliviana de Cemento, S.A.

("SOBOCE").  *Compañía I*, 970 F.3d at 1276-77.  At that time, CIMSA, a Bolivian

company, was SOBOCE's controlling shareholder.  GCC offered CIMSA

approximately $59 million to purchase a 47 percent interest in SOBOCE.

*Id.* at 1276-77.  CIMSA accepted, and on September 22, 2005, the parties entered

into a shareholder agreement as SOBOCE's two principal shareholders (the

"Shareholder Agreement").  *Id.* at 1277.

The Shareholder Agreement allowed each party to sell its shares in SOBOCE

to a third party after a period of five years, so long as the selling party gave notice to

the other party and provided it an opportunity to purchase the shares on the same or

better terms within 30 days.  *Id.*

---

[2] Our opinion in *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 2793 (2021) ("*Compañía I*"), set forth the facts underlying these cases.  We draw facts from that opinion unless otherwise indicated.

Under the Shareholder Agreement, (1) the parties would submit any disputes regarding a breach to international arbitration for final resolution and (2) the rules and regulations of the Inter-American Commercial Arbitration Commission ("IACAC") would govern. *See* 21-1196, Suppl. App. at 2. The "national chapter of the [IACAC] in Bolivia" would conduct the arbitration, three arbitrators would preside, and Bolivian law would apply. *Id.*; *Compañía I*, 970 F.3d at 1278, 1291. The parties agreed that "[a]ny awards or orders issued by the Arbitration Court shall be final and of mandatory compliance" and "expressly waive[d] all actions for annulment, objection, or appeal against the award." 21-1196, Suppl. App. at 2.

2. **The Parties' Commercial Dispute – 2009-2011**

In 2009, GCC informed CIMSA that it intended to sell its SOBOCE shares after the five-year holding period. *Compañía I*, 970 F.3d at 1277. Between 2009 and 2011, the parties attempted to reach a deal for CIMSA to purchase those shares, but they failed to reach an agreement. *Id.*

In July 2011, GCC notified CIMSA that a Peruvian company had tendered a firm offer to buy GCC's SOBOCE shares. *Id.* CIMSA reiterated its desire to purchase the shares. This time GCC said it would accept CIMSA's proposed payment terms. *Id.* In August 2011, GCC sent CIMSA a draft purchase agreement. *Id.*

But "[r]ight before the transaction was set to close, GCC demanded an increase in the number of SOBOCE shares CIMSA would place in trust, from 4% to 27%, allegedly to ensure CIMSA's compliance with a longer payment schedule." *Id.*

4

In response, "CIMSA attempted to exercise its right of first refusal under the terms . . . that had been negotiated by the parties." *Id.* GCC said CIMSA's attempt to exercise that right was invalid and sold its SOBOCE shares to the Peruvian company. *Id.*

3. **Arbitration – 2011-2015**

In November 2011, CIMSA invoked the Shareholder Agreement's arbitration clause and initiated arbitration proceedings, claiming that GCC violated the Shareholder Agreement by failing to honor the right of first refusal. *Id.* at 1278. A three-member tribunal (the "Arbitral Tribunal") presided over the arbitration in Bolivia. *Id.* The parties agreed to bifurcate the proceedings into a merits phase and a damages phase. *Id.*

In September 2013, the Arbitral Tribunal issued a merits ruling, holding that GCC breached the right of first refusal in the Shareholder Agreement (the "Merits Award"). *Id.* In April 2015, the Arbitral Tribunal awarded CIMSA approximately $34 million in damages and $2 million in fees and costs, with interest accruing at 6 percent annually on those amounts (the "Damages Award"). *Id.* at 1280.

B. *Court Proceedings – 2015-2021*

Post-arbitration court proceedings primarily occurred in Bolivia and the United States, often simultaneously.[3] GCC attempted to annul the Merits and Damages

---

[3] Court proceedings also occurred in Mexico, but those are primarily relevant to Case No. 21-1324, so we defer our discussion of those proceedings until we turn to that appeal.

Awards in Bolivia and block their enforcement in Mexico, while CIMSA sought to confirm the arbitral award in the United States. To facilitate an understanding of the background facts and proceedings underlying these appeals, we first provide background on Bolivian courts and legal procedures. We then summarize the proceedings in Bolivia and the United States.

1. **Bolivian Courts and Procedures**

    a. *Bolivian courts*

The Bolivian judiciary has multiple court levels, including trial courts and a Supreme Court. Mauricio Ipiña Nagel, *Update: The Bolivian Legal System*, N.Y.U. Hauser Glob. L. Program, GlobaLex, https://perma.cc/6FVQ-SQKA. Bolivian judges for the Civil and Commercial Court are trial judges, and each judge is assigned a distinguishing number—e.g., the "Twelfth Judge." *See Compañía I*, 970 F.3d at 1275; 21-1196, App., Vol. II at 369.

When a party asserts a constitutional violation, a court is randomly assigned to review it and is referred to as a "Guarantee Court." *Compañía I*, 970 F.3d at 1278; 21-1196, App., Vol. II at 370; 21-1196, App., Vol. IV at 804 n.4. The Plurinational Constitutional Tribunal (the "PCT")—independent from the other Bolivian courts— reviews Guarantee Court decisions. Nagel, *supra*. The PCT is the highest constitutional court. *Id.*; *Compañía I*, 970 F.3d at 1278. It ultimately decides constitutional matters and is comprised of four distinct groups of judges, known as chambers. *See* 21-1196, App., Vol. IV at 879 n.2; 21-1196, App., Vol. V at 1201 n.1.

6

b. *Bolivian procedures*

In Bolivia, a litigant may initiate an *amparo*, "an extraordinary remedy that must be based on an alleged violation of rights protected by the Bolivian Constitution." *Compañía I*, 970 F.3d at 1278; *see* 21-1196, App., Vol. II at 370.[4]   A Bolivian court is then randomly assigned to review the *amparo* as a Guarantee Court.  21-1196, App., Vol. II at 370; 21-1196, App., Vol. IV at 804.  After a Guarantee Court decides an *amparo*, that decision is sent to the PCT for review.  *See* Allan R. Brewer-Carías, *Constitutional Protection of Human Rights in Latin America* 108-09, 404 (2009).

Under Bolivian law, a Guarantee Court's decisions regarding *amparos* "shall be complied with immediately."  21-1196, App., Vol. IV at 779; *see also* 21-1196, App., Vol. II at 374.  A party can seek immediate compliance with an *amparo* decision by filing a *queja por incumplimiento* ("*queja*") with the Guarantee Court

---

[4]     With the adoption of the [Bolivian] Constitution in 2009, individuals can petition an action of amparo (*acción amparo constitucional*) to vindicate their constitutional rights.  The amparo action is one which grants protection against the illegal or wrongful acts or omissions of public officials, as well as individual or collective persons, that restrict, suppress or threaten with restricting or suppressing a person's fundamental rights and guarantees recognized by the Constitution.  In other words, this action can be filed against public and private actors that arbitrarily impair the constitutional rights of others.  In essence, the amparo action allows a person the ability to activate constitutional justice in defense of her fundamental rights or constitutional guarantees, in the face of *ultra vires* actions.

Jorge Farinacci-Fernós, *When Social History Becomes A Constitution:  The Bolivian Post-Liberal Experiment And The Central Role Of History And Intent In Constitutional Adjudication*, 47 Sw. L. Rev. 137, 174 (2017) (quotations omitted).

that issued that decision.  *See* 21-1196, Vol. IV at 779.  A *queja* "is a special

mechanism used to compel compliance by officials with existing *amparo* decisions."

*Id.* at 813-14.  Bolivian law allows "Guarantee Courts and the PCT to adopt

necessary measures to ensure compliance with *amparo* decisions."  *Id.* at 779.

2.  **Bolivian Court Proceedings:  GCC's Challenges to the Merits and Damages Awards – 2015-2017**

    GCC sought to annul the Merits and Damages Awards in two separate

proceedings.  This appeal mainly concerns GCC's challenge to the Damages Award.

We briefly describe the Merits Award proceedings before detailing the Damages

Award proceedings.

    a.  *Merits Award proceedings*

    After the Arbitral Tribunal decided for CIMSA on the merits, GCC filed a

request in a Bolivian court to annul that award.  *Compañía I*, 970 F.3d at 1278.  That

request was assigned to the Eighth Judge for the Civil and Commercial Court of the

Judicial District of La Paz (the "Eighth Judge"), a trial judge.  *Id.*  In August 2015,

the Eighth Judge denied GCC's annulment request.  *Id.*  Under Bolivian law, GCC

could not directly appeal a denial of annulment, but it could initiate an *amparo*.  *Id.*

GCC did so, asserting that the Eighth Judge violated its due process rights and the

right to a defense.  *Id.* at 1297; 21-1196, App., Vol. II at 370, 412.  "GCC's *amparo*

was assigned to . . . a Guarantee Court, which in October 2015 granted GCC's

requested relief, annulled the Eighth Judge['s] [d]ecision, and remanded the matter to

the Eighth Judge for a new decision."  *Compañía I*, 970 F.3d at 1278 (quotations

omitted).  In March 2016, the PCT reversed the Guarantee Court, "concluding that

the Eighth Judge had not violated GCC's constitutional rights."  *Id.* at 1279; *see id.*

at 1297.  We determined that the March 2016 PCT Order "effectively reinstated the

[M]erits [A]ward as a final and binding judgment."  *Id.* at 1298.

    b. *Damages Award proceedings*

    On July 3, 2015, GCC sought leave from the Arbitral Tribunal to file a request

in a Bolivian court to annul the Damages Award.  *Id.* at 1280.  The Arbitral Tribunal

granted GCC leave, and on September 24, 2015, GCC filed a request to annul the

Damages Award.  *See* 21-1196, App., Vol. II at 383.  The matter was assigned to the

Twelfth Civil and Commercial Court of the Judicial District of La Paz (the "Twelfth

Judge").[5]

    i. <u>Annulment and subsequent proceedings</u>

    On October 9, 2015, the Twelfth Judge annulled the Damages Award.

21-1196, App., Vol. III at 512-13; App., Vol. II at 383.  CIMSA then filed two

*amparos* challenging that decision.

    <u>First</u>, on October 28, 2015, CIMSA filed an *amparo* against the Arbitral

Tribunal (the "First *Amparo*").  21-1196, App., Vol. III at 537-38.  It asked the court

to set aside (1) the Arbitral Tribunal's order granting GCC leave to seek judicial

---

    [5] As we describe in more detail below, on September 25, 2015, CIMSA petitioned
to confirm the Damages Award in the United States District Court for the District of
Colorado.  *See Compañía I*, 970 F.3d at 1280; 21-1196, App., Vol. I at 138.

annulment of the Damages Award and (2) the Twelfth Judge's annulment decision. *Id.* at 537-38.

In January 2016, a Guarantee Court denied the First *Amparo*. 21-1196, App., Vol. II at 384. The court explained that it could not reach the merits of the First *Amparo* because the Twelfth Judge annulled the Damages Award and the Twelfth Judge was not included as a party to the First *Amparo*. 21-1196, App., Vol. IV at 717-18. The Guarantee Court thus could not invalidate the Arbitral Tribunal's grant of leave without affecting the annulment decision, which was outside the scope of the First *Amparo*. *Id.* at 804. By law, the Guarantee Court's *amparo* decision was sent to the PCT for review. *Compañía I*, 970 F.3d at 1278.

<u>Second</u>, on April 8, 2016, CIMSA filed an *amparo* against the Twelfth Judge, seeking to set aside the annulment decision (the "Second *Amparo*"). 21-1196, App., Vol. II at 384; 21-1196, App., Vol. III at 538; 21-1196, App., Vol. IV at 772. On October 21, 2016, a different Guarantee Court denied CIMSA's Second *Amparo* because CIMSA could not file it while the First *Amparo* was pending before the PCT. 21-1196, App., Vol. II at 384; App., Vol. IV at 806. That decision was also sent by law to the PCT for review. *Compañía I*, 970 F.3d at 1278.

    ii.  <u>PCT review of the *Amparos*</u>

        1)  November 2016 PCT decision

In November 2016, the PCT affirmed the Guarantee Court's decision rejecting CIMSA's First *Amparo*. 21-1196, App., Vol. II at 384; 21-1196, App., Vol. IV at 805. It explained that because annulling the Arbitral Tribunal's order granting

leave to GCC would lead to annulment of the Twelfth Judge's decision, the PCT could not reach CIMSA's request because the Twelfth Judge was not included as a party.  21-1196, App., Vol. IV at 718.

2)  December 2016 PCT decision

In December 2016, a different chamber of the PCT decided the Second *Amparo* (the "December 2016 PCT Judgment").  21-1196, App., Vol. III at 516. The PCT vacated the Twelfth Judge's annulment order and directed the Twelfth Judge to issue a new order consistent with the PCT's decision.  *Id.* at 547.

<u>First</u>, the PCT determined that it could consider the Second *Amparo* even though CIMSA filed it while the First *Amparo* was pending.  *Id.* at 538-39. It explained that the two *amparos* were separate because they involved different defendants and underlying facts and sought different relief.  *Id.* at 538-39. Specifically, the First *Amparo* challenged the Arbitral Tribunal's "procedural order," which addressed a "purely . . . procedural, rather than a substantive, matter." *Id.* at 537-38.  The Second *Amparo* named the Twelfth Judge as a party and challenged her annulment decision.  *Id.* at 538.

<u>Second</u>, on the merits of the Second *Amparo*, the PCT held that the Twelfth Judge's annulment order "was arbitrary and unreasonable, and consequently violated [CIMSA's] right to due process."  *Id.* at 546.  The annulment order violated CIMSA's due process rights because the Twelfth Judge "got into questioning, considering and revisiting the examination of the evidence . . . and arriv[ed] at a different interpretation than that arrived at by the arbitrators."  *Id.* at 540.

11

Immediately after the December 2016 PCT Judgment, GCC sought

clarification from the PCT, arguing the December ruling had invalidated the PCT's

November 2016 decision.  21-1196, App., Vol. IV at 808-09.  In a January 2017

order, the PCT said "there was no potential for contradiction" between the two PCT

decisions because the first was procedural and did not address the merits, whereas the

December 2016 PCT Judgment did address the merits.  *Id.* at 809.  The PCT

reiterated that each *amparo* "involved distinct parties, subject matters, and causes of

action."  *Id.*

### iii. Remand before the Twelfth Judge

In April 2017, CIMSA petitioned the Twelfth Judge to issue a new decision

consistent with the December 2016 PCT Judgment.  *Id.*  The next day, the Twelfth

Judge issued an order stating that she would do so.  *Id.*  But GCC immediately

initiated a collateral action before the PCT "challenging the constitutionality of

Bolivia's arbitration law and its restriction on the right to appeal an arbitral award,"

which stayed the proceedings before the Twelfth Judge.  21-1196, App., Vol. V

at 1203-04.  The PCT rejected GCC's challenge, finding it "manifestly meritless,"

and again directed the Twelfth Judge to issue a new decision on GCC's request for

annulment of the Damages Award.  *Id.* at 1204.

Following that PCT order, GCC argued to the Twelfth Judge that she lacked

jurisdiction to enter a new decision because a different Bolivian trial judge's

nullification of the Merits Award effectively nullified the Damages Award.  *Id.*  The

Twelfth Judge then requested clarification from the IACAC as to the status of the

Merits Award, but the IACAC did not respond.  *Id.*; 21-1196, App., Vol. IV at 811.

GCC then asked the Twelfth Judge to certify that the Damages Award proceedings

were still pending and that the Damages Award was thus not binding.  21-1196, App.,

Vol. IV at 812.  In response, the Twelfth Judge certified that the Damages Award

proceedings were pending but declined to certify whether the Damages Award was

binding.  *Id*.  No further action was taken.

3. **United States Court Proceedings:  Confirmation of the Damages Award –
   2015-2020**

In September 2015, CIMSA petitioned the United States District Court for the

District of Colorado to confirm the arbitration award.  CIMSA relied on the New

York Convention on the Recognition and Enforcement of Foreign Arbitral Awards

(the "New York Convention"), June 10, 1958, 21 U.S.T. 2517.  *Compañía I*, 970 F.3d

at 1276, 1280.  The New York Convention—implemented through the Federal

Arbitration Act—"is a multilateral treaty that addresses international arbitration."

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,

140 S. Ct. 1637, 1644 (2020).  Under the Convention, a party may apply for

"recognition and enforcement" of an arbitral award.  21 U.S.T. 2517, art. IV.

Although CIMSA had filed its petition to confirm the arbitral award in 2015, it was

unable to serve GCC until 2018 when the district court authorized alternative service

because GCC "supposedly could not be located at the headquarters address shown on

[its] website."  *Compañía I*, 970 F.3d at 1280.

In June 2018, CIMSA filed a renewed motion to confirm the Damages Award. Dist. Ct. Doc. 50.  "GCC responded to the confirmation motion and filed a 'cross-motion' to dismiss the petition," arguing it was not subject to personal jurisdiction.  *Compañía I*, 970 F.3d at 1280.  GCC also asserted that the district court could not confirm the Damages Award because (1) Bolivian courts had nullified the Merits Award and (2) annulment proceedings regarding the Damages Award were ongoing in Bolivia.  The Twelfth Judge had not issued a decision following the December 2016 PCT Judgment.  *See id.*

The district court found that it had personal jurisdiction over GCC.  In March 2019, it confirmed the Damages Award, concluding it was binding under the New York Convention (the "Confirmation Judgment").  *Id.*  GCC appealed, arguing the district court erred in exercising personal jurisdiction and in confirming the award. *See id.* at 1276.

In August 2020, in *Compañía I*, we affirmed the district court's rulings on personal jurisdiction and confirmation of the Damages Award.  *Id.*  We said that "[t]he district court properly determined that CIMSA's injury arose out of or related to GCC's nationwide contacts" and that "exercising personal jurisdiction over GCC comported with fair play and substantial justice because CIMSA established minimum contacts and GCC did not make a compelling case to the contrary."  *Id.*  We further said that service of process on GCC's United States counsel was proper.  *Id.*  In affirming the district court's confirmation of the arbitral award, we agreed with the district court that Bolivian courts had not set aside the Merits Award and that the district court's

14

confirmation of the award was appropriate under the New York Convention even if GCC's challenge to the Damages Award remained pending in Bolivia. *Id.*

### 4. Bolivian Court Proceedings: GCC's Post-Confirmation Challenge to the Damages Award – 2019-2020

In May 2019—approximately two months after the U.S. district court confirmed the arbitral award—GCC initiated a new challenge to CIMSA's *amparos*. It asked the Guarantee Court that decided the First *Amparo* to enforce its decision dismissing that *amparo* and also to dismiss the Second *Amparo*. 21-1196, App., Vol. IV at 813. The Guarantee Court denied GCC's request, explaining that the December 2016 PCT Judgment was binding and that GCC must seek any relief regarding the Second *Amparo* from the same Guarantee Court that addressed it. *Id.* GCC challenged that decision in that Guarantee Court through a *queja*, which "is a special mechanism used to compel compliance by officials with existing *amparo* decisions." *Id.* at 813-14. In its *queja*, GCC argued that the Second *Amparo* was invalid because CIMSA impermissibly filed it in "breach" of the First *Amparo*. *Id.* at 814; 21-1196, App., Vol. V at 1207. The Guarantee Court denied the *queja* because, as the December 2016 PCT Judgment concluded, there was no identity between parties, subject matters, and causes of action between the two *amparos*. 21-1196, App., Vol. IV at 814-15.

GCC appealed the Guarantee Court's decision to the PCT.[6]  *Id.* at 815.
A different chamber of the PCT, which had not been involved in any of the prior PCT
decisions, reviewed the *queja*.  *Compare id.* at 704, *with id.* at 771, *and* 21-1196,
App., Vol. III at 516.  On October 29, 2020, the PCT notified the parties that it had
granted GCC relief and invalidated the December 2016 PCT Judgment (the "2020
PCT Order").  21-1196, App., Vol. IV at 718-19, 722.[7]  It determined that, although
the two *amparos* involved different defendants, "the object and purpose of both
actions turned out to be the same" because both related to the arbitration and GCC's
request for annulment.  21-1196, App., Vol. III at 720.  The PCT concluded that "the
[Second *Amparo*] was [the] product of deceit induced by [CIMSA], failing to observe
the implicit mandate of the [First *Amparo*], since it generated duplicity of actions,
that could have led to judicial chaos."  *Id.* at 721.  The Second *Amparo* thus "was not
brought to juridical life" and "no authority [was] bound to observe a determination
arising from" it.  *Id.*  The PCT ordered "strict observance of the effect caused by the
[First *Amparo*] proceeding" such that all actions after the Guarantee Court's January
2016 order—which rejected the First *Amparo* on procedural grounds—"are annulled
and not subject to validation."  *Id.* at 722.

---

[6] Unlike an *amparo*, which is immediately sent to the PCT for review, a party
must appeal a *queja* decision to the PCT.  *See* 21-1196, App., Vol. IV at 815.

[7] Although the order is dated February 18, 2020, it appears that the PCT backdated
the order. *Compare* App., Vol. IV at 704 (order dated February 18, 2020), *with id.*
at 722-25 (indicating the order was signed on October 29, 2020); *see Compañía I*,
970 F.3d at 1279 (noting another PCT order was backdated six months).

In light of the PCT's ruling, the Twelfth Judge issued an ex parte order on November 5, 2020, reinstating her decision to annul the Damages Award and returning the matter to the Arbitral Tribunal to issue a new damages award. *Id.* at 729, 819.  Days later, CIMSA sought reconsideration of that decision or the right to appeal, but the Twelfth Judge denied both requests.  *Id.* at 819, 821.  CIMSA challenged the Twelfth Judge's dismissal of its request to appeal, which was denied. *Id.* at 821-23.

5. **United States Court Proceedings – 2020-2021**

With the 2020 Bolivian orders in hand, GCC returned to the U.S. district court and moved under Federal Rule of Civil Procedure 60(b)(5) to vacate the district court's judgment confirming the arbitral award.  *Id.* at 658.  Under Rule 60(b)(5), "[o]n motion and just terms, the court may relieve a party . . . from a final judgment" if that judgment "is based on an earlier judgment that has been reversed or vacated." The district court denied that motion.  It "conclude[d] that application of the [Bolivian] orders would offend basic standards of justice," which outweighed according comity to those orders.  21-1196, App., Vol. V at 1198, 1212, 1218.  It also determined that GCC's conduct in Bolivian and U.S. courts "swayed [Rule 60(b)'s] equitable considerations decidedly against it."  *Id.* at 1219.  GCC timely appealed.

In September 2021, the district court ordered GCC to turn over certain assets located in Mexico to the court's registry to satisfy the judgment against it (the "Turnover Order").  21-1324, App., Vol. VII at 1808-809.  GCC timely appealed.

\*     \*     \*     \*

We turn next to each appeal, providing additional background information as needed. We first address GCC's appeal of the district court's order denying relief under Rule 60(b)(5), Case No. 21-1196. We then consider GCC's appeal of the district court's order requiring GCC to turn over certain assets, Case No. 21-1324.

## II. **CASE NO. 21-1196 – DENIAL OF RELIEF UNDER RULE 60(b)(5)**

GCC argues that the district court erred by refusing to vacate the Confirmation Judgment. It contends that the 2020 Bolivian court orders annulling the Damages Award[8] required vacatur. Because the district court did not abuse its discretion by refusing to vacate its Confirmation Judgment, we affirm.

### A. *Standard of Review*

We review a district court's denial of a Rule 60(b)(5) motion for abuse of discretion, "keeping in mind that Rule 60(b) relief is extraordinary and may only be granted in exceptional circumstances." *Dronsejko v. Thornton*, 632 F.3d 658, 664 (10th Cir. 2011) (quotations omitted); *see* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2863 (3d Ed. 1998) ("Wright & Miller") ("The [Rule 60(b)(5)] motion is addressed to the sound discretion of the court."). "In the Rule 60(b) context, we review the district court's ruling only to determine if a definite, clear or unmistakable error occurred below." *Jackson v. Los Lunas Cmty.*

---

[8] These are the 2020 PCT Order granting GCC's *queja* and the Twelfth Judge's reinstatement of the order annulling the Damages Award. Although only the Twelfth Judge's order annulled the Damages Award, the 2020 PCT Order provided the basis for that decision.

*Program*, 880 F.3d 1176, 1191 (10th Cir. 2018) (quotations omitted).  We may

reverse only if there is "a complete absence of a reasonable basis" and we are

"certain that the decision is wrong."  *Id.* (quotations omitted).  A district court abuses

its discretion only when it (1) "fails to consider the applicable legal standard,"

(2) relies on clearly erroneous factual findings, or (3) lacks a reasonable basis in the

evidence to support its ruling.  *Id.* (quotations omitted).

B.  ***Legal Background***

This appeal concerns whether the district court abused its discretion when it

denied a motion to vacate its judgment confirming a foreign arbitral award under the

New York Convention and Rule 60(b)(5).  We thus provide background on the

Convention, Rule 60(b)(5), and related case law.

1.  **New York Convention**

As noted above, the New York Convention is a multilateral treaty on

international arbitration.  Its principal purpose "was to encourage the recognition and

enforcement of commercial arbitration agreements in international contracts and to

unify the standards by which agreements to arbitrate are observed and arbitral awards

are enforced in the signatory countries."  *Scherk v. Alberto-Culver Co.*, 417 U.S. 506,

520 n.15 (1974).  The Supreme Court explained that, following the United States'

adoption of the New York Convention, the "emphatic federal policy in favor of

arbitral dispute resolution . . . applies with special force in the field of international

commerce."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S.

614, 631 (1985).

19

The New York Convention contemplates that an arbitral award may be issued in one country but confirmed in another country.  21 U.S.T. 2517, arts. I, V.  Courts have referred to these countries as primary and secondary jurisdictions.  *See, e.g.*, *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172, 176 (2d Cir. 2017); *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007).  A "primary jurisdiction" is the country where the arbitral award was issued.  *See Thai-Lao*, 864 F.3d at 176.  A "secondary jurisdiction" is the country where confirmation of that award is sought.  *See id.*; *see also Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 62 (2d Cir. 2022).  The Convention states that "[e]ach Contracting State shall recognize arbitral awards as binding."  21 U.S.T. 2517, art. III.  A secondary jurisdiction thus must generally confirm an arbitral award subject to certain defenses. *Compañía I*, 970 F.3d at 1286, 1295.

The Convention lists seven defenses.  A secondary jurisdiction "may . . . refuse[]" to recognize and enforce an award if the party opposing confirmation establishes that any one of them applies.  21 U.S.T. 2517, art. V; *Compañía I*, 970 F.3d at 1287, 1295-96.  "Courts construe [these] defenses narrowly, to encourage recognition and enforcement of commercial arbitration agreements in international contracts."  *Compañía I*, 970 F.3d at 1296 (quotations omitted).  "[A]nd the party opposing confirmation of the award bears the burden of furnishing proof of an enumerated defense."  *Goldgroup Res., Inc. v. DynaResource de Mexico, S.A. de C.V.*, 994 F.3d 1181, 1191 (10th Cir. 2021).

20

One of the defenses provides that "[r]ecognition and enforcement of the [arbitral] award may be refused" if "[t]he award . . . has been set aside or suspended by a competent authority" in the primary jurisdiction.  21 U.S.T. 2517, art. V(1)(e).  Another defense provides that "[r]ecognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country."  *Id.*, art. V(2)(b).  When a primary jurisdiction has annulled an arbitral award, a secondary jurisdiction must balance comity to the foreign annulment order against its country's public policy.  *See Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92, 106 (2d Cir. 2016).  "[C]omity is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."  *MacArthur v. San Juan Cnty.*, 497 F.3d 1057, 1066–67 (10th Cir. 2007) (quotations omitted).

## 2.  **Federal Rule of Civil Procedure 60(b)(5)**

The Convention instructs a secondary jurisdiction to enforce arbitral awards in accordance with its rules of procedure.  21 U.S.T. 2517, art. III.  In the United States, the Federal Rules of Civil Procedure apply.  *See Thai-Lao*, 864 F.3d at 185.  The Federal Rules also apply to motions seeking vacatur of judgments confirming arbitral awards.  *See id.*

Under Federal Rule of Civil Procedure 60(b)(5), a "court may relieve a

party . . . from a final judgment" if that judgment "is based on an earlier judgment

that has been reversed or vacated."  But a court is not required to set aside a

judgment "simply because it was based on a prior judgment that has later been

reversed."  *Manzanares v. City of Albuquerque*, 628 F.3d 1237, 1241

(10th Cir. 2010).  Rather, relief under Rule 60(b)(5) "is an extraordinary remedy"

limited to "exceptional circumstances."  *Jackson*, 880 F.3d at 1191-92.  Thus, the

party seeking vacatur has the burden of establishing it is entitled to relief.  *Dronsejko*,

632 F.3d at 672; *Thai-Lao*, 864 F.3d at 187.

"Rule 60(b) gives the court a grand reservoir of equitable power to do justice

in a particular case."  *Manzanares*, 628 F.3d at 1241 (quotations omitted).  And

"because every Rule 60(b) motion by definition seeks 'equitable relief' from the

court," *In re Gledhill*, 76 F.3d 1070, 1078 (10th Cir. 1996), a court may "consider

whether the moving party has acted equitably," 12 Moore's Federal Practice, § 60.22

(Matthew Bender 3d Ed.); *see Amoco Oil Co. v. U.S. E.P.A.*, 231 F.3d 694, 698-99

(10th Cir. 2000) (evaluating movant's actions to determine whether it was entitled to

"equitable remedy" of vacatur under Rule 60(b)).

In *Thai-Lao*, the Second Circuit explained that "in ruling on a Rule

60(b)(5) motion, even in the context of a judgment entered on a foreign arbitral

award under the New York Convention, a district court should be guided by the full

range of interests protected by Rule 60(b)."  864 F.3d at 186.  It "should consider

whether the motion was made within a reasonable time, whether the movant acted

22

equitably, and whether vacatur would strike an appropriate balance between serving the ends of justice and preserving the finality of judgments."  *Id.*

### 3.  **Relevant Circuit Cases**

Only six circuit decisions, four from the Second Circuit and two from the D.C. Circuit, have addressed whether a U.S. court may confirm an arbitral award that a primary jurisdiction has annulled.  Only *Thai-Lao* concerned a district court's ruling on a Rule 60(b)(5) motion to vacate a judgment confirming an arbitral award that later had been annulled in the foreign primary jurisdiction.[9]  Although "[n]one of these [six] out-of-circuit cases binds this Court," *Tucker v. Faith Bible Chapel International*, 36 F.4th 1021, 1044 (10th Cir. 2022), we find them instructive and provide a brief overview.

a.  Baker Marine

In *Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194 (2d Cir. 1999), the Second Circuit first suggested that U.S. public policy can overcome comity to a foreign annulment order.  *Id.* at 196, 197 n.3.  After arbitration in Nigeria, (1) the parties separately moved in Nigeria to confirm and annul the arbitral awards, (2) the Nigerian court annulled the awards, and (3) the party that had prevailed in arbitration then moved to confirm the arbitral awards in the United States.  *Id.* at 196.  The district court refused to confirm the awards and instead

---

[9] In *Thai-Lao*, the district court granted vacatur.  Here, the district court denied vacatur.  In both instances, the standard of review on appeal is abuse of discretion.

accorded comity to the Nigerian annulment.  *Id.*  The Second Circuit affirmed.  *Id.*
at 198.  It explained that the appellant "ha[d] shown no adequate reason for refusing"
to recognize the annulment order.  *Id.* at 197.  It noted that "[r]ecognition of the
Nigerian [annulment order]" did not "conflict with United States public policy."
*Id.* at 197 n.3.

    b.  Pemex

    In *Pemex*, the Second Circuit affirmed the district court's confirmation of an
arbitral award despite a Mexican court's annulment of that award.  832 F.3d at 97.

    After arbitration in Mexico, a U.S. district court confirmed the arbitral award.
*Id.* at 99.  The nonprevailing party in arbitration then appealed the confirmation
judgment to the Second Circuit and simultaneously filed an action in Mexico to annul
the award.  *Id.*  A Mexican court annulled the award while the appeal was pending, so
the Second Circuit remanded for the district court to consider the effect of the
annulment.  *Id.*  The district court declined to accord comity to the annulment and
again confirmed the award.  *Id.* at 100.

    On appeal from the district court's refusal to accord comity and its second
confirmation of the arbitral award, the Second Circuit explained that under the
Panama Convention,[10] although a secondary jurisdiction may confirm an arbitral

---

[10] The Panama Convention is another multilateral international treaty governing
the enforcement of arbitral awards.  *Goldgroup*, 994 F.3d at 1188 n.4.  Courts interpret
the New York and Panama Conventions interchangeably because "'[t]here is no
substantive difference' between the two conventions and the defenses under each are the
same."  *Id.* (quoting *Pemex*, 832 F.3d at 105).

award that a primary jurisdiction has set aside, it must weigh comity to the foreign

annulment order.  *Id.* at 106.  Thus, an annulment "is generally conclusive *unless*

enforcement of the [annulment] would offend the public policy of the state in which

enforcement is sought."  *Id.* (quotations and alterations omitted).  The *Pemex* court

explained that an annulment is unenforceable on public policy grounds if it "tends

clearly to undermine the public interest, the public confidence in the administration

of the law, or security for individual rights of personal liberty or of private property."

*Id.* (quotations omitted).

The Second Circuit concluded that the district court did not abuse its discretion

by confirming the arbitral award despite the Mexican annulment because public

policy concerns overcame comity.  *Id.* at 107.  It determined that "giving effect" to

the foreign annulment would be "repugnant to fundamental notions of what is decent

and just" under U.S. public policy.  *Id.* at 97, 108-11.

c.  Thai-Lao

In *Thai-Lao*, the Second Circuit held that the district court did not abuse its

discretion by vacating its confirmation of an arbitral award based on the primary

jurisdiction's later annulment of that award.  864 F.3d at 181.

After arbitration in Malaysia, (1) the losing party moved to annul the award in

Malaysia, (2) the U.S. district court confirmed the award, and (3) a Malaysian court

then annulled the award.  *Id.* at 175, 179-180.  The district court then vacated its

confirmation judgment.  *Id.* at 175, 180.  It accorded comity to the Malaysian

annulment because giving effect to the annulment order would not violate U.S.

"notions of what is decent and just." *Id.* at 180-81 (quotations omitted).  On appeal, the appellant—the prevailing party in the arbitration—argued that the district court erred because it did not consider the "full range of interests protected by Rule 60(b)" and should have given more weight to the nonprevailing party's inequitable conduct. *Id.* at 182.  The Second Circuit, emphasizing that it reviewed for abuse of discretion, *see id.* at 181,182, 187, 189, held the district court "did not exceed the permissible bounds of its discretion" by granting relief, *id.* at 187.

In explaining its decision, the court said that under the New York Convention, comity interests generally constrain a court from disregarding a primary jurisdiction's annulment of an arbitral award.  *Id.* at 183, 186.  But it also said a primary jurisdiction's annulment is not "dispositive," *id.* at 186, and a court may refuse to accord comity to an annulment "to vindicate fundamental notions of what is decent and just in the United States," *id.* at 176 (quotations omitted).  A foreign annulment is therefore unenforceable if that annulment or "giving effect to [it]" would violate U.S. public policy.  *Id.* at 183-84, 186.

The court also explained that under Rule 60(b)(5), a district court should consider the timeliness of the motion, whether the movant acted equitably, and the importance of finality of judgments.  *Id.* at 182, 186.  It concluded that the district court did not abuse its discretion by vacating its confirmation judgment because vacatur did not violate U.S. public policy and Rule 60(b)(5) considerations did not bar vacatur.  *Id.* at 189.

d.  Esso

In *Esso*, the Second Circuit held the district court did not abuse its discretion by extending comity to foreign orders partially annulling an arbitral award.  40 F.4th at 61, 77.  After arbitration in Nigeria, (1) a Nigerian trial court annulled the arbitral award, (2) the prevailing party in arbitration petitioned to confirm the award in the U.S., and (3) the Nigerian Court of Appeal affirmed partial annulment of the arbitral award. *Id.* at 64-66.  The Second Circuit noted that appeals from the partial annulment orders were pending before the Supreme Court of Nigeria.  *Id.* at 65.

Quoting *Pemex*, *Esso* said that based on "the prudential concern of international comity," *id.* at 73, a foreign annulment order "is generally conclusive unless enforcement of the [order] would offend the public policy of the state in which enforcement is sought," *id.* at 63 (quoting *Pemex*, 832 F.3d at 106).  It explained that in weighing comity to a foreign annulment order, courts should "consider . . . factors relevant to the circumstances of a particular case."  *Id.* at 71-72.  The Second Circuit affirmed "the district court's discretionary decision to afford comity" to the foreign annulment orders, *id.* at 74, because they were not "repugnant to fundamental notions of what is decent and just in [the United States]," *id.* at 77.[11]

---

[11] *Esso* noted the secondary jurisdiction's role is not to second-guess the primary jurisdiction's "substantive determinations made under [its own] law" but to assess foreign annulment orders "only so far as is required to ascertain whether they are plainly incompatible with U.S. notions of justice."  40 F.4th at 74.

27

e.  TermoRio

In *TermoRio*, the D.C. Circuit affirmed the dismissal of an action to confirm a foreign arbitral award.  487 F.3d at 930.  After arbitration in Colombia, (1) the losing party moved in Colombia to annul the arbitral award, (2) Colombia's highest administrative court annulled the award, and (3) the parties that had prevailed in arbitration then filed an action in the United States to confirm the arbitral award. *Id.* at 929.  The district court dismissed the confirmation action because a Colombian court had annulled the award.  *Id.* at 929-30.

The D.C. Circuit concluded that the appellants failed to show that the foreign annulment should be disregarded on public policy grounds.  *Id.* at 939.  It explained that "there is a narrow public policy gloss on Article V(1)(e) of the Convention and that a foreign [annulment] is unenforceable as against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the United States." *Id.* (quotations omitted).  The court determined that the appellants had "neither alleged nor provided any evidence to suggest that the parties' proceedings before Colombia's [highest administrative court] or the [annulment order] of that court violated any basic notions of justice to which we subscribe." *Id.*

f.  Getma

In *Getma International v. Republic of Guinea*, 862 F.3d 45 (D.C. Cir. 2017), the D.C. Circuit also affirmed a district court's refusal to confirm a foreign arbitral award that a primary jurisdiction had annulled.  *Id.* at 47.  After arbitration, (1) the losing party moved in the primary jurisdiction to annul the award, (2) the prevailing

party filed a U.S. lawsuit to confirm the arbitral award, and (3) the primary

jurisdiction then annulled the award.  *See In re Arb. of Certain Controversies*

*Between Getma Int'l & Republic of Guinea*, 191 F. Supp. 3d 43, 48 (D.D.C. 2016).

The district court refused to confirm the arbitral award because the primary

jurisdiction had annulled it.  *Getma*, 862 F.3d at 48.

The D.C. Circuit said that, "for reasons of international comity, [it has]

declined to 'second-guess' a competent authority's annulment of an arbitral award

absent 'extraordinary circumstances.'"  *Id.* (quoting *TermoRio*, 487 F.3d at 936-39).

It explained that it would "enforce an annulled award only if the annulment is

'repugnant to fundamental notions of what is decent and just' in the United States."

*Id.* (quoting *TermoRio*, 487 F.3d at 938).

4.  **Applicable Law**

The foregoing describes the law that is relevant to our review of the district

court's vacatur decision under the abuse of discretion standard.  We describe here

how it applies to the following scenarios.

When the prevailing party in arbitration seeks confirmation of a foreign

arbitral award in a U.S. district court, the New York Convention calls for recognition

and enforcement of the award absent any defenses to doing so.  21 U.S.T. 2517,

art. V(1).  This was the situation when CIMSA requested the district court to confirm

the Bolivian arbitral award.  The district court entered the Confirmation Judgment,

and this court affirmed.  *Compañía I*, 970 F.3d at 1276.

When the prevailing party seeks confirmation and the nonprevailing party presents the defense that the foreign jurisdiction has set the arbitral award aside, the district court must perform a weighing analysis, generally according comity to the foreign annulment order unless doing so violates United States public policy. *See Pemex*, 832 F.3d at 106; *see also Esso*, 40 F.4th at 73-74; *Getma*, 862 F.3d at 48-49; *TermoRio*, 487 F.3d at 938.  This was the situation in *Pemex*, in which the Second Circuit said that, due to comity, a foreign annulment is "generally conclusive unless enforcement of the [annulment] would offend the public policy of the state in which enforcement is sought."  832 F.3d at 106 (quotations and alterations omitted).  But the *Pemex* court also said a district court may confirm the arbitral award if "giving effect to the subsequent nullification of the award . . . would run counter to United States public policy."  *Id.* at 97; *see also Esso*, 40 F.4th at 63.  And in *Pemex*, the Second Circuit affirmed the district court's confirmation of the arbitral award in the face of a foreign order annulling the award.  832 F.3d at 97.

When the nonprevailing party moves the district court under Rule 60(b)(5) to vacate the court's previous confirmation judgment on the ground that the movant obtained an annulment order from the foreign jurisdiction, additional considerations come into play.  This was the situation in *Thai-Lao*, where the nonprevailing party sought to obtain annulment of the arbitral award in the foreign jurisdiction before the district court had ruled on the prevailing party's request for confirmation of the award, but the annulment order issued after the confirmation order.  864 F.3d at 179-80.  The Second Circuit said, as in *Pemex*, that the district court must balance

30

comity against United States' public policy. *Id.* at 176. But when seeking relief under Rule 60(b)(5), the moving party must provide "highly convincing" evidence that it is entitled to this extraordinary remedy and that its conduct as a matter of equity should allow vacatur. *Id.* at 182; *see also Jackson*, 880 F.3d at 1191-92. In *Thai-Lao*, the Second Circuit affirmed the district court's grant of vacatur under Rule 60(b)(5), holding the district court did not abuse its discretion. 864 F.3d at 189.[12]

Like *Thai-Lao*, our case involves a Rule 60(b)(5) motion to vacate a confirmation order because the foreign jurisdiction has annulled the arbitral award. But the cases differ in two significant respects. <u>First</u>, unlike in *Thai-Lao*, the district

---

[12] The New York Convention and the cases allocate burdens on the parties as follows. When the prevailing party in arbitration seeks confirmation of the award in a secondary jurisdiction, it must provide a copy of the arbitral award and the agreement to arbitrate. 21 U.S.T. 2517, art. IV(1). The nonprevailing party must establish a defense to confirmation, such as a foreign annulment order. *See id.*, art. V(1); *Compañía I*, 970 F.3d at 1287, 1295-96. The burden then shifts to the prevailing party to show that public policy considerations outweigh comity to the annulment order. *See Esso*, 40 F.4th at 74. When the nonprevailing party moves under Rule 60(b)(5) to vacate a confirmation judgment based on a subsequent annulment order, it must show it is entitled to this extraordinary relief. *See Thai-Lao*, 864 F.3d at 182, 186-87; *see also Dronsejko*, 632 F.3d at 672.

*Thai-Lao*, the only circuit decision to consider the Rule 60(b)(5) procedural posture, suggested that the prevailing party has the burden to show that public policy considerations outweigh comity, even though the party seeking vacatur has the burden to show it is entitled to relief. *See* 864 F.3d at 186 ("[T]he party opposing vacatur of a judgment enforcing a later-annulled award may show in support of its opposition that giving effect to the judgment annulling the award would offend" public policy.). We need not resolve which party bears the burden on the public policy versus comity question because we can decide this appeal irrespective of which party may bear that burden.

31

court here denied the Rule 60(b)(5) motion.  Second, the highest Bolivian

constitutional court had rejected annulment of the arbitral award before the

Confirmation Judgment, and GCC initiated new proceedings in Bolivia seeking

annulment after that judgment.[13]  As the district court determined, this implicates the

United States' interest in the finality of the arbitral award and the Confirmation

Judgment and also raises questions about the equity of GCC's conduct.  We explore

those issues below.

## C. *Analysis*

GCC argues that the district court (1) applied the incorrect legal standard and

(2) erred in weighing the relevant factors.  We disagree.  The district court applied

the correct legal standard and reasonably evaluated the factors relevant to resolving a

Rule 60(b)(5) motion based on a later-annulled arbitral award.  We cannot say that a

"definite, clear or unmistakable error occurred below."  *Jackson*, 880 F.3d at 1191

---

[13] The dissent asserts, contrary to the procedural history, that "everyone knew set-aside proceedings were pending in Bolivia" at the time of confirmation, so this case is like *Thai-Lao*.  Dissent at 14-15 n.8; *see id.* at 46.  But in *Thai-Lao*, the losing party moved for annulment in Malaysia nearly a year before the U.S. district court's confirmation judgment.  864 F.3d at 175.  Here, GCC initiated its *queja*—which led to the annulment—*after* the Confirmation Judgment.  So this "set-aside proceeding[]" was not pending when the district court entered the Confirmation Judgment.  Instead, in December 2016, Bolivia's highest court had vacated the order annulling the Damages Award.  21-1196, App., Vol. III at 546.  And in *Compañía I*, when we affirmed the Confirmation Judgment, the only "pending" set-aside proceedings were for the trial judge to issue a new damages decision on remand from Bolivia's highest court.  970 F.3d at 1280.

(quotations omitted).  The district court thus did not abuse its discretion by denying GCC relief under Rule 60(b)(5).

1. **The Applicable Legal Test**

    a. *Analysis*

GCC asserts that the district court applied the wrong legal test when it denied vacatur.  It contends the district court "alter[ed] the . . . [relevant] test in a manner never adopted by any other court" by concluding that "even though the Bolivian annulment *orders* were not repugnant to public policy, *vacatur of its own judgment* supposedly would be."  21-1196, Aplt. Br. at 29; *see also* Oral Arg. at 01:40-02:11.  The only relevant inquiry, GCC says, is whether the "*order itself* is repugnant to fundamental notions of what is decent and just."  21-1196, Aplt. Br. at 29 (quotations omitted).  We disagree.  GCC advances a flawed analysis and a selective reading of the case law.  A district court may decline to enforce a primary jurisdiction's annulment order if the order itself is repugnant *or* if enforcing that order would offend public policy.  The Second Circuit articulated this approach, the Convention supports it, and we adopt it here.

First, contrary to GCC's contention that the district court adopted a novel test, the Second Circuit has applied the same test that the district court applied in this case.  In *Pemex*, the Second Circuit "h[e]ld that the [district court] properly exercised its discretion in confirming the [arbitral] award because *giving effect to* the subsequent nullification of the award in Mexico would run counter to United States public policy."  832 F.3d at 97 (emphasis added).  In support of this holding, it said

33

that under the Convention, a court may confirm an arbitral award despite a foreign

annulment order "to vindicate fundamental notions of what is decent and just in the

United States." *Id.* at 107 (quotations omitted).  The court clearly read the

Convention, as we do, to permit a district court to consider whether enforcement of

an annulment order violates public policy.

In *Pemex*, the Second Circuit recognized "four powerful [public policy]

considerations:

> (1)  the vindication of contractual undertakings and the waiver of sovereign
> immunity;
>
> (2)  the repugnancy of retroactive legislation that disrupts contractual expectations;
>
> (3)  the need to ensure legal claims find a forum; and
>
> (4)  the prohibition against government expropriation without compensation."

*Id.* (spacing altered).  The court did not find the annulment order itself violated these

policies.  It instead determined that enforcing the annulment order would offend each

one.  First, it said that "*[g]iving effect*" to the annulment order would undo the parties'

waiver of sovereign immunity in the arbitration agreements, "thereby impairing one of

the core aims of contract law."  *Id.* at 108 (emphasis added).[14]  Second, it said that

"*[g]iving effect* to the nullification would likewise impair the closely-related concept of

---

[14] The court used the words "*[g]iving effect* to [the] twelfth-hour invocation of
sovereign immunity."  *Pemex*, 832 F.3d at 108 (emphasis added).  The Mexican
annulment order was based in part on the losing arbitral party's sovereign immunity
argument.  *See id.* at 107-08.  The court, referring to the arbitration agreement, said
"[t]hat valid waivers must be enforced is settled domestic law.  The Supreme Court has
blessed contractual waivers of sovereign immunity and accompanying agreements to
arbitrate."  *Id.* at 107.

avoiding retroactive application of laws." *Id.* (emphasis added).[15]  Third, it said that if the district court "had recognized *and implemented* the nullification of the arbitral award, [the prevailing party at arbitration] would have had no sure forum in which to bring its contract claims," a consequence at odds with U.S. public policy and that "magnifies the injustice." *Id.* at 109-10 (emphasis added).[16]  Fourth, the Mexican law "frustrated relief that had been granted to [the prevailing party] in the arbitral forum," amounting "to a taking of private property without compensation for the benefit of the government." *Id.* at 110.[17]

---

[15] The annulment order relied on a Mexican law that was enacted after the arbitral tribunal issued a preliminary award and that ended arbitration of certain claims.  *Pemex*, 832 F.3d at 99.  The Second Circuit noted its "concern[]" that this law would retroactively cancel the parties' rights in the arbitration agreement, a "repugnance" to the "[a]nti-retroactivity . . . principle" in U.S. law that "is deeply rooted in Supreme Court jurisprudence" and "embedded in several provisions of the Constitution."  *Id.* at 108 (quotations and alterations omitted).

[16] The court explained that "[a]bsent confirmation of the [arbitral] award," the prevailing arbitral party "would lose the opportunity to bring its claims" due to a change in Mexican law on the applicable statute of limitations and due to an application of res judicata in Mexico that "offends basic domestic principles of claim preclusion."  *Pemex*, 832 F.3d at 110.

[17] The court expressed concern about causing an unconstitutional taking by enforcing the annulment order, stating the order "did no more than apply th[e] Mexican law," but "[i]n the United States, [enforcement of this law] would be an unconstitutional taking."  *Pemex*, 832 F.3d at 110.  This and the other public policy concerns discussed above underlie *Pemex*'s "hold[ing] that the [district court] properly exercised its discretion in confirming the award because *giving effect* to the subsequent nullification of the award in Mexico would run counter to United States public policy."  *Id.* at 97 (emphasis added).

The Second Circuit thus looked beyond the annulment order itself to consider, as the district court did here, whether "giving effect" or "implement[ing]" the annulment order would violate public policy.  It upheld the district court's confirmation of the arbitral award even though the award had been declared a nullity in Mexico.  *See id.* at 111.  "[T]o do otherwise"—that is, enforce the annulment—"would undermine public confidence in laws and diminish rights of personal liberty and property."  *Id.*

In *Thai-Lao*, the Second Circuit reaffirmed that a court may consider whether "*giving effect* to the judgment annulling the award would offend" U.S. public policy.  864 F.3d at 186 (emphasis added).  Because the issue on appeal was whether the district court should have vacated confirmation of an arbitral award under Rule 60(b)(5) by enforcing a foreign annulment order, the relevant inquiry was whether vacatur would offend U.S. public policy.  *See id.* at 175, 189.  The court said that "[n]o showing ha[d] been made that vacatur [would] offend basic notions of justice in the United States," *id.* at 189, thus confirming that whether giving effect to an annulment order would violate public policy was a relevant consideration in *Thai-Lao*, as it was here.  Further support for this point comes from *Thai-Lao*'s determination that, unlike the consequence of enforcing the annulment order in *Pemex*, enforcing "the Malaysian [order] annulling the [arbitral award] did not leave Petitioners without a remedy."  *Id.* at 187 (quotations and alterations omitted).

In sum, *Pemex* and *Thai-Lao* both support the district court's consideration in this case of whether enforcing the 2020 Bolivian orders would violate U.S. public policy. At the very least, they do not foreclose the district court from doing so.[18]

Second, the district court's approach was also consistent with the New York Convention. The Convention encourages "recognition and enforcement" of foreign arbitral awards. 21 U.S.T. 2517, art. III. But "recognition and enforcement of the award may be refused" if (1) the award "has been set aside" by the primary jurisdiction, *id.*, art. V(1)(e); or (2) "[t]he recognition or enforcement of the award would be contrary to the public policy" of the secondary jurisdiction, *id.*, art. V(2)(b).[19] The D.C. Circuit has recognized a "public policy gloss" on the set-

---

[18] The Second Circuit decided *Esso* after oral argument. In a Fed. R. App. P. 28(j) letter, GCC asserts, "*Esso* refutes . . . that U.S. enforcement can be deemed repugnant." Doc. 10926658. But *Esso* does not say that *Pemex* and *Thai-Lao* wrongly stated that a district court may uphold an arbitral award when giving effect to a foreign annulment would violate U.S. public policy. Indeed, *Esso* relies on language from those cases that support a district court's doing so. *See* 40 F.4th at 63 (an annulment order "is generally conclusive unless enforcement of the [order] would offend the public policy of the state in which enforcement is sought" (quoting *Pemex*, 832 F.3d at 106)); *id.* at 73 (comity to an annulment order is not merited "when enforcing [an arbitral award] is needed to vindicate fundamental notions of what is decent and just in the United States" (quoting *Thai-Lao*, 864 F.3d at 176) (quotations omitted)).

The D.C. Circuit, like *Esso*, focused on whether a foreign annulment order was repugnant to public policy in *Getma*, 862 F.3d at 48, and *TermoRio*, 487 F.3d at 930. But none of these cases said the order itself is the only relevant consideration or that a court would err to consider the public policy consequences of giving effect to an annulment order. And even under GCC's narrow reading of these cases, they do not bind this court, and we find the treatment of this issue in *Pemex* and *Thai-Lao* presented above to be persuasive.

[19] *See* Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.16 cmt. c (Am. L. Inst. Proposed Final Draft 2019): "The Restatement adopts the general understanding that the [New York and Panama] Conventions' use of the permissive term

aside provision.  *TermoRio*, 487 F.3d at 939.  That is, because the Convention explicitly permits a secondary jurisdiction to refuse to enforce an arbitral award on public policy grounds, a court may also refuse to enforce the annulment of an arbitral award on public policy grounds.  *See id.* at 939-40.  We agree with this reading of the Convention.

       <u>Third</u>, GCC's stance effectively ignores that its vacatur motion asked the district court to *enforce* the annulment order.  Just as CIMSA sought "recognition and enforcement" of the arbitral award under the Convention, GCC sought recognition and enforcement of the Bolivian order annulling that award when it moved for vacatur.  "Recognition" and "enforcement" align with our holding that the district court could consider (1) whether the annulment order itself was contrary to public policy—whether it should be recognized—and (2) whether giving effect to the annulment would violate public policy—whether it should be enforced.  Indeed, "enforce" means "[t]o give force or effect to (a law, etc.)."  *Enforce, Black's Law Dictionary* (11th ed. 2019).  "The recognition of an award is different from its enforcement, therefore, it is possible to recognize and not enforce an award, but impossible to enforce it without previous recognition."  Gonzalo Vial, *Influence of the Arbitral Seat in the Outcome of an*

---

'may' entitles a court to grant recognition or enforcement of an arbitral award even though one or more grounds for withholding such relief has been established."  One of those grounds would be a set-aside order.

*International Commercial Arbitration*, 50 Int'l Lawyer 329, 335 (2017).  The same can

be said of an annulment order.[20]

    <u>Fourth</u>, GCC's narrow approach is illogical and impractical.  GCC asked the

district court to vacate the Confirmation Judgment because Bolivian courts had annulled

the arbitral award.  The court refused because enforcing the annulment would violate

U.S. public policy.  GCC argues this consideration should have been irrelevant—all that

matters, GCC says, is whether the Bolivian annulment itself or how it was obtained is

repugnant to U.S. public policy.  *See* 21-1196, Aplt. Br. at 26-27, 29.  This cramped view

defies logic because enforcement of an annulment order can undermine U.S. public

policy apart from whether the foreign order should be recognized.  And GCC's view is

impractical because it would render the district court powerless to protect U.S. public

policy in this circumstance.  If the district court had granted GCC's motion and vacated

the Confirmation Judgment, it would have enforced—given effect to—the annulment

order.  And if, as the district court found, enforcement would violate U.S. public policy,

that concern weighs against comity to the foreign annulment.  The district court thus

---

    [20] In *DeJoria v. Maghreb Petroleum Exploration, S.A.*, 935 F.3d 381
(5th Cir. 2019), when deciding whether an American court should recognize and enforce
a Moroccan judgment, the Fifth Circuit explained:

> Recognition is different from enforcement, but the former is
> necessary for the latter.  *See* Yuliya Zeynalova, *The Law on
> Recognition and Enforcement of Foreign Judgments:  Is It
> Broken and How Do We Fix It?*, 31 Berkeley J. Int'l L. 150,
> 155 (2013) (describing recognition as akin to domesticating
> the judgement and enforcement as enlisting the courts and
> law enforcement to aid in collection).

*Id.* at 385 n.2.

properly considered whether enforcing the 2020 Bolivian orders would violate

U.S. public policy.

We conclude that when a court has been asked to vacate an order confirming

an arbitral award that has later been annulled, it may balance against comity

considerations (1) whether the annulment is repugnant to U.S. public policy or

(2) whether giving effect to the annulment would undermine U.S. public policy.

Although the district court here may have found the 2020 Bolivian orders were not

repugnant, it did not legally err by considering whether giving effect to those orders

through vacatur of its Confirmation Judgment would offend U.S. public policy.

   b. *Response to the dissent*

The dissent asserts that by considering whether enforcing the annulment would

violate public policy, the district court adopted a "novel test" that (1) our sibling circuits

have "consistently rejected" and (2) is inconsistent with the Convention.  Dissent

at 25-33.  We disagree.

First, our sibling circuits have endorsed—and have never rejected—this test.  As

discussed, *Pemex* framed its entire opinion around this approach:  (1) at the outset it

"h[e]ld that the [district court] properly exercised its discretion in confirming the

[arbitral] award because giving effect to the subsequent nullification of the award in

Mexico would run counter to United States public policy," 832 F.3d at 97; and (2) in its

public policy analysis, it began its discussion of the policy interests by concluding that

"[g]iving effect to" or "implement[ing]" the foreign annulment order would violate

public policy, *id.* at 108, 109.  *Thai-Lao* reinforced that a court may consider whether

enforcing a foreign annulment order would violate public policy.  Op. at 36-37.

The dissent says those cases are different because the foreign annulment order in

both violated public policy and here the district court concluded the 2020 Bolivian Orders

did not violate public policy.  *See* Dissent at 29-31.  But *Pemex* never said that the

foreign annulment order itself violated public policy.[21]  In addressing each public policy

consideration, the Second Circuit concluded that "giving effect to" or "implement[ing]"

the annulment order would offend public policy.  *See Pemex*, 832 F.3d at 108-10.  *Pemex*

held that the district court "did not abuse its discretion by confirming the arbitral award

. . . because to do otherwise would" violate public policy.  *Id.* at 111.  In other words,

refusing to confirm the arbitral award—enforcing the annulment order—would violate

public policy.[22]  *Thai-Lao*, having considered the effect of enforcing the foreign

---

[21] Instead, *Pemex* said it was "in no position to pass upon [the Mexican] court's interpretation of Mexican law," 832 F.3d at 108, and the district court did not "second-guess[]" the Mexican court, *id.* at 111.

[22] The dissent says *Pemex* held only that enforcing the Mexican judgment would violate public policy "[g]iven [its] concerns with the repugnancy of the [foreign annulment] itself."  Dissent at 29.  That reading conflicts with the overarching conclusion in *Pemex*:  "We hold that the [district court] properly exercised its discretion in confirming the award because giving effect to the subsequent nullification of the award in Mexico would run counter to United States public policy . . . ."  832 F.3d at 97.

*Pemex*'s concerns were about enforcement of the annulment order.  For example, in concluding that "implement[ing]" the foreign annulment order would leave the prevailing party without a forum, *Pemex* explained the statute of limitations, not the annulment order, would prevent any future action.  832 F.3d at 109-110.  The order itself did not leave the prevailing party without a forum, but enforcement would lead to that result.

The dissent also says that *Pemex* concluded the foreign annulment order "involved retroactive legislation and the taking of private property without compensation."

41

annulment order by noting the petitioners would not be left without a remedy, 864 F.3d

at 187, held that "vacatur" would not offend public policy, *id.* at 189. The Second Circuit

never said in *Pemex* or *Thai-Lao* that a foreign order itself must violate public policy for

enforcement of that order to violate public policy.

The dissent further claims that even if *Pemex* and *Thai-Lao* support considering

whether enforcement violates public policy, in light of *Esso*, the Second Circuit "no

longer labors under" that "misimpression." Dissent at 31. But *Esso* never questioned, let

alone overruled, *Pemex*'s "hold[ing] that the [district court] properly exercised its

discretion in confirming the [arbitral] award because *giving effect to* the subsequent

nullification of the award" would violate U.S. public policy. 832 F.3d at 97 (emphasis

added). Nor did it refute *Thai-Lao*'s affirmance of the district court's vacatur because

"no showing ha[d] been made that *vacatur* will offend" U.S. public policy. 864 F.3d

at 189 (emphasis added).

---

Dissent at 29 (quotations omitted). But *Pemex* emphasized that the foreign annulment
order "specifically stated it was not retroactively applying [Mexican law]" that was not in
effect at the time of arbitration. 832 F.3d at 108. Instead, *Pemex* determined "[t]he
sequence of events and the circumstances in which [the law] was enacted thus resulted in
a retroactive application . . . as a matter of *United States* law." *Id.* at 108-09. Again, the
order itself did not retroactively apply the law, but enforcement of it would. And in
discussing the taking, *Pemex* explained that Mexican law "consigned [the prevailing
party] to a forum in which relief was foreclosed." *Id.* at 110. That involved a different
Mexican law not applied in the foreign annulment order. Thus, enforcement of the order,
not the order itself, violated public policy.

    Even if *Pemex* could be read as having repugnancy concerns about the annulment
order itself, as the dissent contends, the court plainly was primarily concerned with the
enforcement of, or giving effect to, the order.

Indeed, *Esso* did not address the many statements in *Pemex* and *Thai-Lao* that support considering whether enforcement of the foreign annulment order would violate U.S. public policy. *See, e.g.*, *Pemex*, 832 F.3d at 106 ("[A] final judgment obtained through sound procedures in a foreign country is generally conclusive unless *enforcement* of the judgment would offend the public policy of the state in which enforcement is sought.") (quotations and alterations omitted); *Thai-Lao*, 864 F.3d at 176 ("*Pemex* also carved out a 'public policy' exception to the comity principle for occasions when enforcing an arbitral award annulled in the primary jurisdiction is needed to vindicate" U.S. public policy); *id.* at 186 ("Of course, consistently with *Pemex*, . . . [if] *giving effect to* the judgment annulling the award would offend" U.S. public policy, the court may deny vacatur) (emphasis added).[23]

The dissent also suggests that because the D.C. Circuit focused in its cases on the foreign annulment order, it has rejected the district court's approach. *See* Dissent at 28-29. But as discussed, just because the D.C. Circuit limited its analysis to whether a foreign annulment order was repugnant to public policy does not foreclose consideration of whether enforcement would violate public policy. *See* Op. at 37 n.18.

---

[23] The dissent says "*Esso* unambiguously understood *Pemex* to involve a repugnant foreign order." Dissent at 29-30 n.19. But we see no such "unambiguous[] underst[anding]." Indeed, *Esso* quotes *Pemex*'s statement that "[a] final judgment obtained through sound procedures in a foreign country is generally conclusive unless *enforcement* of the judgment would offend the public policy of the state in which enforcement is sought." *Esso*, 40 F.4th at 63 (quoting *Pemex*, 832 F.3d at 106) (emphasis added); *see also id.* at 73 (comity to an annulment order is not merited "when enforcing [an arbitral award] is needed to vindicate fundamental notions of what is decent and just in the United States" (quoting *Thai-Lao*, 864 F.3d at 176) (quotations omitted)).

In sum, our sibling circuits have not "consistently rejected" a district court's consideration of whether enforcing an annulment order would violate public policy, as the dissent suggests. Dissent at 28. As discussed in detail throughout this opinion, those cases support, or at least do not foreclose, a district court's consideration of whether a foreign annulment order itself or enforcing that order violates public policy.[24]

<u>Second</u>, the dissent suggests that the Convention prevents courts from considering whether enforcing a foreign annulment order would violate public policy. It notes the Convention only "permits a refusal to enforce an *award*[, not a foreign annulment order,] on public policy grounds." Dissent at 26. But, as the dissent also notes, "the majority correctly explains that United States courts have placed a 'public policy gloss' on Article V(1)(e)," *id.* at 22, which says "[r]ecognition and enforcement of [an arbitral] award may be refused" if the award "has been set aside," 21 U.S.T. 2517, art. V(1)(e). Indeed, the dissent "agree[s] . . . that the public policy defense . . . forms part of the international bargain by which signatories agree to recognize other signatories'

---

[24] Thus, unlike the dissent, we see no circuit split. *See* Dissent at 53-54. Only the Second and D.C. Circuits have decided relevant cases. The Second Circuit cases— especially *Pemex* and *Thai-Lao*—support a district court's consideration of whether enforcement of a foreign judgment would violate U.S. public policy. At the very least, they do not foreclose it, and neither do the D.C. Circuit cases. The dissent claims that these out-of-circuit cases "have addressed the precise substantive question at issue in this case" and "determined the foreign judgment to be the operative focus of potential repugnancy." Dissent at 53-54 (quotations and emphasis omitted). For the reasons discussed, the cases do not say that. Also, no other circuit has reviewed a district court's denial of a Rule 60(b)(5) motion to vacate a judgment confirming a foreign arbitral award based on a later foreign annulment order. The unique procedural posture of this case further undercuts the dissent's claim of a circuit split.

decisions." Dissent at 23-24.  Because Article V(1)(e) allows a court to refuse

"[r]ecognition and *enforcement*," 21 U.S.T. 2517, art. V (emphasis added), a court may

refuse to enforce an annulment order if doing so would violate public policy.

## 2.  Rule 60(b)(5) Analysis

In addition to its claim of legal error, GCC challenges the district court's

balancing of the factors relevant to a Rule 60(b)(5) motion.

As discussed, the district court confirmed the Damages Award after Bolivia's

highest constitutional court had rejected GCC's attempt to annul that award.  After

confirmation, GCC initiated a new attempt in Bolivia to annul the Damages Award

and succeeded.  GCC then moved under Rule 60(b)(5) in the district court for vacatur

of the Confirmation Judgment on the ground that the 2020 Bolivian orders annulled

the Damages Award.[25]

Under the legal framework previously described, in deciding whether to grant

vacatur of a confirmed arbitral award, a district court weighs comity considerations

---

[25] The dissent asserts that this appeal "is ultimately a New York Convention case." Dissent at 9.  But as the dissent appears to acknowledge, the Convention is not self-executing.  None of its provisions "operates of itself without the aid of any legislative provision."  *Medellin v. Texas*, 552 U.S. 491, 505 (2008) (quotations omitted).  Instead, the Convention instructs secondary jurisdictions to apply their domestic procedural rules in enforcing the Convention.  *See* 21 U.S.T. 2517, art. III.  In the United States, this means the Federal Rules of Civil Procedure.  GCC invoked Rule 60(b)(5), which frames our analysis of the substantive law at issue.

The dissent states that "[w]hat matters here is not just that the district court has discretion under Rule 60(b)(5), as the majority highlights, but whether its exercise of that discretion comports with the New York Convention."  Dissent at 11.  We agree, but what also matters is whether giving effect to the annulment order undermines the interest in finality of the Confirmation Judgment and the arbitral award.

against whether an annulment order or enforcing that order would be repugnant to U.S. public policy. "[W]e review [the] district court's decision to extend or deny comity to a foreign proceeding for abuse of discretion." *Pemex*, 832 F.3d at 100 (quotations omitted). A district court also considers whether, under Rule 60(b)(5), the movant has shown it is entitled to the extraordinary remedy of vacatur and why its conduct, as a matter of equity, should allow vacatur. *See Thai-Lao*, 864 F.3d at 182; *see also Jackson*, 880 F.3d at 1191-92. The parties agree that we review the denial of a Rule 60(b)(5) motion to vacate a confirmation judgment for abuse of discretion. *See* 21-1196, Aplt. Br. at 18; 21-1196, Aplee. Br. at 22. As in *Thai-Lao*, the abuse of discretion standard of review plays a significant role in our consideration of this balancing issue. *See Thai-Lao*, 864 F.3d at 189.

We conclude that the district court did not abuse its discretion. In denying the Rule 60(b)(5) motion to vacate, the court concluded that (1) giving effect to the 2020 Bolivian orders would offend U.S. public policy and (2) GCC acted inequitably in the United States and Bolivian proceedings. 21-1196, App., Vol. V at 1212-13. GCC has failed to show "a complete absence of a reasonable basis" for these determinations. *Jackson*, 880 F.3d at 1191.

    a. *Public policy*

        i. <u>Analysis</u>

The district court concluded that vacating its Confirmation Judgment would offend United States public policy, outweighing comity to the 2020 Bolivian orders. *See* 21-1196, App., Vol. V at 1212-13, 1218. It said giving effect to those orders

through vacatur would encourage "proceedings without end." *Id.* at 1215-16.  The court explained that when it entered the Confirmation Judgment, there was a "final resolution" on the Damages Award from Bolivia's highest constitutional court. *Id.* at 1216.  In 2016, the PCT had overruled the Twelfth Judge's annulment of the Damages Award and directed her to issue a new decision.  *Id.*  After the Confirmation Judgment in 2019, GCC initiated a new attempt at annulment and ultimately succeeded.  *Id.* at 1216-17.

Based on GCC's repeated attempts to challenge the Damages Award, the district court determined that granting GCC relief would undermine the finality of the Confirmation Judgment and the arbitral award by "encourag[ing] an endless barrage of challenges to unfavorable arbitral awards or court orders."  *Id.* at 1216.  It said that "[t]he Supreme Court has long recognized '[p]ublic policy dictates that there be an end of litigation.'"  *Id.* at 1217 (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981)).  The court also discussed the parties' agreement that arbitral awards would be final and unappealable, which reenforced the import of finality.  *Id.*  Finality was thus central to the court's assessment of whether public policy outweighed comity.  *See id.* at 1212-13, 1217-18.

The district court acted within its discretion.  Three strong United States interests support this conclusion:  (1) protecting the finality of judgments,

(2) upholding parties' contractual expectations, and (3) the policy in favor of arbitral

dispute resolution.[26]

    <u>First</u>, the Supreme Court has acknowledged "the law's important interest in the

finality of judgments." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356 (2006)

(quotations omitted).  "Public policy dictates that there be an end of litigation." *James*

*B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 542 (1991) (quotations omitted).  And

this court has explained that "the public gains a strong interest in protecting the

finality of judgments" after they are entered.  *Nelson v. City of Albuquerque*,

921 F.3d 925, 929 (10th Cir. 2019).[27]  Respecting final judgments protects against

---

[26] As discussed above, *Pemex* identified the following public policy considerations:  "(1) the vindication of contractual undertakings and the waiver of sovereign immunity; (2) the repugnancy of retroactive legislation that disrupts contractual expectations; (3) the need to ensure legal claims find a forum; and (4) the prohibition against government expropriation without compensation."  *Pemex*, 832 F.3d at 107.  The Second Circuit recently made clear in *Esso* that this list is not exclusive, and a court may weigh other public policy considerations in deciding whether to enforce a foreign annulment order.  40 F.4th at 71-72.

[27] The Supreme Court has recognized the importance of finality in a variety of contexts, *see, e.g.*, *Concepcion v. United States*, 142 S. Ct. 2389, 2398 n.3 (2022) ("No one doubts the importance of finality."); *McCleskey v. Zant*, 499 U.S. 467, 491 (1991) ("importance of finality" in habeas context); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) ("important interest in finality" in state criminal litigation); *Murray v. Carrier*, 477 U.S. 478, 491 (1986) (emphasizing importance of finality of judgments); *Strickland v. Washington*, 466 U.S. 668, 693 (1984) (noting the "profound importance of finality in criminal proceedings"), and this court has as well, *see, e.g.*, *Pelt v. Utah*, 539 F.3d 1271, 1289 (10th Cir. 2008) ("[W]e recognize the importance of finality of judgments."); *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. State of Utah*, 114 F.3d 1513, 1520 (10th Cir. 1997) (recognizing "importance of finality" in deciding whether to modify decision); *Gilbert v. Scott*, 941 F.2d 1065, 1067 (10th Cir. 1991) ("importance of finality served by state procedural rules") (quotations omitted); *Bender v. Clark*, 744 F.2d 1424, 1426 (10th Cir. 1984) ("The purpose of the finality requirement [in 28 U.S.C. § 1291] is to avoid piecemeal review.").  Although the nature and weight of finality may vary in

"the costs, uncertainty, and even disrespect reflected by repeated and otherwise unfounded challenges to [courts'] judgments." *Thai-Lao*, 864 F.3d at 188. Rule 60(b)(5) supports this interest by providing only limited grounds for vacatur. *See Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1444 (10th Cir. 1983) (a Rule 60(b) motion "must be considered with the need for finality of judgment"); Wright & Miller § 2851 ("Generally, the cases interpreting Rule 60(b) have reflected the courts' preference for finality.").

Here, GCC attempted to undo the Confirmation Judgment, which the district court entered after Bolivia's highest constitutional court had rejected GCC's attempt to annul the Damages Award.[28]  After the district court issued the Confirmation

---

different procedural contexts, as we explain above, the district court's reliance on finality to deny vacatur of the Confirmation Judgment under Rule 60(b)(5) was not an abuse of discretion.

[28] The dissent says "[i]f the district court anchored its finality concerns to the 2016 PCT Orders, this would be problematic" because "the 2016 PCT Orders were both conflicting" and "the district court simply selected one of the two as its reference point." Dissent at 45.  But the district court based the finality analysis on its Confirmation Judgment.  And the district court followed *Compañía I*, which affirmed the Confirmation Judgment based on the December 2016 PCT Judgment.  *See* 970 F.3d at 1280.  We explained "the PCT . . . found that the Twelfth Judge had violated CIMSA's constitutional rights [by annulling the damages award], and remanded for further proceedings."  *Id.*  The dissent also overlooks that the PCT had twice determined that the two judgments did not conflict.  In the December 2016 PCT Judgment, the PCT determined that judgment could not conflict with the November 2016 PCT Order. 21-1196, App., Vol. III at 537-39.  In a January 2017 clarification order—requested by GCC—the PCT again held "there was no potential for contradiction" between the two PCT decisions.  21-1196, App., Vol. IV at 809.

Judgment, GCC initiated a new challenge to the Damages Award leading to a *queja*.[29] A separate chamber of the PCT reversed the 2016 decision that had rejected annulment of the Damages Award.

The district court appropriately considered GCC's actions leading to its vacatur motion.  In every case affirming a district court's decision not to confirm an arbitral award due to a foreign court's annulment, the movant had sought annulment in the primary jurisdiction *before* confirmation of the arbitral award in the United States.  *See Esso*, 40 F.4th at 65-66 (trial court in primary jurisdiction annulled arbitral award before U.S. confirmation action filed); *Thai-Lao*, 864 F.3d at 179-80 (nonprevailing party sought annulment of arbitral award in primary jurisdiction before the U.S. district court confirmed arbitral award); *Getma*, 862 F.3d at 48 (nonprevailing party sought annulment of arbitral award before U.S. district court confirmed the award); *TermoRio*, 487 F.3d at 929-30 (primary jurisdiction annulled arbitral award before U.S. confirmation action filed).  And in *Pemex*, the Second Circuit affirmed the district court's re-confirmation of an arbitral award despite a foreign annulment order when the movant brought its first challenge to the arbitral award in Mexico after confirmation.  832 F.3d at 99.  Here, unlike any of those cases, the highest Bolivian court had rejected annulment of the Damages Award years

---

[29] The district court's concern about "an endless barrage of challenges to unfavorable arbitral awards or court orders," 21-1196, App., Vol. V at 1216, aligns with the finality principle embodied in 28 U.S.C. § 1291 to avoid piecemeal litigation, *Clark*, 744 F.2d at 1426, and with the res judicata principle of respecting final judgments—here, the Confirmation Judgment, *Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011).

before the district court confirmed it, and then GCC launched a new attempt at

annulment after confirmation.[30]

Based on the facts of this case, the district court acted within its discretion to

conclude that the U.S. interest in finality outweighed comity concerns.[31]

---

[30] In *Pemex* and this case, the district court declined to enforce an order annulling
an arbitral award. The Second Circuit in *Pemex*, deferring to the district court's
balancing of comity and public policy, held the district court did not abuse its discretion.
The different procedural posture of this case compared to *Pemex* should make our
deference to the district court stronger because GCC sought to undo a judgment.

In *Pemex*, the prevailing arbitral party asked the district court to confirm an
arbitral award despite the presence of an annulment order. Here, by contrast, the district
court had already confirmed the arbitral award after Bolivia's highest constitutional court
had refused to annul it, this court had affirmed the confirmation in *Compañía I*, and then
GCC, the losing arbitral party, asked the district court to vacate the confirmation
judgment—an extraordinary remedy under Rule 60(b)(5)—based on a post-confirmation
annulment order.

[31] GCC asserts the district court:
- Improperly "rested its finality analysis on the supposed finality of the
  December 2016 PCT [Judgment]." 21-1196, Aplt. Br. at 35. In fact, its
  finality analysis "rested" on the finality of its Confirmation Judgment.
- "Ignored" that the 2016 PCT Order had remanded for further proceedings.
  21-1196, Aplt. Br. at 35. In fact, the district court addressed the remand.
  21-1196, App., Vol. V at 1216.
- "Import[ed] U.S. law on how precedent should be treated into the
  Bolivian legal system," 21-1196, Aplt. Br. at 37, and used "finality" as
  nothing more than a shorthand for disagreeing with the highest Bolivian
  court. *Id.* In fact, the district court assumed that the 2020 PCT Order
  overturned the 2016 PCT Order and was not repugnant. 21-1196, App.,
  Vol. V at 1215. Its denial of vacatur stemmed from the U.S. public
  policy consequences of enforcing the 2020 Bolivian orders.
- Incorrectly relied on finality to "treat[] the PCT decisions as repugnant to
  fundamental notions of justice." 21-1196, Aplt. Br. at 37-38. But the
  district court "did not consider the 2020 orders themselves to be
  repugnant." 21-1196, App., Vol. V at 1215.

51

Second, public policy favors upholding the parties' contractual expectations in the arbitration context, including the finality of arbitral awards. "The principal purpose of the [Federal Arbitration Act ("FAA")] is to ensure that private arbitration agreements are enforced according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (quotations and alterations omitted). That principle also underlies the Convention, as the Supreme Court has explained that "[t]he goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements." *Scherk*, 417 U.S. at 520 n.15; *see also* 9 U.S.C. § 201 (FAA's statutory implementation of the Convention). When "enforcing an agreement to arbitrate or construing an arbitration clause, [we] must give effect to the contractual rights and expectations of the parties" because, "as with any other contract, the parties' intentions control." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quotations omitted). We enforce agreements to allow parties to "foretell with accuracy what will be their rights and liabilities under the contract." *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 428 (10th Cir. 2006) (quotations omitted).

Other courts have honored parties' contractual expectations in declining to give effect to a foreign court's annulment of an arbitral award. *See Pemex*, 832 F.3d at 107-08 (affirming district court's denial of vacatur in part to "vindicat[e] [the parties'] contractual undertakings" and support "investment-backed expectation[s] in contracting"); *id.* at 108 (noting concern that "[g]iving effect to the nullification"

52

"would deprive [the prevailing party at arbitration] of its contract rights"); *In re Arb. Between Chromalloy Aeroservices & Arab Republic of Egypt*, 939 F. Supp. 907, 913 (D.D.C. 1996) (refusing to recognize foreign annulment in part because parties had agreed that arbitration would be final and not subject to appeal).

Here, "the parties' agreement demonstrates that the arbitration award became binding upon issuance for purposes of the New York Convention." *Compañía I*, 970 F.3d at 1300. In the Shareholder Agreement, the parties agreed that arbitral awards "shall be final and of mandatory compliance" and "waive[d] all actions for annulment, objection, or appeal against that award." 21-1196, Suppl. App. at 2. The district court's denial of vacatur comports with "[t]he principal purpose of the [FAA]," *AT&T Mobility*, 563 U.S. at 344, by respecting the parties' clear agreement to the finality of arbitral awards.[32]

Third, pointing to the Convention, the Supreme Court has recognized the "emphatic federal policy in favor of arbitral dispute resolution" that "applies with special force in the field of international commerce." *Mitsubishi*, 473 U.S. at 631. A corollary to the policy favoring enforcement of agreements to arbitrate is a strong interest in enforcing the resulting award. *See Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 935 (10th Cir. 2001) ("[C]ourts must not only enforce the agreements to

---

[32] GCC asserts we should disregard the parties' agreement that arbitral awards would be final because "U.S. courts uniformly hold that this language does not insulate such judgments from judicial review." 21-1196, Aplt. Br. at 38 (quotations omitted). Even so, the parties' agreement still supports the parties' expectation that arbitral awards would be final and is an appropriate consideration for judicial review.

arbitrate but also enforce the resulting arbitration awards.").  This public policy applies to the Arbitral Tribunal's award of damages to CIMSA in 2015.

*    *    *    *

The interests in the finality of judgments, respecting parties' contractual expectations, and the U.S. policy favoring arbitral dispute resolution support the district court's conclusion that vacatur of its Confirmation Judgment would violate U.S. public policy.  These considerations correspondingly support the district court's decision against extending comity to the 2020 Bolivian orders.  The district court entered a Confirmation Judgment following a final judgment from Bolivia's highest constitutional court refusing to annul the Damages Award.  Only after the Confirmation Judgment did GCC initiate a new challenge, its fourth, to the Damages Award.  The district court acted within its discretion to find that public policy concerns about enforcing the 2020 Bolivian orders outweighed according comity to those orders.

### ii.  Response to the dissent

The dissent contends that (1) finality is not a valid public policy consideration, (2) the district court undervalued comity, and (3) we misconstrue the parties' arbitration agreement.  None of these arguments has merit.

#### 1)  Finality

The dissent "question[s]" whether finality is a proper public policy consideration as a matter of law.  *See* Dissent at 44.  Although it admits that "GCC's litigation conduct may implicate interests under Rule 60(b)(5)," the dissent claims those interests are "not a

54

matter of United States public policy." *Id.* at 46-47.  And although the dissent recognizes

that "[t]he Supreme Court assigns the assessment of public policy to judges," *id.* at 39, it

argues that the New York Convention narrows the range of public policy considerations

the district court may weigh.  The dissent offers no support for these statements.

The Supreme Court and Tenth Circuit cases cited earlier recognize a strong

interest in finality.  And in *Thai-Lao*, the only other case concerning the Convention and

Rule 60(b)(5), the Second Circuit recognized the interest in "preserving the finality of

judgments."  864 F.3d at 186.  As for the Convention, it does not define "public policy"

and says nothing about what counts as a valid public policy concern.  *See* Restatement

(Third) U.S. Law of Int'l Comm. Arb. § 4.16 cmt. a.  Instead, the Convention provides

that in determining whether to enforce an arbitration award, a secondary jurisdiction must

assess its own public policy, not the public policy of the primary jurisdiction.  *See*

21 U.S.T. 2517, art. V(2) (a court in "the country where recognition and enforcement is

sought" may consider whether "recognition or enforcement of the award would be

contrary to the public policy of *that country*") (emphasis added).[33]

---

[33] The dissent states that we have crafted a "new permissive" and "unbounded" "approach" in which "a public policy under Rule 60(b)(5) is identical to the term 'public policy' used in Article V(2)(b) of the New York Convention."  Dissent at 44 and 44 n.22. That is not what we have said and is not our intent.  We hold only that finality was a valid public policy interest for the district court to consider in this case, as demonstrated by the ample support cited above, including *Thai-Lao*, 864 F.3d at 186.

55

2)  Comity

The dissent accuses the district court of "neglect[ing] to situate comity as the 'guiding value' against which to weigh the proffered public policy interest under the Convention."  Dissent at 33 (quoting *Esso*, 40 F.4th at 74); *id.* at 39 ("The district court should have started its balancing inquiry with comity considerations at their zenith."). We disagree and find no such error.

In providing legal background, the district court said:  "The Convention's implicit concerns for comity must be considered and deference must generally be afforded to the decision of a competent authority in the primary jurisdiction."  21-1196, App., Vol. V at 1210.  Indeed, it relied on the same authority as the dissent does.  *Compare id.* ("The annulment of an arbitral award in the primary jurisdiction should be given significant weight." (quoting *Thai-Lao*, 864 F.3d at 186)), *with* Dissent at 14 (foreign annulment should "weigh heavily") (quoting *Thai-Lao*, 864 F.3d at 186).  The district court emphasized it could confirm an annulled award only under "narrow circumstances." 21-1196, App., Vol. V at 1210-11 (quotations omitted); *see id.* at 1211 (recognizing a "narrow public policy" exception to comity).  The dissent seems to recognize this, saying "[t]he district court . . . accurately articulated" this "as a narrow public policy exception." Dissent at 24 (quotations omitted).

In its Rule 60(b)(5) analysis, the district court again stressed the "narrow public policy exception to the principle of comity under the New York Convention."  21-1196, App., Vol. V at 1212; *see id.* ("[C]ompelling circumstances [must] exist to justify the enforcement of an arbitral award that has been set aside by a competent authority.").  The

56

court recognized the import of comity and the narrow circumstances under which an annulment order may not be accorded comity.[34]

The dissent repeatedly uses the term "presumption of comity," Dissent at 7, 8, 34, 37, 39, 43, 48, which does not appear in the Convention or any of the cases discussed here.  Indeed, *Thai-Lao* said:

> The Convention's concern for comity is thus only one of the considerations to be taken into account in deciding a Rule 60(b)(5) motion.  Accordingly, courts acting on Rule 60(b)(5) motions that are based on later-annulled arbitral awards must not simply treat the annulment as dispositive of the Rule 60(b)(5) analysis.  They should analyze the full range of Rule 60(b) considerations, including the weighty interests served by protecting the finality of judgments of our courts, and must be attentive to the fact that the burden of demonstrating that vacatur is appropriate lies with the party seeking that result.

864 F.3d at 186-87.  *Pemex* described comity as a "prudential concern."  832 F.3d at 106.  No one disputes that a foreign order setting aside the award is entitled to

---

[34] The dissent asserts that we "say[] comity is not a command."  Dissent at 37. Confusingly, it points to our direct quote of *Hilton v. Guyot*, 159 U.S. 113 (1895), which the dissent also cites.  *See* Op. at 77:  Comity is "neither a matter of absolute obligation . . . nor of mere courtesy and good will." (quoting *Hilton*, 159 U.S. at 163-64); Dissent at 35-36.  And we explained a district court must "generally accord[] comity to the foreign annulment order."  Op. at 30; *see also id.* ("[A] foreign annulment is generally conclusive unless enforcement of the annulment would offend the public policy of the state in which enforcement is sought." (quotations and alterations omitted)).  (Our quote of *Hilton* appears in our discussion of GCC's appeal of the turnover order, which the dissent does not address.  *See* Dissent at 1 n.1.)

comity, and in that sense comity is presumed.  But this does not foreclose the court from weighing a competing public policy concern.[35]

### 3)  The parties' arbitration agreement

The dissent suggests we are "frustrat[ing]" the parties' "agree[ment] to arbitrate under Bolivian . . . law."  Dissent at 48-49.  But the dissent's view instead would frustrate the parties' agreement, which provides that all arbitral awards are final, and which was key to our determination in *Compañía I* that the Damages Award was binding. *Compañía I* said:  "[T]he parties' agreement demonstrates that the arbitration award became binding upon issuance for purposes of the New York Convention" because the parties "expressly waive[d] all actions for annulment, objection, or appeal against the award."  970 F.3d at 1300 (quotations omitted).  We also noted that the parties agreed to "the use of IACAC arbitration rules," which "provided that the award . . . shall be final and binding on the parties and subject to no appeal."  *Id.* (quotations and alterations

---

[35] The dissent cites decisions from foreign jurisdictions "to better discern the Convention's meaning."  Dissent at 19.  They are, of course, not binding here, and at least two of those cases acknowledge that a secondary jurisdiction has discretion to enforce an arbitral award despite a set-aside order.  *See, e.g.*, LCivA 44/21 B.I. Science (2009) Ltd. v. Luminati Networks Ltd. (2021), Judgment of the Supreme Court of Israel, 21 Apr. 2021 (jusmundi.com), at 8 (while "[i]n general, setting aside the arbitral award in the Original Country bars its enforcement and recognition in a foreign country," "the court [in the secondary jurisdiction] has discretion in the matter, and is able to recognize and enforce the arbitral award even though it was set aside in the Original Country"); Malicorp v. Government of the Arab Republic of Egypt [2015] EWHC 361, ¶ 22 (a secondary jurisdiction tribunal should "give effect to" an annulment order "unless it offends . . . domestic concepts of public policy") (quotations omitted).

omitted).  We fail to see how the parties' agreement to arbitrate under Bolivian law affects their agreement that arbitral awards would be final.

The dissent also "assume[s] CIMSA . . . knew the possibility of appeal through the Bolivian judicial system."  Dissent at 49.  But CIMSA protected against that possibility through its contract with GCC.  At that time, the parties bargained for binding arbitration.  *See* 21-1196, Suppl. App. at 2.  They agreed arbitral awards "shall be final and of mandatory compliance" and "waive[d] all actions for annulment, objection, or appeal against the award."  *Id.*  The "possibility of appeal" would violate that clear choice of forum and agreement to finality.  The parties agreed to international arbitration, the international rules provided awards would be final, and the Convention requires "[e]ach Contracting State shall recognize arbitral awards as binding."  21 U.S.T. 2517, art. III.[36]

* * * *

---

[36] The dissent also addresses the interest in enforcing arbitral awards, saying this "pro-enforcement bias . . . is better understood as a pro-comity bias" because "[t]he extension of comity is a first principle of the Convention."  Dissent at 50.  But the Convention says "[e]ach Contracting State *shall* recognize arbitral awards as binding," 21 U.S.T. 2517, art. III, and that "[r]ecognition and enforcement of [an] [arbitral] award *may be* refused" if it "has been set aside," *id.*, art. V(1)(e).  The dissent's "bias" characterizations do not stand up under the Convention's mandatory language for enforcement of arbitral awards and permissive language for extending comity to a foreign annulment order.  *See* Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.16 cmt. b (Am. L. Inst. Proposed Final Draft 2019) ("As with other grounds for granting or denying recognition or enforcement, public policy is interpreted in light of the presumption in favor of effectuating [arbitral] awards."); *see also Pemex*, 832 F.3d at 105 (The Convention "evince[s] a pro-enforcement bias" for "foreign arbitral awards." (quotations omitted)).

We have no quarrel with the dissent about the importance of comity.  Had we considered the Rule 60(b)(5) motion as a district court in the first instance, we may have found that comity outweighed any competing public policy concerns and granted the motion.  But we review only for abuse of discretion and "may not substitute our own judgment for that of the trial court."  *Mid-Continent Cas. Co. v. Vill. at Deer Creek Homeowners Ass'n, Inc.*, 685 F.3d 977, 981 (10th Cir. 2012) (quotations omitted).  For the reasons discussed, we cannot say there is "a complete absence of a reasonable basis" in the district court's decision.  *Jackson*, 880 F.3d at 1191 (quotations omitted).

    b.  *Equitable conduct*

GCC also challenges the district court's conclusion that its conduct in the Bolivian and United States proceedings weighed against Rule 60(b)(5) relief.  *See* 21-1196, App., Vol. V at 1218-19.  The district court made clear that the U.S. public policy interests in preserving the Confirmation Judgment were sufficient to deny GCC's motion.  It discussed GCC's conduct insofar as it "reinforced" denial of relief. *Id.* at 1218.

We find no abuse of discretion in the district court's additional analysis finding that GCC's conduct also weighed against relief.  The record supports the court's conclusion that GCC acted inequitably by (1) initiating another challenge to the Damages Award in Bolivian courts only after its efforts against enforcement of the arbitral award in the United States failed and (2) delaying proceedings in the United States by frustrating service of process for nearly three years and refusing to satisfy the arbitral award.  *See* Suppl. App. at 46-48.

i.  GCC's conduct in Bolivia

The district court did not abuse its discretion in concluding that GCC acted inequitably in the Bolivian proceedings in relation to the United States' proceedings because it "slept on its rights."  21-1196, App., Vol. V at 1218.  GCC "waited until its efforts to defend against enforcement in the United States were unsuccessful" before it initiated a new challenge to the Damages Award leading to a *queja*.  *Id.* It waited until May 2019—after the district court had confirmed the award against it—to initiate yet a fourth, new attempt in the Bolivian courts to set aside the Damages Award.[37]  *Id.* at 1218-19.

As discussed, the 2020 PCT Order was based on a challenge that GCC initiated *after* the district court confirmed the Damages Award.  21-1196, App., Vol. III at 614; 21-1196, App., Vol. IV at 813.  Not only did GCC wait to pursue its *queja*, but the PCT had previously rejected the arguments presented in that *queja*. Years before GCC filed its May 2019 *queja*, the PCT had twice refused to invalidate the Second *Amparo* (and thereby the Damages Award) based on GCC's argument that it was duplicative of the First *Amparo*.  21-1196, App., Vol. III at 524-25, 538-39; 21-1196, App., Vol. IV at 808-09.  Nonetheless, GCC asserted again in its post-

---

[37] As previously discussed, (1) GCC filed an action to annul the Damages Award. 21-1196, App., Vol. II at 383.  After the PCT rejected annulment, GCC also (2) unsuccessfully challenged the constitutionality of Bolivia's arbitration law and (3) argued the Twelfth Judge lacked jurisdiction to enter a Damages Award decision because a different Bolivian trial judge had annulled the Merits Award.  21-1196, App., Vol. V at 1203-04.

confirmation *queja* that the Second *Amparo* was duplicative of the First *Amparo* and therefore invalid.  21-1196, App., Vol. IV at 704-05, 712-14, 813-15.  GCC thus continued raising the same challenges in Bolivia until it received the answer it wanted.

GCC's justification for its delay rings hollow.  GCC asserts it "did not bring [its *queja*] any sooner only because it thought it had already prevailed in obtaining a [Bolivian] judgment setting aside the Merits Award" in January 2017.  21-1196, Aplt. Br. at 41.  But in *Compañía I*, we rejected GCC's argument that the January 2017 order set aside the Merits Award.  970 F.3d at 1298.[38]  And GCC's conduct in the Bolivian courts undercuts this argument.  In April 2017, GCC initiated a new attack on the Damages Award after it believed the Merits Award was set aside.  21-1196, App., Vol. IV at 809-10.

GCC's other arguments are also unpersuasive.  It contends that in *Thai-Lao*, the arbitration loser's delay in asking a Malaysian court to set aside an arbitral award did not amount to inequitable conduct, so GCC's delay in filing the *queja* should not count against it.  21-1196, Aplt. Br. at 40-41.  But recall that *Thai-Lao* reviewed a

---

[38] GCC failed to inform this court in *Compañía I* that it had filed a *queja*.  In its briefing, GCC represented that "proceedings regarding the annulment of the Damages Award remain[ed] pending" because it had argued to the Twelfth Judge that she "lacked jurisdiction to rule on the Damages Award because it was effectively nullified by the annulment of the Merits Award." 19-1151, Aplt. Br. at 10.  But GCC never mentioned that it had initiated a new *queja* or appealed to the PCT.  Now GCC seeks to benefit from the fact that the *queja* was pending during *Compañía I*.  It argues here that "[h]ad the 2020 PCT Order issued only a few weeks earlier, this Court could have considered it" in *Compañía I*.  21-1196, Aplt. Br. at 34.

*grant* of Rule 60(b)(5) relief for abuse of discretion, which included the consideration of inequitable conduct.  *Thai-Lao*, 864 F.3d at 187-88.  Here, we are reviewing a *denial* for abuse of discretion.  Further, there the arbitration loser sought to annul the arbitral award in Malaysia only once, approximately a year after the arbitral award was issued and before the district court confirmed the award.  *Thai-Lao*, 864 F.3d at 175, 180.  Here, GCC attempted and failed to annul the Damages Award in Bolivia before the Confirmation Judgment.  And then it sought annulment again after the Confirmation Judgment, more than four years after the Damages Award.

GCC also argues that by considering its conduct in Bolivian proceedings, United States courts are "polic[ing] the litigation conduct of parties in foreign courts," 21-1196, Aplt. Br. at 40, and "micromanag[ing] foreign court deadlines," 21-1196, Aplt. Reply Br. at 22.  The district court's analysis was hardly "micromanaging."  The court would have been remiss to ignore GCC's conduct in Bolivia given that GCC sought extraordinary relief here under Rule 60(b)(5) based on proceedings it initiated in Bolivia.  Indeed, *Thai-Lao* evaluated the movant's conduct in Malaysian proceedings.  *See Thai-Lao*, 864 F.3d at 187.  "Rule 60(b) gives the court a grand reservoir of equitable power to do justice in a particular case." *Manzanares*, 628 F.3d at 1241.  A district court may consider a movant's conduct in both foreign and domestic tribunals.  *See Amoco*, 231 F.3d at 698-99.

       ii.  <u>GCC's conduct in the United States</u>

The district court also determined that GCC acted inequitably in the United States proceedings by frustrating service of process and failing to satisfy the arbitral

award.  21-1196, App., Vol. V at 1219.  The court explained that CIMSA's inability to serve GCC at its publicly listed address significantly delayed confirmation of the Damages Award.  *Id.*  It further noted that after the Confirmation Judgment, GCC "repeatedly asked for a stay while refusing to post a supersedeas bond" and made no effort to satisfy the arbitral award despite its substantial business activity in the United States.  *Id.*

The district court acted within its discretion in concluding GCC acted inequitably in the United States proceedings.  The court was well-situated to assess how GCC's actions affected the proceeding before it.  We noted in *Compañía I* that CIMSA was unable to serve GCC in Mexico for nearly two years because GCC's offices were not located at its published address.  970 F.3d at 1280.  And GCC refused to authorize its United States counsel to accept service on its behalf.  *See* 21-1196, App., Vol. I at 158 ¶ 18.  CIMSA thus moved to effect alternative service on GCC's United States counsel, which the district court granted.  *Compañía I*, 970 F.3d at 1280.

In addition, GCC repeatedly shunned its obligation to satisfy the Damages Award.  On multiple occasions, it sought to stay execution of the Confirmation Judgment without posting a supersedeas bond.  Dist. Ct. Docs. 108, 202, 239.  Under the Federal Rules, "a party may obtain a stay by providing a bond or other security."  Fed. R. Civ. P. 62(b).  We have explained that "[a] party against whom judgment is entered may either satisfy the judgment or post a supersedeas bond."  *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1237 (10th Cir. 2000), *aff'd*, 532

U.S. 588 (2001).  Because GCC did not satisfy the judgment or post bond, the district court ordered GCC to turn over certain assets to the court's registry.  *See* 21-1324, App., Vol. VII at 1813.  GCC challenged the Turnover Order before a Mexican court, which enjoined GCC and its affiliates from complying with the Order.  *See* 21-1196, Doc. 10875458.  GCC's pursuit of a foreign court order stating that it could not comply with the Turnover Order interfered with the United States proceedings.

GCC had the burden to show it was entitled to relief under Rule 60(b)(5).  Its conduct in both the Bolivian and United States proceedings appropriately informed the district court, which did not abuse its discretion by concluding that GCC's conduct provided an additional basis for denying it relief.

### D. *Conclusion*

The district court acted within its discretion in declining to grant GCC the extraordinary relief of vacatur under Rule 60(b)(5).  It applied the correct legal standard by considering whether the 2020 Bolivian orders or giving effect to those orders would offend U.S. public policy.  And it reasonably concluded that (1) vacatur would offend United States public policy to the point of outweighing comity to the 2020 Bolivian orders and (2) GCC's conduct also supported denial of relief under Rule 60(b)(5).  We do not "find[] a complete absence of a reasonable basis" in the court's decision, nor can we be "certain that the decision is wrong." *Jackson*, 880 F.3d at 1191.  We thus affirm.

### III. **CASE NO. 21-1324 – TURNOVER ORDER**

GCC challenges the Turnover Order, arguing that (1) Colorado's turnover rule does not allow a court to order turnover of property held by third parties abroad, (2) the Turnover Order is an impermissible extraterritorial application of United States law, and (3) the district court should have abstained from entering the Turnover Order on international comity grounds.  These arguments are unavailing. The district court did not abuse its discretion by entering the Turnover Order, and we affirm.

#### A. *Additional Procedural History*

GCC challenged the Arbitral Tribunal's decisions not only in Bolivia but also in Mexico.  GCC contends that the resulting 2014 and 2021 Mexican court orders support its challenge to the Turnover Order.  We summarize those orders and the U.S. district court turnover proceedings.

#### 1. **2014 Mexican Injunction**

Following the 2013 arbitral Merits Award, GCC, proceeding ex parte, asked a Mexican court to stay the damages phase of the arbitration.  21-1324, App., Vol. V at 1191.  On December 3, 2014, the court "provisionally" (1) enjoined CIMSA from commencing any proceedings to confirm any arbitral award and (2) suspended the arbitration damages proceeding (the "2014 Mexican Injunction").  *Id.* at 1203-04. The Arbitral Tribunal in Bolivia concluded that the Mexican court lacked jurisdiction to issue the injunction, disregarded it, and ultimately issued the Damages Award. 21-1324, App., Vol. VII at 1810.

2.  **United States Turnover Proceedings**

Approximately six months after the 2019 Confirmation Judgment, CIMSA sought an order requiring GCC to turn over certain assets to the court's registry to satisfy the Damages Award.  21-1324, App., Vol. IV at 960.  The district court stayed consideration of CIMSA's request pending our resolution of *Compañía I*.  21-1324, App., Vol. V at 1288-90.  After that decision issued, the parties provided supplemental briefing regarding a turnover order.  *See* 21-1324, App., Vol. VI at 1528, 1612; 21-1324, App., Vol. VII at 1726.

In September 2021, the district court granted CIMSA's motion and issued the Turnover Order under Colorado Rule of Civil Procedure 69(g).[39]  21-1324, App., Vol. VII at 1808-09, 1834.  It directed GCC to turn over the following assets located in Mexico:  (1) publicly traded common stock held in GCC's corporate treasury; (2) funds held by GCC's in-house bank, Cementos de Chihuahua, S.A. de C.V.; and (3) interest payments due on nine intercompany loans to GCC's subsidiaries. *Id.* at 1808-09.

3.  **2021 Mexican Injunction**

GCC, again proceeding ex parte, next asked a Mexican trial court, the Mexico City Superior Court, whether it was obligated to comply with the Turnover Order.

---

[39] As we explain below, in proceedings involving execution on a money judgment, a federal court applies the rules of procedure of the state where it is located.  Fed. R. Civ. P. 69(a).  Here, the district court was in Colorado, so Colorado rules of civil procedure applied.

*See* Aplt. Reply Br. Addendum at 2. On November 23, 2021, a Mexican trial judge enjoined GCC and other affiliated Mexican entities from complying with the Turnover Order, the Confirmation Judgment, or any other decisions requiring GCC to pay the Damages Award (the "2021 Mexican Injunction"). *Id.* at 2-4. Because the 2021 Mexican Injunction was issued after the Turnover Order, the U.S. district court never considered it because GCC had already brought this appeal. *Id.* at 1. GCC's opening brief does not mention that it had initiated proceedings in Mexico after the Turnover Order.[40]

### B.  *Standard of Review*

Courts review a district court's entry of a turnover order for abuse of discretion. *Jiao v. Xu*, 28 F.4th 591, 599 (5th Cir. 2022); *Divane v. Krull Elec. Co.*, 194 F.3d 845, 848 (7th Cir. 1999). We review a district court's refusal to accord comity to a foreign court's order for abuse of discretion. *In re Colorado Corp.*, 531 F.2d 463, 468-69 (10th Cir. 1976); *Cincinnati Ins. Co. v. AMSCO Windows*, 593 F. App'x 802, 811 (10th Cir. 2014) (unpublished) (cited as instructive under 10th Cir. R. 32.1 and Fed. R. App. P. 32.1). A district court abuses its discretion when it (1) "fails to consider the applicable legal standard," (2) relies on clearly erroneous factual findings, or (3) lacks a reasonable basis in the evidence to support its ruling. *Jackson*, 880 F.3d at 1191.

---

[40] Because GCC filed its opening brief on November 16, 2021, five days before the 2021 Mexican Injunction issued, it first mentioned the injunction in its reply brief.

C. *Legal Background*

The district court entered the Turnover Order under Colorado Rule of Civil Procedure 69(g).  We previously reviewed a turnover order issued under that rule in *Wharf*.  We provide background on (1) the applicable federal and state procedural rules and (2) *Wharf*.

1. **Applicable Rules of Civil Procedure**

Federal Rule of Civil Procedure 69(a) states:  "The procedure on execution [on a money judgment]—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located . . . ."  It "defers to state law to provide methods for collecting judgments."  *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 834 (1988).  Rule 69(a) thus "unambiguously permits a federal district court sitting in Colorado to reference and apply Colorado law in 'proceedings on and in aid of execution.'"  *Wharf*, 210 F.3d at 1235 (quoting Fed. R. Civ. P. 69(a)).

Under Colorado law, a prevailing party is "entitled to employ supplemental proceedings in aid of execution to collect [on a] judgment."  *First Nat. Bank of Denver v. Dist. Ct. In & For City & Cnty. of Denver*, 652 P.2d 613, 617 (Colo. 1982).  Colorado Rule of Civil Procedure 69(g) provides one such procedure.  *Id.*  It states:

> The court, master, or referee may order any party or other person over whom the court has jurisdiction, to apply any property other than real property, not exempt from execution, whether in the possession of such party or other person, or owed the judgment debtor, towards satisfaction of the judgment.

Colo. R. Civ. P. 69(g).  Colorado courts "interpret[] [Rule 69] liberally to assist judgment creditors in enforcing final money judgments."  *Isis Litig., L.L.C. v. Svensk Filmindustri*, 170 P.3d 742, 746 (Colo. App. 2007) (citing *Hudson v. Am. Founders Life Ins. Co.*, 417 P.2d 772, 776 (Colo. 1966)).

## 2.  *Wharf*

In *Wharf*, this court affirmed an order entered under Colorado's turnover rule against a foreign judgment debtor whose assets were held by third parties abroad. 210 F.3d at 1234, 1236-37.  The district court directed the debtor to turn over assets held in "various foreign bank accounts and stock certificates" to satisfy the judgment. *Id.* at 1234.  On appeal, we rejected the judgment debtor's arguments that the turnover order violated principles of extraterritoriality and international comity. *Id.* at 1236.

First, we concluded the turnover order did not conflict with the presumption against extraterritoriality.  As we explained, this presumption "limit[s] the United States' ability to hold a party legally accountable for conduct that occurred beyond its borders."  *Id.*[41]  The presumption therefore did not apply because the turnover order "merely directed a party over whom it had personal jurisdiction to turn over assets." *Id.*  We said that"[o]nce personal jurisdiction of a party is obtained, the District Court

---

[41] Courts evaluate the extraterritorial reach of statutes under the canon of statutory interpretation known as the "presumption against extraterritoriality."  *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016).  Although *Wharf* referred to this as "extraterritoriality principles," here we refer to it as the "presumption against extraterritoriality."

has authority to order it to 'freeze' property under its control, whether the property be within or without the United States." *Id.* (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965)).

Second, the turnover order did not raise comity concerns. *Id.* We explained that "[i]n general, we will not consider an international comity . . . issue unless there is a 'true conflict' between United States law and the relevant foreign law." *Id.* at 1223 (quoting *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798-99 (1993)). We determined that "[c]ompliance with the turnover order did not require [the judgment debtor] to violate [foreign] law, nor did it preclude [it] from satisfying its obligations elsewhere." *Id.* at 1236. The district court thus did not err by entering the turnover order. *Id.*

### D. *Analysis*

GCC argues (1) it did not possess the assets under Colorado's turnover rule, (2) the order calls for impermissible extraterritorial application of United States law, and (3) the order violates principles of comity. These arguments are unpersuasive. In *Wharf*, we upheld a turnover order under almost identical circumstances and rejected the extraterritoriality and comity arguments that GCC makes here. We thus affirm the district court.

### 1. **Application of Colorado Rule 69(g) to Assets Held by Third Parties Abroad**

GCC contends the district court misapplied Rule 69(g) because third parties held its assets abroad, so GCC did not "possess" them. We disagree. GCC possessed

the assets under Rule 69(g) for the same reason *Wharf* upheld Rule 69(g)'s application to property held by third parties abroad.

Under Rule 69(g), a court "may order any party or other person over whom the court has jurisdiction" to apply property "whether in the possession of such party or other person . . . towards satisfaction of the judgment." Colo. R. Civ. P. 69(g). Because it is undisputed that the district court had jurisdiction over GCC, the only issue is whether GCC possessed the assets.[42]

In *Wharf*, we upheld a turnover order under Rule 69(g) that applied to assets held in foreign bank accounts and foreign stock certificates. 210 F.3d at 1236. We said that when the district court had personal jurisdiction over the judgment debtor, the location of the debtor's assets was irrelevant. *Id.* Here, like the assets in *Wharf*, GCC's assets were in a foreign bank account and in foreign stock certificates. The foreign bank account was in GCC's in-house bank. *See* 21-1324, App., Vol. VI at 1511. Indeed, the connection between GCC and its bank is stronger than the one between the judgment debtor and the unrelated bank in *Wharf*. Rule 69(g) thus applies to the assets at issue.

Contrary to GCC's suggestion, "possession" under Rule 69(g) does not require actual possession. *See* 21-1324, Aplt. Br. at 14. The Colorado Supreme Court has explained that "[i]t is the principle and policy of [Rule 69(g)] to subject all property

---

[42] It is also undisputed that the third parties holding GCC's assets were outside the court's jurisdiction. *See* 21-1324, Aplt. Br. at 10; 21-1324, Aplee. Br. at 21.

of the judgment debtor, not specifically exempt, to the payment of his debts."
*Hudson*, 417 P.2d at 776. Also, Colorado courts "interpret[] [Rule 69] liberally to
assist judgment creditors in enforcing final money judgments." *Svensk Filmindustri*,
170 P.3d at 746. Although Colorado courts have not specifically interpreted
"possession" in Rule 69(g), we conclude based on the foregoing that they would not
limit "possession" to actual possession.[43]

Dictionaries point to the same conclusion. The Supreme Court of Colorado
"frequently look[s] to the dictionary to ascertain the meaning of undefined words in a
statute." *See People v. Thoro Prods. Co.*, 70 P.3d 1188, 1194 (Colo. 2003). Black's
Law Dictionary defines possession as "[t]he fact of having or holding property in
one's power," "the right under which one may exercise control over something to the
exclusion of all others," or "[s]omething that a person owns or controls." *Possession*,
*Black's Law Dictionary* (11th ed. 2019). Under those definitions, GCC possessed the
assets subject to the Turnover Order because it could exercise control over them.

Practical considerations also support this reading. If Rule 69(g) applied only
to assets over which the judgment debtor had actual possession, then a judgment
debtor's assets would never be subject to turnover if a third party held them outside
the court's jurisdiction. Under such a reading, a judgment debtor could avoid

---

[43] The prior version of Colorado's turnover rule applied to property "in the hands"
of the debtor. *Hudson*, 417 P.2d at 776. The revision from "in the hands" to
"possession" suggests that the legislature broadened the rule to reach beyond actual
possession.

enforcement of a judgment by transferring its property to any foreign third party, including a foreign bank.

Finally, GCC's reliance on *Commonwealth of Northern Mariana Islands v. Canadian Imperial Bank of Commerce*, 990 N.E.2d 114 (N.Y. 2013), is misplaced. That case concerned an order that required a third-party bank to direct its foreign subsidiary to turn over the judgment debtor's assets held abroad. *Id.* at 64. Here, the district court ordered GCC to turn over assets held abroad; it did not, as in *Mariana Islands*, order a third party to direct a foreign entity to turn over assets. Indeed, *Mariana Islands* noted that the order there differed from the order in *Miller v. Doniger*, 814 N.Y.S.2d 141 (1st. Dept. 2006), which upheld a turnover order that required a judgment debtor to turn over assets held in bank accounts outside the court's jurisdiction. *Id.*

The district court did not err in applying Rule 69(g) to GCC's assets held by related third parties abroad because the court had jurisdiction over GCC and GCC had control over and therefore possessed those assets.

## 2. **Presumption Against Extraterritoriality**

The district court correctly applied *Wharf*'s holding that a turnover order under Rule 69(g) does not implicate the presumption against extraterritoriality. 210 F.3d at 1236. GCC's suggestion that we should overrule *Wharf* lacks merit.

The presumption against extraterritoriality "reflects the presumption that United States law governs domestically but does not rule the world." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013) (quotations omitted). The Supreme

Court has explained that the presumption "typically appl[ies]" to "discern whether an Act of Congress regulating conduct applies abroad." *Id.* at 116. *Wharf* rejected the judgment debtor's argument that the turnover order triggered the presumption against extraterritoriality. 210 F.3d at 1236. We said:

> Extraterritoriality principles limit the United States' ability to hold a party legally accountable for conduct that occurred beyond its borders. Here, the district court merely directed a party over whom it had personal jurisdiction to turn over assets. The location of those assets is irrelevant.

*Id.*

GCC argues that Supreme Court cases decided after *Wharf* that address the presumption against extraterritoriality require us to overrule *Wharf*. But GCC does not identify any Supreme Court decision addressing enforcement of a federal court judgment confirming a foreign arbitral award. Nor do any of the cases that GCC discusses "contradict[] or invalidate[] our prior analysis" in *Wharf*. *United States v. Salazar*, 987 F.3d 1248, 1254 (10th Cir.), *cert. denied*, 142 S. Ct. 321 (2021) (quotations omitted). GCC's cases dealt with the extraterritorial reach of statutes regulating conduct, including those that provide a cause of action for certain conduct. *See RJR Nabisco*, 579 U.S. at 338 (considering extraterritorial application of RICO's provisions prohibiting certain conduct and creating a private right of action); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 261-65, 273 (2010) (evaluating extraterritorial reach of Securities and Exchange Act provision regulating the purchase or sale of securities). Rule 69(g), by contrast, provides a post-judgment

enforcement mechanism to assist with collecting a final judgment. It does not even mention, let alone regulate, the conduct underlying a judgment.

GCC asserts that this case gives rise to the presumption against extraterritoriality because the Supreme Court in *RJR Nabisco* "expressly extended the presumption to statutes affording relief" and Colorado's turnover rule "affords relief." 21-1324, Aplt. Br. at 19. But, as GCC acknowledges, the issue in *RJR Nabisco* was whether a statute providing a private right of action applied extraterritorially. *See id.* (quoting *RJR Nabisco*, 579 U.S. at 350). The Court overruled the Second Circuit's conclusion that the presumption against extraterritoriality did not apply to that statute, *RJR Nabisco*, 579 U.S. at 346, stating that it applied because "providing a private civil remedy for foreign conduct creates a potential for international friction." *Id.* at 346-47. Colorado's turnover rule does not similarly provide a cause of action. Instead, as we said in *Wharf*, it merely allows a court to direct a party to turn over certain property to satisfy a judgment. 210 F.3d at 1236.

GCC also emphasizes *Morrison*'s statement that courts "must 'apply the presumption [against extraterritoriality] in all cases.'" 21-1324, Aplt. Br. at 18 (quoting *Morrison*, 561 U.S. at 261). But in a more recent decision, the Court explained that "[w]e typically apply the presumption to discern whether an Act of Congress *regulating conduct* applies abroad" and concluded that principles of extraterritoriality "similarly constrain[ed] courts considering causes of action that

may be brought under the [Alien Tort Statute.]" *Kiobel*, 569 U.S. at 116 (emphasis added).

The district court correctly followed *Wharf* when it concluded that the Turnover Order did not implicate the presumption against extraterritoriality. We discern no basis to overrule *Wharf*.

3. **Principles of Comity**

Finally, GCC argues the district court erred by concluding that the Turnover Order did not violate principles of comity. We find no such error. The Turnover Order did not conflict with foreign law and thus did not raise comity concerns.

a. *Additional legal background*

Comity is "neither a matter of absolute obligation . . . nor of mere courtesy and good will." *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895). "But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Id.* at 164. Comity "counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." *Wharf*, 210 F.3d at 1236 (quotations omitted).

In *Wharf*, we said the turnover order did not raise international comity concerns. *Id.* "In general, we will not consider an international comity . . . issue unless there is a 'true conflict' between United States law and the relevant foreign

77

law." *Id.* at 1223 (quoting *Hartford Fire* , 509 U.S. at 798-99). "A true conflict exists only when a person subject to regulation by two states cannot comply with the laws of both." *Id.* We explained that "[c]ompliance with the turnover order did not require [the judgment debtor] to violate [foreign] law" or preclude it from "satisfying its obligations elsewhere." *Id.* at 1236. The turnover order in *Wharf* was thus compatible with comity. *Id.*

b. *Analysis*

GCC seeks reversal of the Turnover Order on comity grounds because (1) the Turnover Order conflicted with Mexican law, (2) comity considerations other than a conflict with foreign law should have been considered, and (3) its assets were "exempt from execution" under Rule 69(g).[44]

i. <u>True conflict with Mexican law</u>

GCC argues that the Turnover Order conflicts with the 2014 Mexican Injunction, the Mexican Stock Exchange Act, and the 2021 Mexican Injunction. But, as in *Wharf*, there is no true conflict between the Turnover Order and foreign law. The district court correctly held that the order did not raise comity concerns.

1) The 2014 Mexican Injunction

The Turnover Order does not conflict with the 2014 Mexican Injunction because the injunction expired before the Turnover Order was entered.

---

[44] Although GCC does not explain why its exempt-assets theory concerns comity, we nonetheless address this argument.

78

In 2014, GCC moved ex parte in Mexico for certain "provisional" measures pending conclusion of the Bolivian proceedings regarding annulment of the Merits Award.  21-1324, App., Vol. V at 1191-93.  GCC sought to (1) suspend the damages phase of the arbitration and (2) prevent CIMSA from enforcing any arbitral award.  *Id.* at 1191-93.  The Mexican court "provisionally" granted GCC the requested relief, calling the 2014 Mexican Injunction an "interim measure."  *Id.* at 1203.  The 2014 Mexican Injunction remained in effect only until annulment proceedings regarding the Merits Award concluded.  *Id.*  GCC acknowledges that Merits Award annulment proceedings concluded nearly five years before the Turnover Order was entered.  21-1196, Aplt. Br. at 41 (GCC "thought it had already prevailed in obtaining a judgment setting aside the Merits Award" in January 2017); 21-1324, App., Vol. VII at 1808-09 (Turnover Order entered in September 2021).  The 2014 Mexican Injunction expired by its terms.

GCC argues, though, that the 2014 Mexican Injunction did not expire because "the annulment proceedings ended with the Damages Award being annulled."  21-1324, Aplt. Br. at 33.  But the 2014 Mexican Injunction concerned the Merits Award annulment proceedings, not the Damages Award annulment proceedings.  As the district court noted, GCC had represented that the 2014 Mexican Injunction only "ordered a stay of the arbitral proceedings until the annulment of the [Merits] Award had been decided."  21-1324, App., Vol. VII at 1824 n.12 (quoting GCC's Resp. to Mot. to Confirm at 15).

79

GCC also asserts that the 2014 Mexican Injunction is viable because the Mexican court never annulled or revoked it.  21-1324, Aplt. Br. at 33-34.  But because the injunction provided the terms of its expiration, the court did not need to revoke it.  *See* 21-1324, App., Vol. V at 1203.  The 2014 Mexican Injunction said its measures were "provisionally decreed until a final resolution [was] reached on the adoption of the interim measures requested, or a final and definitive resolution on the annulment recourse [was] dictated."  *Id.* at 1203.

In sum, the 2014 Mexican Injunction expired by its own terms and did not conflict with the Turnover Order.

### 2) Mexican Stock Exchange Act

GCC argues the Turnover Order's requirement that GCC transfer its shares conflicts with the Mexican Stock Exchange Act, which forbids it to transfer its "treasury shares."  21-1324, Aplt. Br. at 34.  According to GCC, under that Act, "treasury shares . . . can only be issued to new shareholders . . . and cannot be transferred."  *Id.*

The district court rejected this argument.  It concluded there was no conflict with the Mexican Stock Exchange Act because "the shares at issue [were] not Treasury Shares but [were] instead freely transferrable shares held in GCC's corporate treasury."  21-1324, App., Vol. VII at 1821.  On appeal, GCC repeats its argument that treasury shares cannot be transferred under the Act, 21-1324, Aplt. Br. at 34-35, but it does not contest the district court's determination that the shares were

freely transferrable because they were not treasury shares.  In short, GCC has not shown that the district court erred.[45]

GCC has not shown that the district court erred by concluding there was no conflict between the Turnover Order and the Mexican Stock Exchange Act.

### 3)  2021 Mexican Injunction

For the first time in its reply brief, GCC asserts that we must accord comity to the 2021 Mexican Injunction, which prohibits GCC from complying with the Turnover Order.  We disagree.

As an initial matter, because GCC failed to raise this argument in its opening brief, it is waived.  "We have held that a failure to raise an issue in an opening brief waives that issue, and that we will not entertain issues raised for the first time on appeal in an appellant's reply brief."  *Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1271 (10th Cir. 2020) (quotations omitted).  Relatedly, the district court could not have abused its discretion by failing to accord comity to the 2021 Mexican Injunction because the injunction did not exist when it entered the Turnover Order.

---

[45] Further undermining GCC's argument is its acknowledgement that it could transfer treasury shares if a Mexican court ordered it to do so.  21-1324, Aplt. Br. at 34.  As the district court said, GCC has "present[ed] no logical reason why a corporation would be permitted to place its repurchased shares on the stock exchange for purchase by a third-party and why a Mexican court would be permitted to order a transfer of those shares to a third-party, but the corporation would be prohibited from transferring the same shares to the same third-party in satisfaction of a foreign judgment."  21-1324, App., Vol. VII at 1821.

Even if we reach this issue because the 2021 Mexican Injunction issued just days after GCC filed its opening brief, its argument fails. Courts do not accord comity when a party deliberately seeks to block collection of a confirmed U.S. judgment. In *Motorola v. Uzan*, 388 F.3d 39 (2d Cir. 2004), the Second Circuit rejected the appellants' argument that the district court should accord comity to foreign orders that barred them from transferring assets listed in a turnover order. *Id.* at 60. It explained that foreign orders "are not entitled to comity if the litigants who procure them have deliberately courted legal impediments to the enforcement of a federal court's orders." *Id.* (quotations omitted). Comity to the foreign orders was unwarranted because securing them was "an overt attempt to interfere with [the district court's] jurisdiction." *Id.* at 60-61 (quotations omitted). The Fourth Circuit also concluded that a foreign order was not entitled to comity when the defendant "used the [foreign] courts to impede U.S. collection efforts" on a "largely unsatisfied U.S. judgment." *SAS Inst., Inc. v. World Programming Ltd.*, 952 F.3d 513, 525 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1053 (2021) (explaining that comity is not advanced "when one country enjoins legitimate collection efforts in another country").

Comity is not warranted here. GCC sought an injunction in Mexico to avoid its obligations under the Turnover Order. It now argues that "it would strike at the heart of comity" to require GCC to take actions "that are expressly prohibited by a Mexican court." 21-1324, Aplt. Reply Br. at 4. But "[c]omity is not advanced when a foreign country condones an action brought solely to interfere with a final U.S.

judgment." *SAS*, 952 F.3d at 525. By ordering GCC not to comply with the Turnover Order, the Mexican court accorded no comity to the Turnover Order. GCC's arguments thus "come burdened with the failure of [Mexican courts] to recognize comity." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 939 (D.C. Cir. 1984). The 2021 Mexican Injunction is not entitled to comity.

ii. <u>The district court's failure to weigh other factors</u>

GCC also argues that the district court erred by failing to consider comity factors beyond whether a true conflict exists. *See* 21-1324, Aplt. Br. at 26-29. We disagree. Under *Wharf*, once the district court determined there was no true conflict, it correctly held that the Turnover Order did not implicate international comity concerns.

In *Wharf*, we said, "In general, we will not consider an international comity . . . issue unless there is a 'true conflict' between United States law and the relevant foreign law." 210 F.3d at 1223. We refused to overrule the turnover order on comity grounds because "[c]ompliance with the turnover order did not require [the judgment debtor] to violate [foreign] law, nor did it preclude [the judgment debtor] from satisfying its obligations elsewhere." *Id.* at 1236. *Wharf* thus provides that comity considerations arise only if there is a true conflict between the turnover order and foreign law. As applied to our case, after finding no true conflict, the district court correctly concluded that the "turnover order under the circumstances presented here does not threaten the comity of nations." 21-1324, App., Vol. VII at 1825.

GCC's argument to the contrary is not persuasive. It asserts that "the Ninth Circuit has held 'the district court erred when it required the existence of a true conflict when it analyzed the application of international comity.'" 21-1324, Aplt. Br. at 27 (quoting *Mujica v. AirScan Inc.*, 771 F.3d 580, 602 (9th Cir. 2014)). *Mujica* said a true conflict was only one factor for a court to consider when evaluating whether to "decline to exercise jurisdiction in a case properly adjudicated in a foreign state." 771 F.3d at 599, 602. But *Wharf*, not Ninth Circuit precedent, governs here. *Wharf* held that without a conflict between the turnover order and foreign law, comity does not apply. 210 F.3d at 1223, 1236. Thus, the district court was not required to evaluate the "other considerations" that GCC now contends it should have considered. 21-1324, Aplt. Br. at 28-29.

Further, *Mujica* is distinguishable because it involved claims for damages brought by Colombian plaintiffs based on a bombing in Colombia against U.S. companies. 771 F.3d at 584-85. The Ninth Circuit addressed whether the district court should have abstained from evaluating the state-law claims while Colombian criminal and civil proceedings were ongoing. *See id.* at 585-87, 596-97. Here, by contrast, the parties had already adjudicated their dispute through arbitration. The Turnover Order enforces collection on the resulting award.

### iii. Assets not exempt from execution

Finally, GCC seeks reversal because the Turnover Order targets property that is "exempt from execution" under Rule 69(g). Rule 69(g) allows a court to order turnover of property "not exempt from execution." Colo. R. Civ. P. 69(g).

84

The district court rejected this argument.  21-1324, App., Vol. VII at 1816.  It

determined that

- Mexican law applied to determine whether the assets were exempt under Rule 69(g), *id.* at 1814;[46]

- Article 434 of the Mexican Federal Code of Civil Procedure, "which enumerates specific assets exempt from attachment," was the relevant law, *id.* at 1815 (quotations omitted), and Article 434 covered both attachment and execution, *id.* at 1815-16; and

- Article 434 did not list any of the assets at issue, and they were thus not "exempt from execution" under Rule 69(g), *id.* at 1816.

The court explained that Article 434 exempted the following categories of assets

from execution:

> 1.- assets expressly incorporated into the so-called Family Assets, 2.- personal items, 3.- artisan's working instruments, 4.- agricultural equipment, 5.- books and records of individuals rendering personal services , 6.- military equipment, 7.- instruments and equipment essential to the operation of a commercial or industrial facility, 8.- grains, 9.- *usufruct* itself but not the products derived therefrom, 10.-certain real property rights . . ., 11.- wages of public servants, 12.- life rent, 13.- ownership as member of a rural area under community ownership.

*Id.* (quoting Dist. Ct. Doc. 139-1 at 7).  This list does not include any of the assets at

issue here.

On appeal, GCC repeats arguments that the district court rejected:

(1) Article 434 is inapplicable because it lists assets that are exempt from *attachment*,

---

[46] Before the district court, the parties disputed whether Colorado or Mexican law applied to determine whether the assets were exempt from execution.  21-1324, App., Vol. VII at 1814.  On appeal, neither party challenges the district court's choice-of-law analysis.

not *execution*; and (2) assets can be exempt from execution based on Mexican public policy or court orders. *See* 21-1324, Aplt. Br. at 36-37. We find neither argument persuasive.

First, GCC provides no basis to reject the district court's conclusion that Article 434 pertains to assets that are exempt from execution. Relying on its expert, GCC asserts that Article 434 lists assets "exempt from 'attachment' not 'execution.'" 21-1324, Aplt. Br. at 36. GCC's expert said that "[a]ttachment . . . is a form of pre or post judgment relief that prevents an asset from being sold until a judgment is issued or the debtor pays a debt." *Id.* (quoting 21-1324, App., Vol. V at 1278.) But that statement does not show that Article 434 applies to attachment and not execution. Neither GCC nor its expert cites any authority indicating that Mexican law distinguishes between attachment and execution.[47] GCC has thus not shown the district court erred by concluding that Article 434 addresses assets exempt from execution.

Second, GCC provides no ground for concluding that Mexican public policy or court orders exempt the assets from execution. It asserts that "sub-section XV of Article 434 says that 'any other assets exempted by law' are exempt from attachment." *Id.* at 36. But GCC cites nothing to support its argument that this

---

[47] CIMSA cites a secondary source stating that under Mexican law, "enforcement is done through attachment," suggesting there is no distinction between attachment and execution. 21-1324, Aplee. Br. at 25 (quoting Ovalle Favela, José, *Derecho Procesal Civil* 293-295 (Oxford University Press) (2012)).

provision means that assets can be exempt from execution on public policy grounds. Without more, we cannot conclude the district court erred.

\*    \*    \*    \*

The Turnover Order does not raise comity concerns.

### E.  *Conclusion*

The district court did not err by entering the Turnover Order.  We affirm the district court.

21-1196; 21-1324, *Compañía de Inversiones Mercantiles S.A.* v. *Grupo Cementos de Chihuahua S.A.B. de C.V.*

**ROSSMAN, J., dissenting**

My colleagues in the majority affirm the district court's decision under Federal Rule of Civil Procedure 60(b)(5). I would reverse.[1]

Before us is a "quintessentially foreign dispute." *Getma Int'l* v. *Republic of Guinea*, 862 F.3d 45, 47 (D.C. Cir. 2017). Both parties are foreign corporate entities—one Bolivian ("CIMSA") and two Mexican (collectively, "GCC")—involved in a purely private commercial controversy. They arbitrated under Bolivian law, according to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or "Convention"), June 10, 1958, 21 U.S.T. 2517. Bolivia has been the site of their substantive litigation over the merits of the Bolivian arbitration decision (the "Merits Award") and the damages awarded by the arbitral tribunal (the "Damages Award").

In August 2020, after several years of parallel proceedings where GCC sought to invalidate the Awards in Bolivia while CIMSA sought to enforce them in the United States, this court affirmed the Awards in *Compañía de Inversiones Mercantiles, S.A.* v. *Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269 (10th Cir. 2020) ("*CIMSA I*"). The panel in *CIMSA I*

---

[1] Because I would reverse in Case No. 21-1196, I do not reach the turnover order in Case No. 21-1324.

acknowledged, however, the Damages Award remained subject to then-ongoing litigation in Bolivia. *Id.* at 1275.[2]

The Bolivian litigation over the Damages Award ended three weeks after the mandate issued in *CIMSA I*. In October 2020, the Plurinational Constitutional Tribunal (the "PCT" or "Tribunal")—the highest court in Bolivia, similar to the United States Supreme Court—ruled for GCC, concluding the Damages Award must be set aside under Bolivian law (the "2020 PCT Order"). The 2020 PCT Order also conclusively resolved a conflict between apparently competing 2016 rulings in Bolivian courts.

The inconsistencies between the November 2016 PCT Order and the December 2016 PCT Order were a product of simultaneous remand proceedings originating in different chambers of the PCT—a unique feature of Bolivia's highest court. The 2020 PCT Order declared the December 2016 PCT Order a juridical nullity and essentially reinstated the earlier 2016 decision—

---

[2] The majority suggests GCC acted inequitably by failing to notify the *CIMSA I* panel of its *queja por incumplimiento* filing. Maj. Op. at 62 n.38; *see also id.* at 32 n.13. I disagree. The salient—and undisputed—point is this court (like the district court) *knew* of ongoing litigation over the Damages Award in Bolivia when it rendered its decision. *See CIMSA I*, 970 F.3d at 1275 (acknowledging "[t]he parties continue to litigate the [D]amages [A]ward in Bolivia"). That GCC did not further specify those ongoing Bolivian proceedings involved a *queja* is of no moment, particularly given the observation by the *CIMSA I* panel it was unable to "render[] consistent[] and logical all of the twists, turns, and orders in the Bolivian proceedings, at least by standards recognizable to American jurists and litigants." *Id.* at 1297.

this resulted in the annulment of the Damages Award. There is no serious question the 2020 PCT Order is the last word on the Damages Award: the Bolivian courts have followed its mandate to order a new damages arbitration, Mexican courts have observed it,[3] and CIMSA has no pending challenges to reinstate the Damages Award in Bolivia.[4]

About a year before the 2020 PCT Order entered, and while the parties were litigating the Damages Award in Bolivia, the District of Colorado granted CIMSA's request to enforce the Awards, based on the December 2016 PCT Order (the "Confirmation Judgment"). *CIMSA I*, 970 F.3d at 1276. But when the 2020 PCT Order issued, GCC returned to federal court in Colorado and sought Rule 60(b)(5) relief from the Confirmation Judgment. GCC's argument was simple: the Confirmation Judgment was based on the Damages Award, and the Damages Award no longer existed under Bolivian law. Invoking the New York Convention, GCC argued the Confirmation Judgment should be vacated under Article V(1)(e), because "[t]he award has . . . been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." Among other authorities, GCC relied on *Thai-*

---

[3] GCC had challenged the arbitral awards in Mexico, too. *CIMSA I*, 970 F.3d at 1275.

[4] The Merits Award stands in favor of CIMSA. As the district court correctly observed, "[t]he nullification proceedings in the context of the Merits Award did not end favorably for GCC." R. vol. V at 1213.

*Lao Lignite (Thailand) Co.* v. *Government of Lao People's Democratic Republic*, 864 F.3d 172 (2d Cir. 2017), the only other U.S. case considering Rule 60(b)(5) within the Convention, where the Second Circuit had affirmed vacatur in similar circumstances.

Though the Confirmation Judgment rested on a now-annulled Damages Award, CIMSA opposed Rule 60(b)(5) relief. "[T]here is no obligation on the part of the court to extend comity to a foreign judgment," CIMSA claimed. R. vol. IV at 890. CIMSA urged the court to disregard the 2020 PCT Order on public policy grounds, contending the order was "repugnant to fundamental notions of what is decent and just" in the United States—a standard drawn from the Restatement (Second) of Conflict of Laws § 117, cmt. c (1971), and cases interpreting Article V(2)(b)'s "public policy" exception to enforcement of a foreign arbitral award. *TermoRio S.A. E.S.P.* v. *Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007) (quoting *Ackermann* v. *Levine*, 788 F.2d 830, 841 (2d Cir. 1986)). CIMSA's repugnancy argument hinged on its assertion that the 2020 PCT Order annulling the Damages Award was the product of political bias and corruption in Bolivia.

In reply, GCC clarified comity was actually at its zenith because the Rule 60(b)(5) proceeding involved a foreign judgment annulling an arbitral award governed by *treaty*. GCC explained the New York Convention unquestionably requires contracting states to give great deference to the authority of the

primary jurisdiction (the arbitral seat) and permits a court in the secondary jurisdiction to reject the arbitral seat's judgment only in very narrow circumstances—if the foreign judgment is so-called "repugnant." But, as GCC emphasized, the repugnancy standard "is high" and "infrequently met," and applies "[o]nly in clear-cut cases." *TermoRio*, 487 F.3d at 938 (alteration in original) (citation omitted). CIMSA did not prove the Bolivian orders were repugnant, GCC maintained, and took issue with the Bolivian court system only when it stopped ruling in its favor. GCC also contended the district court could not second guess the decisions of Bolivia's highest court.

The district court denied GCC's Rule 60(b)(5) motion. R. vol. V at 1198-1220. The district court assumed the 2020 PCT Order was valid and had nullified the Damages Award under Bolivian law. The district court also rejected CIMSA's public policy argument, holding, "I do not consider the 2020 [Bolivian] orders themselves to be 'repugnant to fundamental notions of what is decent and just' in the United States . . . ." *Id.* at 1215. Still, the district court refused to extend comity to the foreign arbitral seat because "application of those orders through vacatur of this Court's prior [Confirmation] Judgment would rise to that unacceptable level." *Id.* In other words, the district court determined that extending comity to the 2020 PCT Order would require undoing its own Confirmation Judgment, and this vacatur would offend United

5

States public policy which, the court reasoned, "dictates that there be an end of litigation." *Id.* at 1217 (citation omitted).

To be sure, "[*p*]*roperly applied* Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments." *Nemaizer* v. *Baker*, 793 F.2d 58, 61 (2d Cir. 1986) (emphasis added). But I cannot say with confidence, as the majority does, that the district court properly applied Rule 60(b)(5) here, where its discretionary determination was based on a legally erroneous interpretation and application of the New York Convention. *El Encanto, Inc.* v. *Hatch Chile Co.*, 825 F.3d 1161, 1162 (10th Cir. 2016) (holding "a district court always abuses its discretion when it errs on a legal question"); *see also CIMSA I*, 970 F.3d at 1296 (noting we review de novo "a district court's legal interpretations of the New York Convention") (citation omitted).

The district court's decision to deny Rule 60(b)(5) relief was guided by two fundamental errors of law, which, regrettably, the majority now endorses.

*First*, the district court mistakenly declined to extend comity to the 2020 PCT Order after concluding the order was not "repugnant," as CIMSA had argued. This error alone compels reversal. Every other court to consider the issue has held—based on well-established comity principles and the language of the New York Convention—that a foreign judgment setting aside a foreign arbitral award should be respected unless the judgment *itself* is "repugnant to

6

fundamental notions of what is decent and just." *TermoRio*, 487 F.3d at 938 (citation omitted).

*Second*, the district court mistakenly determined a general finality interest in the secondary jurisdiction could satisfy the repugnancy standard under the New York Convention and thus overcome any deference owed to the arbitral seat. No other court has so held, and for good reason. "[P]rotecting the finality of judgments of our courts" is a "weighty interest[]" under Rule 60(b)(5), *Thai-Lao*, 864 F.3d at 182, but finality, without more, is not enough to meet the high bar of the "repugnancy" standard. The presumption of comity in the Convention context cannot be trumped merely by worry over proceedings without end where, as here, the non-repugnant judgment of the arbitral seat demands deference in the secondary jurisdiction.

I fear the majority opinion reprises the mistakes it affirms. The majority opinion frequently emphasizes the district court's vast discretion under Rule 60(b)(5) and leans heavily on deferential appellate review. But discretion and deference cannot insulate legal errors, as the majority itself observes. Maj. Op. at 19 ("A district court abuses its discretion . . . when it . . . 'fails to consider the applicable legal standard.'" (citation omitted)); *see El Encanto*, 825 F.3d at 1162 ("[W]e decide the presence or absence of legal error de novo. So really in cases like this, where everything turns on the interpretation of rules,

regulations, and statutes, it's a bit anomalous to ask whether the district court abused its discretion.").

The majority also sets out a new legal rule under the New York Convention, concluding a court in the secondary jurisdiction may decline comity to a primary jurisdiction's annulment order if the order *itself* is repugnant *or* if its *enforcement* would offend public policy. And by endorsing the district court's generalized concerns over finality as a legitimate basis for invoking the Convention's narrow public policy exception, the majority mistakenly suggests the presumption of comity yields readily to an easily satisfied "repugnancy" standard. The majority opinion also creates a circuit split and moves this court out of line globally with signatory countries.

We should reverse the district court's order denying Rule 60(b)(5) relief and remand with instructions to vacate the judgment. Because my colleagues in the majority conclude otherwise, I respectfully dissent.

\* \* \* \*

This dissent proceeds as follows. *Part I* addresses Rule 60(b)(5) as a procedural tool operating within the Convention. *Part II* considers and rejects the majority's conclusion that the district court exercised its Rule 60(b)(5) discretion in a manner "consistent" with the Convention. Maj. Op. at 37. *Part III* explains why refusing to enforce the 2020 PCT Order after concluding the Order itself was not "repugnant to fundamental notions of what is decent and

8

just" was legal error. *Part IV* discusses why vindicating finality, though a relevant interest under Rule 60(b)(5), is not alone a public policy sufficient to overcome the presumptive extension of comity contemplated under the New York Convention. *Part V* concludes with some practical considerations about the implications of today's decision.

# I

The majority opinion explains Rule 60(b)(5) provides an "extraordinary remedy" requiring "extraordinary circumstances." Maj. Op. at 22 (citing *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1191-92 (10th Cir. 2018)).[5] It also underscores the vastness of a district court's discretion under Rule 60(b)(5)—"a grand reservoir of equitable power." Maj. Op. at 22 (quoting *Manzanares* v. *City of Albuquerque*, 628 F.3d 1237, 1241 (10th Cir. 2010)). I agree Rule 60(b)(5) relief will be the exception not the rule. But where Rule 60(b)(5) is invoked as a procedural tool under the New York Convention, the hurdle for claimants is not as high, nor the district court's discretion quite as limitless, as the majority posits.

Though we are reviewing the decision to deny Rule 60(b)(5) relief, this is ultimately a New York Convention case. The Convention provides contracting

---

[5] Notably, *Jackson* draws this "extraordinary" language from cases where the reviewing court was concerned with litigants using Rule 60(b) as an impermissible substitute for direct appeal—a circumstance not presented here. *See, e.g.*, *Servants of Paraclete* v. *Does*, 204 F.3d 1005, 1009 (10th Cir. 2000).

nations—including the United States and 169 other countries—will recognize and enforce arbitral awards "in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down" in other provisions. New York Convention art. III. As the district court correctly concluded, Rule 60(b)(5) is one such rule of procedure. R. vol. V at 1212 n.6; *Thai-Lao*, 864 F.3d at 185 ("Rule 60(b)(5) applies to motions to vacate judgments confirming arbitral awards that are subsequently set aside in the primary jurisdiction.").

Our cases counsel Rule 60(b) "should be liberally construed when substantial justice will thus be served." *Thompson* v. *Kerr-McGee Refin. Corp.*, 660 F.2d 1380, 1385 (10th Cir. 1981). The Rule is a procedural acknowledgement that things change, that facts come to light, that decisions rendered may be unrendered; it is itself an exception to finality. *See Frew ex rel. Frew* v. *Hawkins*, 540 U.S. 431, 441 (2004) ("The Rule encompasses the traditional power of a court of equity to modify its decree in light of changed circumstances.").

When there has been a "significant change either in factual conditions or in law," Rule 60(b)(5) "provides a means by which a party can ask a court to modify or vacate a judgment." *Horne* v. *Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo* v. *Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). When a "significant change" is shown, a court abuses its discretion by *refusing* to

modify or vacate the earlier judgment. *Id.* (citing *Agostini* v. *Felton*, 521 U.S. 203, 215 (1997)). By the Rule's text, significant change includes the reversal or vacatur of an earlier judgment. Fed. R. Civ. P. 60(b)(5) (providing "[o]n motion and just terms, the court may relieve a party . . . from a final judgment" when "it is based on an earlier judgment that has been reversed or vacated").

GCC's motion came within the clear purview of Rule 60(b)(5). Recall, GCC invoked Rule 60(b)(5) because, under Article V(1)(e) of the Convention, the Damages Award had been "set aside or suspended by a competent authority of" Bolivia, "the country in which, [and] under the law of which, that award was made." Here, the Confirmation Judgment was "based on" the December 2016 PCT Order, since nullified by the 2020 PCT Order.

The majority insists, however, "a court is not required to set aside a judgment 'simply because it was based on a prior judgment that has later been reversed.'" Maj. Op. at 22 (quoting *Manzanares*, 628 F.3d at 1241). That general principle helps little under the circumstances. What matters here is not just that the district court has discretion under Rule 60(b)(5), as the majority highlights, but whether its exercise of that discretion comports with the New York Convention. *Manzanares*, a purely domestic civil-rights action, is not about applying Rule 60(b)(5) to a foreign judgment overturning an arbitral award under the New York Convention. Here, the treaty makes all the

difference because it informs and guides a district court's discretion under Rule 60(b)(5).

The Second Circuit in *Thai-Lao* has articulated the general rule: a Rule 60(b)(5) motion should be granted where a foreign arbitral award has been set aside. While the majority touches on the Second Circuit's understanding, Maj. Op. at 25-26, its recitation remains incomplete. The majority does not acknowledge "[t]he annulment of an arbitral award in the primary jurisdiction should . . . be given *significant weight*" under Rule 60(b)(5). *Thai-Lao*, 864 F.3d at 186 (emphasis added). Nor does the majority discuss, as the Second Circuit did, that when Rule 60(b)(5) is invoked as a procedural tool under Article III, "district courts should consider the point that 'under the Convention, the power and authority of the local courts of the [primary jurisdiction] remain of paramount importance.'" *Id.* (alteration in original) (quoting *Yusuf Ahmed Alghanim & Sons* v. *Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997)). Though the district court thoughtfully recognized it was proceeding under the Convention, its Rule 60(b)(5) analysis did not give "significant weight" to the Bolivian annulment order or otherwise acknowledge the "paramount importance" of the primary jurisdiction.

Finally, the movant invoking Rule 60(b)(5) under the New York Convention does not face the high barrier suggested by the majority. As the Second Circuit recognized, there is not an "onerous burden for the beneficiaries

of the annulment" seeking relief under Rule 60(b)(5). *Thai-Lao*, 864 F.3d at 187. Indeed, "[c]ourts considering Rule 60(b)(5) motions are generally, and correctly, solicitous of a movant seeking relief when a prior judgment on which the challenged judgment relies has been vacated." *Id.* at 186 (citations omitted). This solicitude makes sense because the Convention provides a strong presumption in favor of the primary jurisdiction's ruling (here, Bolivia) but tightly circumscribes the discretion of secondary jurisdictions (any other signatory in which enforcement is sought, including the United States).

The majority does not decide the burden allocation issue, noting "[w]e need not resolve which party bears the burden on the public policy versus comity question because we can decide this appeal irrespective of which party may bear that burden." Maj. Op. at 31 n.12. There seems no reason we should not follow the framework as articulated by the Second Circuit in *Thai-Lao*. Rule 60(b)(5) places on movants the burden of showing entitlement to relief— vacatur, in our case.[6] When the vacatur request is based on Article V(1)(e), as

---

[6] Citing *Thai-Lao*, 864 F.3d at 182, the majority says the moving party, when seeking relief under Rule 60(b)(5), "must provide 'highly convincing' evidence that it is entitled to this extraordinary remedy and that its conduct as a matter of equity should allow vacatur." Maj. Op. at 31. The majority does not elaborate on what "highly convincing evidence" means, but the case on which *Thai-Lao* relied speaks of "documentary evidence" to support vacatur. *Kotlicky* v. *U.S. Fid. & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987). GCC certainly produced sufficient documentary evidence to show the Damages Award had been set aside.

here, the movant must show the challenged judgment relies on a prior judgment that has been annulled. *Thai-Lao*, 864 F.3d at 182, 187. The burden then shifts to the party opposing Rule 60(b)(5) relief to show the annulment order does not deserve comity because it is repugnant to United States public policy. *Id.* at 186. "In the absence of such a public policy concern, however, the annulment of an award in the primary jurisdiction should weigh heavily in a district court's Rule 60(b)(5) analysis." *Id.*[7]

Here, GCC carried its burden under Rule 60(b)(5). For purposes of Article V(1)(e), GCC showed the 2020 PCT Order was valid and had annulled the legal basis for the Confirmation Judgment. CIMSA then asserted a public policy defense, claiming repugnancy of the 2020 PCT Order based on alleged irregularities in the Bolivian political and judicial systems. The district court rejected CIMSA's public policy argument. Under these circumstances, identical to those where *Thai-Lao* upheld Rule 60(b)(5) vacatur,[8] the district court

---

[7] This was also the burden allocation framework understood by the parties and applied by the district court in the Rule 60(b)(5) proceedings. *See* R. vol. III at 665-67; vol. V at 1215; *see also* vol. IV at 890-905.

[8] The majority contends *Thai-Lao* "differ[s] in two significant respects" and thus does not compel vacatur here. Maj. Op. at 31. I respectfully disagree.

*First*, the majority observes here, the district court *denied* the Rule 60(b)(5) motion, but there, the district court had *granted* it. Maj. Op. at 31-32. The majority appears to suggest that, where abuse of discretion review is applied, reversal necessarily requires more than affirmance. But the veil of

mistakenly refused to extend deference to the primary jurisdiction's application of its own law to set aside an arbitration award issued in its country. Instead, the district court elevated its own conception of United States public policy and procedural values over a treaty that demands international comity and speaks in terms of mutual obligation. The district court effectively read the Convention out of its Rule 60(b)(5) analysis, and the majority opinion endorses that mistake.

## II

I now turn to the majority's conclusion that the district court exercised its Rule 60(b)(5) discretion in a manner "consistent" with the Convention. *See* Maj. Op. at 37. As I will explain, the district court's decision to deny Rule

---

deference is pierced when the district court errs on the law, so the standard of review does no meaningful work for the majority.

*Second*, the majority emphasizes here, GCC initiated new proceedings in Bolivia *after* the district court's Confirmation Judgment, but there, Laos had sought annulment *before* the confirmation judgment. This difference, the majority claims, "implicates the United States' interest in the finality of the arbitral award and the Confirmation Judgment." Maj. Op. at 32. The majority's rule—where "proceedings-after-Confirmation" necessarily trigger U.S. finality interests—sets an arbitrary post. But *Thai-Lao* explains finality does not "stand in the way" of vacatur where "the party seeking to enforce the Award [here, CIMSA] knew proceedings to set aside the Award in the primary jurisdiction were ongoing before the District Court entered judgment, and the party seeking vacatur [here, GCC] sought relief promptly after courts in the primary jurisdiction annulled the award." 864 F.3d at 189. In our case, everyone knew set-aside proceedings were pending in Bolivia and, when they concluded, GCC filed its Rule 60(b)(5) motion within fifteen days.

15

60(b)(5) relief runs counter to the text of the Convention, the intent of its drafters, and the nearly universal practice of all its signatories providing for deference to the lawful decisions of the primary jurisdiction. Only in exceptional circumstances, absent here, should an annulment by courts of the primary jurisdiction not carry effect in every secondary jurisdiction.

## A

Our analysis must begin with the Convention's text, *Medellín* v. *Texas*, 552 U.S. 491, 506 (2008), but may also include an examination of the negotiating and drafting history to determine the shared understanding of that text. *See id.* at 507 ("Because a treaty ratified by the United States is 'an agreement among sovereign powers,' we have also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty . . . .") (citation omitted).

The Convention provides, "Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles." New York Convention, art. III. Recall, one of those "conditions" is that "[r]ecognition and enforcement of the award may be refused, at the request of the party against whom it is invoked," art. V(1), if that party shows that "[t]he award has . . . been set aside or suspended by a

competent authority of the country in which, or under the law of which, that award was made," art. V(1)(e).

The Convention is thus clear the arbitral seat alone has the authority and the jurisdiction to vacate an award. *See* Albert Jan van den Berg, *Annulment of Awards in International Arbitration*, *in* International Arbitration in the 21st Century: Towards "Judicialization" and Uniformity? 134 (Richard B. Lillich & Charles N. Brower eds. 1994); *cf. Int'l Standard Elec. Corp.* v. *Bridas Sociedad Anónima Petrolera*, 745 F. Supp. 172, 177 (S.D.N.Y. 1990) (finding Article V(1)(e) "undoubtedly referenced" the arbitral seat). The text of the Convention places *no* restrictions on the ability of the arbitral seat to review awards but *does* circumscribe the review performed in secondary seats. New York Convention art. V. It rejects "a-national" or "internationalized" arbitral awards and preserves the centrality of the primary jurisdiction in making or unmaking arbitration awards. *See Yusuf*, 126 F.3d at 23 ("The Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief.").

A necessary corollary of this observation is the primary state "may set aside an award on grounds that are not consistent with the laws and policies of a secondary Contracting State." *TermoRio*, 487 F.3d at 937. The majority's

endorsement of signatories free to disregard an arbitral seat's annulment of an award frustrates this harmonious reading of the Convention and diminishes the Convention to a regime "in which the supposed independence of the State is reduced to subjecting its conduct to whatever others follow." I Antonio Sánchez de Bustamente y Sirven, *Tratado de Derecho Internacional Privado* 456 (1896) [translated]. One wonders why the setting aside of an award in the primary jurisdiction would ever matter if parties can just proceed to every one of the other 169 signatories to enforce the award.

In practice, a view has prevailed globally that annulled awards carry no legal force. Professor Pieter Sanders, the text's drafter and the "Father of the Convention," understood the enforcement of an annulled award to be a legal impossibility and a potential violation of the public policy of any country willing to conclude otherwise. Pieter Sanders, *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 6 Neth. Int'l L. Rev. 43, 55 (1959); *cf.* Gary B. Born, *International Commercial Arbitration* 3389 (2d ed. 2014) (comparing annulment to an appellate court's vacatur of a trial court judgment).

Conscious of our modest role as one of many jurisdictions worldwide interpreting a shared text, we ought to examine, too, the decisions of our sister

signatories. This review allows us to better discern the Convention's meaning.[9]

The majority pays these decisions little mind.

Most foreign courts generally refuse to recognize and enforce arbitration awards set aside at the primary jurisdiction. Brazil has a categorical bar on recognition of set-aside awards.[10] German courts have similarly held that enforcement of annulled awards "must" be denied and that null awards no longer exist to be enforced.[11] Swiss and Dutch courts will defer to the seat of arbitration absent a finding that exceptional reasons—e.g., significant due

---

[9] Considering the decisions of our sister signatories where a treaty is concerned also helps us become more clearly aware of our legal system's practices and biases, which will not always be shared by the other signatories, and some of which may implicitly lead us to favor the categorical righteousness of our own determinations.

[10] S.T.J.J. [Superior Tribunal de Justiça], Sentença Estrangeira Contestada No. 2011/0129084-7, Relator: Min. Jorge Mussi, 16.12.2015, (Braz.) *available at* STJ - Jurisprudência do STJ (finding an award annulled in Argentina to be null in Brazil); *cf.* Corte Suprema de Justicia [C.S.J.] [Supreme Court], 8 september 2011, *EDF Internacional S.A.* c. *Endesa Latinoamericana S.A. et al.*, no. 4390-2010) (Chile), *available at* Base Jurisprudencial del Poder Judicial (pjud.cl) (refusing to enforce judgment in Chile that was set aside in Argentina).

[11] *See, e.g.*, Bundesgerichtshof [BGH] [Federal Court of Justice] Feb. 22, 2001, 23 Neue Juristische Wochenschrift [NJW] 1730, 1730-31 ("If the arbitral award is not yet binding in the issuing State or if it has been set aside, it must be refused recognition in the executing State.") [translated]; Oberlandesgericht [OLG] München [Higher Regional Court] Jul. 30, 2012, 6 Zeitschrift für Schiedsverfahren [SchiedsVZ] 339, 341 ("If a foreign arbitral award is set aside in the country of origin, it can no longer have any effect in Germany[.]") [translated].

19

process violations—counsel otherwise.[12] Israel follows the same approach.[13] And in England and Wales, one seeking to enforce a set-aside award must bear "a heavy burden to establish not only that a foreign court's decisions were wrong or manifestly wrong[,] but that they are *so perverse as for it to be concluded that they could not have been arrived at in good faith or otherwise than by bias*."[14] Only one signatory jurisdiction, France, consistently permits enforcement of annulled awards, but it does so based on domestic law treating

---

[12] Tribunal fédérale [TF] [Federal Supreme Court] Dec. 8, 2003, 4P.173/2003/ech (Switz.) ("Pursuant to [Article V(1)(e)], enforcement of an arbitral award *must* be refused if the party objecting to enforcement provides proof that the award . . . [has been] set aside or suspended by a competent authority in the country in which, or pursuant to which law, it was rendered.") (emphasis added) [translated]; Hoge Raad der Nederlanden [HR] [Supreme Court of the Netherlands] 24 november 2017, NJ 2019/223 m.nt. H.J. Snijders ([Applicant]/OJSC Novolipetsky Metallurgichesky Kombinat) (Neth.) (placing on party requesting enforcement of annulled award burden of showing "special circumstances" to disregard Article V(1)(e)) [translated].

[13] LCivA 44/21 B.I. Science (2009) Ltd. v. Luminati Networks Ltd. (2021), *available at* [Luminati Networks v. B.I. Science, Judgment of the Supreme Court of Israel, 21 Apr 2021 (jusmundi.com)](https://jusmundi.com) ("In general, after the arbitral award is set aside in the Original Country, it should not be recognized and enforced by virtue of the New York Convention, except for exceptional cases. For example, the decision to set it aside was made by a judicial forum that is not autonomous and independent.") [translated].

[14] Maximov v. Open Joint Stock Co. OJSC "Novolipetsky Metallurgichesky Kombinat" [2017] EWHC (Comm) 1911 (emphasis added); *see also* Malicorp v. Government of the Arab Republic of Egypt [2015] EWHC (Comm) 361.

foreign awards as decoupled from the arbitral seat and thus functionally domestic.[15]

**B**

Every circuit court in the United States to consider the matter has held a foreign court order annulling an arbitration award issued under its own laws must be given effect unless the foreign order itself is "repugnant to fundamental notions of what is decent and just."[16] I now address that narrow caveat.

---

[15] *See, e.g.*, Cour de cassation [Cass.] [supreme court for judicial matters] 1e civ., Oct. 9, 1984, Bull. civ I, No. 248 (Fr.) (holding French courts must apply "more-favorable-right" provisions of domestic law).

[16] *Esso Expl. & Prod. Nigeria Ltd.* v. *Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 71 (2d Cir. 2022) ("[T]he standard . . . for evaluating a petition to enforce an arbitral award that has been annulled in the primary jurisdiction is, simply, whether the foreign judgment setting aside the award is . . . 'repugnant to fundamental notions of what is decent and just' in the United States.") (citation omitted); *Getma*, 862 F.3d at 48 ("We will enforce an annulled award only if the *annulment* is 'repugnant to fundamental notions of what is decent and just' in the United States.") (emphasis added) (citation omitted); *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V.* v. *Pemex-Exploración y Producción*, 832 F.3d 92, 107 (2d Cir. 2016) ("*Pemex*") ("[A *foreign*] *judgment* is unenforceable as against public policy to the extent that it is 'repugnant to fundamental notions of what is decent and just [in the United States.]'") (emphasis added) (citation omitted); *TermoRio*, 487 F.3d at 939 (same); *Thai-Lao*; 864 F.3d at 183-84 (reiterating the Second Circuit's adoption of the *TermoRio* formulation); *Baker Marine (Nig.) Ltd.* v. *Chevron (Nig.) Ltd.*, 191 F.3d 194, 196-97 (2d Cir. 1999) (rejecting appellant's arguments that the Nigerian judgments annulling the arbitral award were somehow defective as a matter of United States public policy).

Article V(1)(e) clearly provides awards set aside in the primary jurisdiction—here, Bolivia—may be unenforceable. But a *different* section, Article V(2)(b), provides that *recognition* and *enforcement* of an *award* may be refused if a secondary jurisdiction concludes recognition or enforcement would be "contrary to the public policy of that country." Though the text of the Convention says nothing about public policy as a ground to refuse recognition of an Article V(1)(e) *vacatur*, the majority correctly explains that United States courts have placed a "public policy gloss" on Article V(1)(e). Maj. Op. at 37-38. This "public policy gloss" is essentially what CIMSA relied upon in defending against GCC's Rule 60(b)(5) motion, R. vol. IV at 890-905, and what the district court identified as the "narrow public policy exception to the principle of comity under" the Convention, *id.* vol. V at 1212.

If we are to venture beyond the text of the Convention, however, we again would be wise to consider its drafting history.

The drafters favored a narrow public policy exception to recognition and enforcement of an arbitral award set aside in the primary jurisdiction. The Convention delegates sought to "limit the scope of the public policy clause as far as possible." 2 Pieter Sanders, *International Commercial Arbitration* 323 (1960). The narrow exception under Article V(2)(b) represented a change from the 1927 Geneva Convention, which required an affirmative demonstration that "recognition or enforcement of the award [would not be] contrary to the

public policy or to the principles of the law of the country in which it is sought to be relied upon." Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, art. 1(e), 92 L.N.T.S. 301.

The public policy exception asks whether the award is "distinctly contrary to the basic principles of the legal system of the country where the award is invoked." U.N. Econ. & Soc. Council, *Report of the Committee on the Enforcement of International Arbitral Awards*, Mar. 28, 1955 (UN Doc. E/AC.42/4/Rev.1), at 13; *see Slaney* v. *Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 593 (7th Cir. 2001); *Fotochrome, Inc.* v. *Copal Co.*, 517 F.2d 512, 516 (2d Cir. 1975). It exists as "a safety valve to be used in those exceptional circumstances when it would be *impossible* for a legal system to recognize an award and enforce it without abandoning the very fundament[al]s on which it is based." Secretariat of the United Nations Commission on International Trade Law, *Guide on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards* 240 (2016) (emphasis added); *see also* U.N. Econ. & Soc. Council OR, 21st Sess., U.N. Doc. E/2822/Add.4, at 2 (April 3, 1956) *and* U.N. Econ. & Soc. Council OR, 11th mtg. at 7, U.N. Doc. E/CONF.26/SR.11 (Sept. 12, 1958) (French and Dutch delegations' comments during the drafting process).

I agree with the majority and district court that the public policy defense has an appropriate place within the New York Convention. It forms part of the

international bargain by which signatories agree to recognize other signatories' decisions, and functions as an "escape device[] designed to protect the fundamental, mandatory policies of national legal regimes." 3 Gary B. Born, International Commercial Arbitration § 26.05(C)(9)(a) (3d ed. 2020). But the public policy exception is just that—an exception. The district court correctly acknowledged this limitation in theory yet did not observe it in practice.

### III

The district court assumed, rightly, "that the 2020 [PCT] Order overturned [the December 2016 PCT Order] and that the Twelfth Judge had authority to nullify the Damages Award." R. vol. V at 1215. It correctly assumed, too, "both courts are 'competent authorit[ies]' as defined by Article V(1)(e)." *Id.* (alteration in original). The district court then accurately articulated the exception to comity as "a narrow public policy exception when a *foreign judgment* or the *foreign proceedings* are 'repugnant to fundamental notions of what is decent and just.'" *Id.* at 1211 (emphases added). The district court rejected CIMSA's arguments about bias and corruption in Bolivia and concluded the 2020 PCT Order annulling the arbitration award was *not* repugnant to United States public policy. *Id.* at 1215 ("I do not consider the 2020 orders themselves to be 'repugnant to fundamental notions of what is decent and just' in the United States . . . .") (citation omitted). Everyone—the

district court, the majority, Maj. Op. at 40, 51 n.31, and I—agree on this point. That should end the discussion and require reversal.

Having found the 2020 PCT Order itself not repugnant, the district court should have afforded comity to the Bolivian decree and vacated its Confirmation Judgment, which enforced a now-null foreign arbitral award. Instead, the district court refused to vacate its Confirmation Judgment because this would mean enforcing the 2020 PCT Order and that enforcement would be "repugnant" to "fundamental notions of what is decent and just." R. vol. V at 1215-16.

The majority affirms the district court's application of this enforcement-focused repugnancy standard. According to the majority, "[a] district court may decline to enforce a primary jurisdiction's annulment order if the order itself is repugnant *or* if enforcing that order would offend public policy." Maj. Op. at 33. Per the majority's "either-or" framing, district courts in this circuit now may refuse to afford comity to foreign judgments under the New York Convention if *either* the foreign *judgment* itself is repugnant *or* the *enforcement* of that judgment would offend, or simply "undermine," public policy. *Id.* at 33, 40. This is an extraordinary grant of discretionary power to district courts, unsupported by the Convention—which sought to circumscribe

such open-ended discretion—or cases interpreting it.[17] Nevertheless, the majority adopts this novel test, convinced the "the Convention supports" this approach and "[t]he Second Circuit articulated" it. *Id.* at 33. I respectfully disagree on both fronts.

## A

*First*, the text of the Convention supports neither the district court's enforcement-focused repugnancy test nor the majority's either-or analysis. A treaty's text is always paramount but becomes especially important when reviewing exercises of jurisprudential power not otherwise provided for. *See Medellín*, 552 U.S. at 506.

Recall, in studying the Convention, we see the public policy exception in Article V(2)(b) permits a refusal to enforce an *award* on public policy grounds. Article V(2)(b) does not provide a defense to the *enforcement of foreign court judgments*. *TermoRio*, 487 F.3d at 937 ("A judgment whether to recognize or enforce an award that has not been set aside in the State in which it was made is quite different from a judgment whether to disregard the action of a court of

---

[17] Nor is it the legal standard understood by the parties. In opposing Rule 60(b)(5) relief, CIMSA identified at least five separate grounds on which the district court should find the 2020 PCT Orders to be the product of corruption or bias or brazen legal error. CIMSA did not rely on the repugnancy of *enforcement*; it offered, instead, reasons a U.S. court might find the *foreign judgment* repugnant.

competent authority in another State."). Though the majority suggests this is a "cramped view," Maj. Op. at 39, it is what the Convention prescribes.

Eschewing the text, the majority cites only one case, *TermoRio*, which supposedly approves a public policy enforcement defense to Article V(1)(e) vacaturs. Maj. Op. at 37-38. The *TermoRio* court accepted there may be "a narrow public policy gloss on Article V(1)(e)." 487 F.3d at 939. However, it did *not* say, as the majority posits, that the secondary jurisdiction's enforcement may be the sole focus of the public-policy inquiry. It said just the opposite. A "*foreign judgment* is unenforceable as against public policy *to the extent that it* [the foreign judgment] is 'repugnant to fundamental notions of what is decent and just in the United States.'" *Id.* (emphases added) (quoting *Tahan* v. *Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981)). Contrast this with the majority's new formulation of the legal standard: "We conclude that when a court has been asked to vacate an order confirming an arbitral award that has later been annulled, it may balance against comity considerations (1) whether the annulment is repugnant to U.S. public policy or (2) whether giving effect to the annulment would undermine U.S. public policy." Maj. Op. at 40.

27

**B**

*Second*, our sister circuits have consistently rejected the test performed by the district court and affirmed by the majority.[18]

In *Getma*, the D.C. Circuit emphasized the determination of repugnancy looked to the foreign judgment itself. *See* 862 F.3d at 47 ("For us to intervene in this quintessentially foreign dispute, we would need to find *the CCJA's annulment of the award* to be repugnant to the United States's most fundamental notions of morality and justice.") (emphasis added); *id.* at 48 ("We will enforce an annulled award *only if the annulment is 'repugnant* to fundamental notions of what is decent and just' in the United States." (emphasis added) (citation omitted)); *id.* at 49 ("In any event, even if the parties intended to opt out of the CCJA's fee schedule, *the CCJA's decision* to enforce its set fees for arbitrators is not 'repugnant to fundamental notions of what is decent and just in the United States.'" (emphasis added) (citation omitted)). And recall the D.C. Circuit in *TermoRio* referred to the foreign judgment, not

---

[18] The majority first affirmatively states "[t]he Second Circuit articulated" the repugnancy-enforcement test used here, Maj. Op. at 33, but later, the majority claims only that the Second Circuit in *Pemex* and *Thai-Lao* never explicitly *rejected* its approach, *id.* at 42. Respectfully, the majority and I must read these opinions very differently. In both *Pemex* and *Thai-Lao*, the Second Circuit's central focus for public policy purposes was the foreign order itself. *See, e.g.*, *Pemex*, 832 F.3d at 108 (finding extension of comity inappropriate in part because Mexican judgment was based on "[r]etroactive legislation that cancels existing contract rights" and "is repugnant to United States law").

the U.S. court's enforcement, as the source of potential repugnancy. 487 F.3d at 938; *see also id.* at 941 ("We must honor the judgment of the Colombia court vacating the disputed arbitration award, because there is nothing in the record here indicating that the proceedings before the Consejo de Estado were fatally flawed or that the judgment of that court is other than authentic.").

Confronted with these cases, the majority seeks shelter in the Second Circuit's *Pemex* and *Thai-Lao* decisions. Maj. Op. at 33-37. True, the language in both *Pemex* and *Thai-Lao* references the repugnancy of the foreign judgments *and* their enforcement in this country. But a closer look reveals little more than first-blush support for the majority's reasoning.

*Pemex* and *Thai-Lao* did *not* do what the district court and majority do here: find the foreign judgment itself was not violative of this country's public policy *but still refuse to enforce it*. In *Pemex*, for example, the court found the Mexican decision at issue involved "retroactive legislation" and the "taking of private property without compensation" by Mexican authorities. 832 F.3d at 107-08, 110. Given these concerns with the repugnancy of the Mexican judgment itself, enforcing that judgment would "offend[] basic standards of justice in the United States." *Id.* at 111.[19] *Thai-Lao*, citing *Pemex*, adopted the

---

[19] At note 22, the majority claims this "reading conflicts with the overarching conclusion in *Pemex*" and further contends the Second Circuit "plainly was primarily concerned with the enforcement of, or giving effect to," the Mexican order, not the repugnancy of the Mexican order itself. The majority's

same approach: enforcement or vacatur might offend United States public policy *but only if* there was something about the parties' conduct or the foreign courts' reasoning that "so tainted" the foreign order itself. 864 F.3d at 175. These cases confirm the public policy/repugnancy analysis turns on the repugnancy of the foreign judgment. *See Esso*, 40 F.4th at 73 ("*Pemex* teaches that a district court should enforce an award that was set aside in the primary jurisdiction . . . only if the *judgment setting aside the award* can be properly

---

understanding, and its attendant suggestion *Pemex* supports a district court's discretion to decline enforcement of non-repugnant foreign judgments, is not one for which I can discern support in *Pemex* itself. *See Pemex*, 832 F.3d at 111 ("[T]he Southern District exercised discretion . . . to assess whether the *nullification of the award* offends basic standards of justice in the United States.") (emphasis added); *id.* at 100 (affirming the district court's confirmation of the award "on the ground that *annulment of the award* 'violated basic notions of justice in that it applied a law that was not in existence at the time the parties' contract was formed and left COMMISA without an apparent ability to litigate its claims'" (emphasis added) (quoting *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V.* v. *Pemex Exploración y Producción*, 962 F. Supp. 2d 642, 644 (S.D.N.Y. 2013))).

Nor does the majority's understanding accord with the Second Circuit's own understanding of *Pemex*. According to the majority, the *Pemex* court "never said that the foreign annulment order itself violated public policy," Maj. Op. at 41, but *Esso* unambiguously understood *Pemex* to involve a repugnant foreign order. *See* 40 F.4th at 73 ("*Pemex* teaches that a district court should enforce an award that was set aside in the primary jurisdiction . . . only if the *judgment setting aside the award* can be properly characterized as 'repugnant to fundamental notions of what is decent and just' in the United States, in which case reliance on the judgment would be contrary to U.S. public policy.") (emphasis added); *see also id.* at 74 ("Esso has not carried its burden under *Pemex* of showing that the *Nigerian judgments* partially setting aside the Award clearly contravene U.S. public policy.") (emphasis added).

30

characterized as 'repugnant to fundamental notions of what is decent and just' in the United States, in which case reliance on the judgment would be contrary to U.S. public policy.") (emphasis added).

To the extent the foreign judgment is repugnant as against United States public policy, therefore, it obviously would be repugnant to enforce it here. This makes all the sense in the world under the Convention: it preferences the arbitral seat's processes and judgments while preserving the narrow discretion of the secondary jurisdiction. *Cf. Laker Airways Ltd.* v. *Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) ("[F]rom the earliest times, authorities have recognized that the obligation of comity expires when the strong public policies of the forum are vitiated *by the foreign act*.") (emphasis added).

If *Pemex* and *Thai-Lao* created a misimpression, the Second Circuit no longer labors under it. Writing for the Second Circuit in *Esso*, Judge Carney (who also authored *Thai-Lao*) could not have been clearer:

> [W]e clarify that the standard set forth in *Pemex* for evaluating a petition to enforce an arbitral award that has been annulled in the primary jurisdiction is, simply, whether the *foreign judgment* setting aside the award is, in the operative phrase, "repugnant to fundamental notions of what is decent and just" in the United States.

40 F.4th at 71 (emphasis added) (citation omitted).

In the D.C. and Second Circuits, the appropriate question is thus whether there is something about the foreign judgment itself, or the processes that yielded it, that violates fundamental notions of decency and justice in the United States. In this circuit, by contrast, a court now may balance against comity "whether the annulment is repugnant" *or* "whether giving effect to the annulment would undermine U.S. public policy." Maj. Op. at 40. This is a novelty anchored neither by text nor precedent and one that I cannot endorse.

Here, when confronted with whether the 2020 Bolivian orders were "repugnant," the district court unambiguously answered "no." R. vol. V at 1215. Unlike the court in *Pemex*, which had identified fundamental problems implicating the repugnancy of the annulment order, the district court here found none. At this point, the district court should have recognized the "power and authority of the local courts of the rendering state remain[ing] of paramount importance," *Yusuf*, 126 F.3d at 22, and acknowledged the presumptive comity interests counseling vacatur of the Confirmation Judgment. Instead, it refused to afford comity and enforced a null award. Unlike my colleagues in the majority, I would have followed the consistent approach of our sister circuits and reversed on this issue alone.

## IV

Even under the majority's repugnancy-enforcement test, the district court committed reversible error in performing the New York Convention's

32

public policy balancing analysis, which resulted in denial of GCC's Rule 60(b)(5) motion.

*First*, the district court neglected to situate comity as the "guiding value" against which to weigh the proffered public policy interest under the Convention. *Esso*, 40 F.4th at 74.

*Second*, the district court mistakenly determined vindicating finality interests, without more, could overcome the presumptive extension of comity under the Convention.

*Third*, the district court impermissibly second guessed the decisions of Bolivia's highest court.

## A

According to the majority, "[w]hen a primary jurisdiction has annulled an arbitral award, a secondary jurisdiction must balance comity to the foreign annulment order against its country's public policy." Maj. Op. at 21. But a primary jurisdiction's judgment annulling an arbitration award deserves comity *unless* outweighed by a relevant public policy interest of the secondary jurisdiction. *See Pemex*, 832 F.3d at 106 ("[A] final judgment obtained through sound procedures in a foreign country is generally conclusive . . . *unless* . . . enforcement of the judgment would offend the public policy of the state in which enforcement is sought.") (alterations in original) (quotation omitted); *see also Thai-Lao*, 864 F.3d at 184 ("[*Pemex*] recognized a strong presumption in

favor of following the primary jurisdiction's ruling."). The majority expresses confusion about what "presumption of comity" means. Maj. Op. at 57.[20] But the answer is clear: the New York Convention is not an ordinary balancing test between coequal values, so district courts must drop the anchor at the right place and presume comity will be afforded absent some prevailing public policy concern.

"Comity is not just a vague political concern favoring international cooperation when it is in our interest to do so. Rather it is a principle under which judicial decisions reflect the systemic value of reciprocal tolerance and goodwill." *Société Nationale Industrielle Aérospatiale* v. *U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 555 (Blackmun, J., concurring in part and

---

[20] The majority says "presumption of comity" is a phrase that "does not appear in the Convention or any of the cases discussed here." Maj. Op. at 57. Yet that language derives from, and faithfully describes, the applicable law. *See Pemex*, 832 F.3d at 106 ("Accordingly, 'a final judgment obtained through sound procedures in a foreign country is generally conclusive . . . *unless* . . . enforcement of the judgment would offend the public policy of the state in which enforcement is sought.'" (alterations and emphasis in original) (quoting *Ackermann*, 788 F.2d at 837)); *Thai-Lao*, 864 F.3d at 184 (noting the court in *Pemex* "nonetheless recognized a *strong presumption* in favor of following the primary jurisdiction's ruling") (emphasis added); *Esso*, 40 F.4th at 61 ("[T]he district may exercise its discretion to enforce a set-aside award only where the primary jurisdiction's judgment vacating the award is 'repugnant to fundamental notions of what is decent and just' in the United States, a standard that we have cautioned is 'high, and infrequently met.' *Otherwise*, the district court is obligated to afford comity to the foreign court's judgment and must decline to enforce the arbitral award that the foreign court set aside.") (emphasis added) (citation omitted).

dissenting in part). Comity is part of the "true foundation on which the administration of international law must rest," one of the vital "rules . . . which arise from mutual interest and utility, from a sense of the inconveniences which would result from a contrary doctrine." Joseph Story, *Commentaries on the Conflict of Laws* § 35 (M. Bigelow ed., 8th ed. 1883). It is not a light courtesy afforded; it is a "moral necessity to do justice, in order that justice may be done to us in return." *Id.*

Comity considerations are at their apex when, as here, there is no United States involvement. *Spier* v. *Calzaturificio Tecnica, S.p.A.*, 71 F. Supp. 2d 279, 286 (S.D.N.Y. 1999) (finding comity concerns particularly heightened where the governing documents "'make no reference whatever to United States law,' and '[n]othing suggests that the parties intended United States domestic arbitral law to govern their disputes'" (alteration in original) (quoting *Baker Marine*, 191 F.3d at 197)); *cf. Matter of Colo. Corp.*, 531 F.2d 463, 468 (10th Cir. 1976) ("Comity is withheld when the granting of recognition of foreign laws would prejudice the rights of the forum's own citizens. We cannot see how [recognizing foreign decrees] can prejudice American citizens.") (citation omitted).

In *Hilton* v. *Guyot*, 159 U.S. 113 (1895), the Supreme Court explained comity should be afforded to a foreign judgment when certain guarantees have attached to the foreign proceeding. These requirements are satisfied when

> there has been opportunity for a full and fair trial abroad before a
> court of competent jurisdiction, conducting the trial upon regular
> proceedings, after due citation or voluntary appearance of the
> defendant, and under a system of jurisprudence likely to secure an
> impartial administration of justice between the citizens of its own
> country and those of other countries, and there is nothing to show
> either prejudice in the court, or in the system of laws under which
> it was sitting, or fraud in procuring the judgment, or any other
> special reason why the comity of this nation should not allow it full
> effect . . . .

*Id.* at 202. *Hilton* did not endorse refusals to recognize foreign judgments based only on the fact that the processes of other countries may, literally, be foreign to our own. *Id.* at 205 ("[W]e are not prepared to hold that the fact that the [foreign] procedure . . . differed from that of our own courts is, of itself, a sufficient ground for impeaching the foreign judgment.").

Interpreting *Hilton*, we have explained principles of comity "*require recognition of a foreign judgment*" if these basic due process guarantees are met. *Society of Lloyd's* v. *Reinhart*, 402 F.3d 982, 999 (10th Cir. 2005) (emphasis added) (summarizing *Hilton* factors); *cf. Her Majesty the Queen in Right of the Province of B.C.* v. *Gilbertson*, 597 F.2d 1161, 1163 (9th Cir. 1979) ("Generally, judgments from a foreign country are recognized by the courts of this country when the [*Hilton*] principles of comity are satisfied."). Our court will refuse comity *only* if due process is so absent that the foreign jurisdiction's courts function as "rogue bodies that deny due process to litigants." *Leser* v. *Berridge*, 668 F.3d 1202, 1208 n.2 (10th Cir. 2011).

Comity also generally precludes us from inquiring into the merits of foreign adjudications, or another signatory's interpretation of its own law. *See Navani* v. *Shahani*, 496 F.3d 1121, 1128 (10th Cir. 2007) (finding English court's interpretation of English law to be "entitled to our respect"); *Shealy* v. *Shealy*, 295 F.3d 1117, 1123 (10th Cir. 2002) (refusing to "second guess" a German court's interpretation of German law).

The majority says comity is not a command. Maj. Op. at 77. It is, though, a central corollary of our own sovereignty and the deference due to a world that does not halt at our frontiers. Comity concerns are acute in international commercial arbitration, which depends on states giving effect to the outcome of proceedings in countries with processes and laws different from their own. W. Michael Reisman, *Systems of Control in International Adjudication and Arbitration* 139 (1992).

The Second and D.C. Circuits have uniformly recognized the need to approach the question of vacated foreign arbitral awards with the same deferential presumption of comity the district court here neglected to extend.

The D.C. Circuit has stressed the presumption of comity attaches to valid foreign judgments under the Convention. In *TermoRio*, the court found lawful annulment by a competent court in the arbitral seat destroyed any cause of action for enforcement in the United States. 487 F.3d at 930. "The Convention does not endorse a regime in which secondary States (in determining whether

to enforce an award) routinely second-guess the judgment of a court in the primary State . . . ." *Id.* at 937.

The Second Circuit in *Thai-Lao* affirmed it is an extraordinary case that will present those "rare circumstances" in which "it would *not* be an abuse of discretion to reject the demands of comity in favor of honoring public policy." 864 F.3d at 184 (citation omitted). It emphasized, too, the "prudential concerns for international comity and the high standard for overcoming the presumptive effect of a primary jurisdiction's annulment." *Id.* at 186. *Thai-Lao* further acknowledged the "annulment of an arbitral award in the primary jurisdiction should . . . be given significant weight" within the context of the Rule 60(b)(5) determination, *id.*, particularly when, "although we might not necessarily agree with the merits of the [primary jurisdiction's] judgments, we see no grounds for [public policy] concerns," *id.* at 187.

And in *Esso,* the Second Circuit again affirmed comity as "a vital prudential concern," reiterated that repugnancy is a "demanding" standard, and clarified that Article V(1)(e) is not "an invitation to a relaxed exercise of impressionistic discretion." 40 F.4th at 73. Absent a "clear adverse effect on . . . fundamental public policy concerns, comity stands firmly as our guiding value," *id.*, and annulment orders issued in the arbitral seat would be "conclusive," *id.* at 63.

The district court should have started its balancing inquiry with comity considerations at their zenith. This is *not* a case where the record evidenced the due process concerns identified in *Hilton* or the Restatements. And only foreign, private parties are involved. The remaining question was whether a prevailing United States public policy interest, necessary to vindicate fundamental notions of decency and justice, existed here to override the presumption of comity due to the 2020 PCT Order. On this record, none exists.

**B**

"Public policy" first appears to be an ethereal concern permitting unbounded, interpretive discretion. Like comity, however, public policy is a concrete concept, well developed by U.S. courts and particularly well defined in the Convention context.

The Supreme Court assigns the assessment of public policy to judges. *W.R. Grace & Co.* v. *Local Union 759*, 461 U.S. 757, 766 (1983) ("[T]he question of public policy is ultimately one for resolution by the courts."). But "public policy . . . is a very unruly horse, and when once you get astride it you never know where it will carry you." *Richardson* v. *Mellish* [1824] 2 Bing 229, 252 (Burrough, J.). United States courts have recognized the "extremely narrow" nature of the public policy exception. The Supreme Court requires an invoked public policy be "explicit," "well defined and dominant," ascertained by "reference to the laws and legal precedents and not from general considerations

of supposed public interests." *W.R. Grace & Co.*, 461 U.S. at 766 (quoting *Muschany* v. *United States*, 324 U.S. 49, 66 (1945)).

In the Convention context, it takes "much more than a mere assertion that the judgment of the primary State 'offends the public policy' of the secondary State to overcome a defense raised under Article V(1)(e)." *TermoRio*, 487 F.3d at 937; *see also Europcar Italia, S.p.A.* v. *Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998) ("[T]his public policy exception is to be construed very narrowly and should be applied 'only where enforcement would violate our most basic notions of morality and justice.'") (citations omitted). A "roving 'public policy exception,'" *Baker by Thomas* v. *Gen. Motors Corp.*, 522 U.S. 222, 233 (1998), would become a "parochial device protective of national political interests [and] would seriously undermine the Convention's utility," *Parsons & Whittemore Overseas Co.* v. *Société Generale de L'Industrie du Papier*, 508 F.2d 969, 974 (2d Cir. 1974). The delegates to the Convention knew of the hazards posed by "parochial views" of the signatories' courts. *Scherk* v. *Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974) (citing G. Haight, *Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference* 24-28 (May/June 1958)); *see also* Linda Silberman, *The New York Convention After Fifty Years: Some Reflections on the Role of National Law*, 38 Ga. J. Int'l & Comp. L. 25, 35 (2009) ("Of course, the standard for 'public policy' in the context of the New York Convention and

40

international arbitration should not be one of parochial or national interests, but of broader international scope.").

The Convention's public policy exception thus applies only in cases implicating "the forum state's most basic notions of morality and justice." *Vantage Deepwater Co.* v. *Petrobras America, Inc.*, 966 F.3d 361, 370 (5th Cir. 2020) (quoting *Karaha Bodas Co.* v. *Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004)). One instructive example of such a well-defined public policy is the national policy of refusing to recognize certain foreign defamation judgments emanating from courts or jurisdictions considered insufficiently protective of the freedom of speech. *See* Securing the Protection of our Enduring and Established Constitutional Heritage Act ("SPEECH" Act), Pub. L. 111-223, 124 Stat. 2381 (2010) (codified at 28 U.S.C. § 4102); *Trout Point Lodge, Ltd.* v. *Handshoe*, 729 F.3d 481 (5th Cir. 2013) (declining to enforce Canadian judgment on this ground). *Hilton* itself concerned certain clear procedural rights protected by our Constitution and elaborated upon for over a century. It is thus a "rare case[]" that will present the "extraordinary circumstances" required. *Esso*, 40 F.4th at 74.

Unlike the majority opinion, our sister circuits uniformly emphasize the narrowness of the public policy gloss.

The Second Circuit in *Baker Marine* focused on the hazards of the public policy defense as imported to Article V(1)(e). Enforcement of annulled awards,

the court reasoned, would thwart the purpose of the Convention by "seriously undermin[ing] finality and regularly produc[ing] conflicting judgments." 191 F.3d at 197 n.2. These conflicting judgments would encourage global forum shopping, as the losing party would "pursue its adversary 'with enforcement actions from country to country until a court is found, if any, which grants the enforcement.'" *Id.* (citation omitted).

The D.C. Circuit in *TermoRio* acknowledged the public policy exception existed, but only when the foreign judgment was "repugnant to *fundamental* notions of what is *decent* and *just*," 487 F.3d at 938 (emphases added) (quoting *Ackermann*, 788 F.2d at 841); absent these extraordinary circumstances, when a foreign court has lawfully annulled a foreign arbitral award, "United States courts should not go behind that decision," *id.* (citation omitted).

And in *Getma*, the D.C. Circuit understood the fundamental notions standard to be a "demanding burden" and "infrequently met." 862 F.3d at 48 (citation omitted). U.S. courts should not "enforce an annulled award on a mere showing that the annulment is erroneous or conflicts with the United States's public policy." *Id.* at 48-49 (citing *TermoRio*, 487 F.3d at 938). The latter ground required something "offensive to 'basic notions of morality and justice.'" *Id.* at 50 (quoting *TermoRio*, 487 F.3d at 938).

Even the Second Circuit's *Pemex* decision, which confirmed an annulled award, ultimately clarifies the fineness of the Convention's public policy gloss.

42

The *Pemex* court warned United States courts "should act with trepidation and reluctance in enforcing an arbitral award that has been declared a nullity by the courts having jurisdiction over the forum in which the award was rendered." 832 F.3d at 111. The majority dismisses this aspect of *Pemex*, viewing the repugnancy standard as a catch-all concern providing a losing foreign litigant any number of vetoes in United States court. *See* Maj. Op. at 24-25. That reading does not withstand scrutiny. *Pemex* concerned extraordinary circumstances implicating the parties' *fundamental* rights— whether the very existence of substantive rights or the availability of a forum in which to vindicate them.[21]

The weight of authority shows only dominant, well-defined, and clearly expressed public policies might surmount the presumption of comity in the Convention context. Here, against that strong presumption, the district court set an interest in "finality." As the majority correctly notes, various decisions outside the Convention context acknowledge finality as an important United States public policy. Maj. Op. at 48-49 n.27. And protecting the finality of judgments in our courts fits well within "the full range of interests" under Rule

---

[21] According to the majority, "The different procedural posture of this case compared to *Pemex* should make our deference to the district court stronger because GCC sought to undo a judgment." Maj. Op. at 51 n.30. Again, I fail to understand how deferential appellate review can insulate legal error, notwithstanding any difference in procedural posture.

43

60(b), *Thai-Lao*, 864 F.3d at 186, which, of course, itself exists "to make an exception to finality," *Buck* v. *Davis*, 137 S. Ct. 759, 779 (2017) (citation omitted). But I would not conclude, as the majority does, Maj. Op. at 54-55, that a public policy under Rule 60(b)(5) is identical to the term "public policy" used in Article V(2)(b) of the New York Convention.[22] Rather, I question whether finality is so dominant and clearly defined an interest as to qualify as a United States public policy for a repugnancy analysis *under the Convention* and, even if it so qualifies, whether it alone rises to the level of repugnancy as something so offensive to our laws.[23] The majority says yes to both; I disagree.

---

[22] In grounding its new permissive approach to the Convention's public policy exception, the majority appears to conflate "public policy" in the general sense—i.e., the way we might discuss zoning policy—with "public policy" in the Convention's Article V(2)(b) exception. Maj. Op. at 55 ("[T]he Convention . . . does not define 'public policy' and says nothing about what counts as a valid public policy concern."). Perhaps the majority is suggesting any and every U.S. "public policy" is a "public policy" for purposes of the Convention, but I see no support for such an unbounded approach.

[23] Our courts have rejected a "doctrine of disability at self-correction." *Helvering* v. *Hallock*, 309 U.S. 106, 121 (1940). Indeed, the procedures of our own appellate courts contemplate revisiting decisions in the same case under appropriate circumstances. See Fed. R. App. P. 40, 10th Cir. R. 40 (providing for panel rehearing); Fed. R. App. P. 35, 10th Cir. R. 35 (providing for rehearing en banc). Error correction seems precisely what the Bolivian PCT was engaged in by explaining and reconciling the conflict between two 2016 orders issued by different chambers of the same body.

*1*

To start, what was the finality interest the district court identified for the Convention's public policy exception? Reading the record, it is hard to tell.

Recall, CIMSA's public policy pitch consisted of attacks on the Bolivian judiciary and the merits of the 2020 PCT Order under Bolivian law. The district court rejected those arguments. R. vol. V at 1215. Instead, the district court focused only on vindicating finality interests. *Id.* at 1218. As the majority explains, the district court determined "granting GCC relief would undermine the finality of the Confirmation Judgment *and* the arbitral award." Maj. Op. at 47 (emphasis added). "Repugnant," the district court declared, "is a fitting description of proceedings without end." R. vol. V at 1216.

If the district court anchored its finality concerns to the 2016 PCT Orders, this would be problematic. GCC persuasively explains the 2016 PCT Orders were both conflicting (meaning the district court simply selected one of the two as its reference point) and clearly not final under Bolivian law (subject, as they were, to pending litigation at the arbitral seat). Opening Br. at 35. *No one* understood there to be a "final" word on the merits of the Damages Award in Bolivia until the 2020 PCT Order.

If the district court based its finality concerns only on preserving its own Confirmation Judgment—which seems to be the majority's reading, *see* Maj. Op. at 51 n.31—this is even more troubling. I have no doubt the district court

45

was legitimately frustrated, given (as it described) the "congeries of rulings and clarification orders" in the Bolivian courts and the years of parallel proceedings contesting the Merits Award and the Damages Award, including before the district court and this court. R. vol. V at 1201. But even an objectively understandable interest in protecting the finality of its own Confirmation Judgment *under Rule 60(b)(5)* cannot obviate the district court's obligation to identify a public policy *for Convention purposes*—one that would legitimately satisfy the high bar of the infrequently-met repugnancy standard and overcome any deference owed to the arbitral seat.

The majority faults GCC for initiating new proceedings in Bolivia after the district court's Confirmation Judgment entered and concludes this "implicates the United States' interest in the finality of the arbitral award and the Confirmation Judgment." Maj. Op. at 32. As an initial matter, no one understood, or should have understood, the Bolivian proceedings to be final. CIMSA—and the district court and this court in *CIMSA I*—knew GCC was seeking to set aside the arbitral award when CIMSA pursued the Confirmation Judgment. CIMSA sought enforcement in the United States the next day after GCC pursued annulment in Bolivia. And GCC sought relief promptly, filing its Rule 60(b)(5) motion within fifteen days of the 2020 PCT Order. GCC's litigation conduct may implicate interests under Rule 60(b)(5), but it is not a

46

matter of United States public policy.[24] Like the district court, the majority incorrectly imports a U.S. court's finality interest under Rule 60(b)(5) into the distinct public policy exception contemplated by the Convention.

To my knowledge, no other U.S. court has rested its refusal to recognize a competent jurisdiction's vacatur of an arbitral award under the New York Convention only on the ambient "finality" interest invoked here. *Thai-Lao*, consistent with the weight of U.S. caselaw, teaches finality is not a shibboleth to be uttered whenever justice requires us to revisit our prior judgments. Indeed, *Thai-Lao* recognizes, in the Convention context, discretion under Rule 60(b)(5) is "constrained by the prudential concern of international comity." 864 F.3d at 183 (citations omitted). In only *one* of the cases cited by the majority—*Pemex*—did the U.S. court enforce an award annulled at the issuing seat on *any* grounds. *See* Maj. Op. at 23-29. And there, the *Pemex* court specifically

---

[24] GCC argues convincingly that it was availing itself of rights and remedies under Bolivian law. Opening Br. at 39-44. But in describing the procedural history, the majority uses language that adds an air of the disreputable to what appears just to be *lawyering*: "GCC *convinced* a different chamber of [the PCT] to invalidate its prior decision," Maj. Op. at 2; "GCC *initiated a new attempt* in Bolivia to annul the Damages Award and succeeded," *id.* at 45; "GCC *initiated a new attempt* at annulment and ultimately succeeded," *id.* at 47; "Based on GCC's *repeated attempts to challenge* the Damages Award . . ." *id.*; "Here, GCC *attempted to undo* the Confirmation Judgment," *id.* at 49; "GCC thus *continued raising the same challenges* in Bolivia until it received the answer it wanted." *Id.* at 62 (emphases added). Significantly, the district court did not suggest GCC's arguments were frivolous or made in bad faith. The record would not support such a conclusion anyway.

47

identified compelling public policy interests it understood to override the presumption of comity. "[I]n the rare circumstances of this case," the Second Circuit explained, the district court "did not abuse its discretion by confirming the arbitral award at issue because to do otherwise *would undermine public confidence in laws and diminish rights of personal liberty and property*." *Pemex*, 832 F.3d at 111 (emphasis added) (citing *Ackermann*, 788 F.2d at 841). Neither the majority nor the district court explain how extending comity to the 2020 PCT Order to preserve finality of either the Damages Award or the Confirmation Judgment satisfies this exacting legal standard.

*2*

The majority identifies two additional "strong United States interests" to shore up affirmance: "upholding parties' contractual expectations" and "the policy in favor of arbitral dispute resolution." Maj. Op. at 47-48. The majority says these interests "support the district court's conclusion that vacatur of its Confirmation Judgment would violate U.S. public policy. These considerations correspondingly support the district court's decision against extending comity to the 2020 Bolivian orders." *Id*. at 54. Again, the majority blurs the line between Rule 60(b)(5) and the Convention's narrow public policy exception. *Id*. In any case, neither interest supports denying Rule 60(b)(5) relief to GCC.

*First*, the majority claims its decision upholds "parties' contractual expectations in the arbitration context." *Id*. at 52. I don't see that. The parties

48

here agreed to arbitrate under Bolivian, not U.S., law. The majority's decision to affirm frustrates that choice by nullifying an undisputedly competent Bolivian tribunal's decision and injures the standardizing impulse behind the Convention. The majority claims its decision enforces the agreement to "allow parties to 'foretell with accuracy what will be their rights and liabilities under the contract.'" *Id.* (citation omitted). But beyond this circuit becoming a haven for parties to enforce now-null awards from around the world, I do not read the majority opinion to advance predictability goals.

And while the decision is a boon for CIMSA, neither parties' agency is respected, contrary to the majority's aim. Maj. Op. at 52-53. I would assume CIMSA, the Bolivian party to the agreement, knew the possibility of appeal through the Bolivian judicial system, notwithstanding the parties' waiver. *See* R. vol. IV at 802-03 (CIMSA's Bolivian litigation counsel explaining Bolivian law provides "very limited discretion" to refuse appeals for annulment).

*Second*, the majority identifies an "emphatic federal policy in favor of arbitral dispute resolution." Maj. Op. at 53 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). *Mitsubishi*, on which the majority leans for this point, instructively frames its discussion of the "emphatic federal policy" within the parameters of a "strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions." 473 U.S at 631. But the majority dilutes this "strong presumption,"

essentially holding our court is a more competent decisionmaker than the Bolivian arbitrators and the Bolivian PCT.[25] And what the majority describes as this country's pro-enforcement bias, Maj. Op. at 53, is better understood as a pro-comity bias. The extension of comity is a first principle of the Convention and essential to international arbitration. It also benefits the development of business and industry, which "will hardly be encouraged if . . . we insist on a parochial concept that all disputes must be resolved under our laws and in our courts." *M/S Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 9 (1972). The district court's decision and the majority opinion seem to reject, rather than enforce, the parties' freely negotiated contractual choice to arbitrate and litigate in Bolivia.

## C

Finally, the district court also departed from fundamental comity principles by detouring into several discrete commentaries on the merits of the

---

[25] The majority's reliance on *In re Arb. Between Chromalloy Aeroservices & Arab Republic of Egypt*, 939 F. Supp. 907, 913 (D.D.C. 1996), is ill placed. As the same court later noted, "[t]he court's decision in *Chromalloy* is both questionable on the merits and distinguishable on the facts. . . . [T]here is no . . . U.S. party involved in this case, as there was in *Chromalloy*. The lack of a U.S. party diminishes the U.S. interest in applying U.S. law; indeed, the presence of a U.S. party in *Chromalloy* arguably was decisive." *TermoRio S.A. E.S.P.* v. *Electrificadora Del Atlántico S.A. E.S.P.*, 421 F. Supp. 2d 87, 98-99 (D.D.C. 2006).

Bolivian proceedings. The majority appears untroubled by the district court's observations.

As the majority correctly acknowledges, "the secondary jurisdiction's role is not to second-guess the primary jurisdiction's 'substantive determinations made under [its own] law.'" Maj. Op. at 27 n.11 (quoting *Esso*, 40 F.4th at 74). It is well settled the Convention "does not endorse a regime in which secondary States . . . second-guess the judgment of a court in a primary State." *TermoRio*, 487 F.3d at 937; *see also Medellín* v. *Dretke*, 544 U.S. 660, 670 (2005) (Ginsburg, J., concurring) ("It is the long-recognized general rule that, when a judgment binds or is respected as a matter of comity, a 'let's see if we agree' approach is out of order."). Only in exceptional circumstances would *Hilton* permit revisiting the merits of a foreign case. 159 U.S. at 202-03.

The 2020 PCT Order explained the later of the two 2016 Orders was a juridical nullity because "it is not possible to file two or more legal protection proceedings with the same purpose whenever a prior action is pending." R. vol. IV at 713. All agree this substantive determination on a matter of Bolivian law upended the legal basis for the Confirmation Judgment. The district court's "analysis [should] go no further: it is simply not [a] court's role to engage in a more probing analysis of the substance of [another] court's judgments." *Esso*, 40 F.4th at 75; *see also Ingenohl* v. *Walter E. Olsen & Co.*, 273 U.S. 541, 544 (1927) (where the "final exponent of th[e] law[] authoritatively declares" its

meaning, "we do not see how it is possible for a foreign Court to pronounce [that] decision wrong").

Yet, the district court:

- questioned if the PCT correctly concluded Bolivian law trumped the parties' contractual agreement not to appeal, R. vol. V at 1217 n.11;

- opined the "2020 Procedural Order reversed a *well-reasoned* decision by the PCT . . . on two *specious* grounds," *id.* at 1216 n.9 (emphases added);

- expressed doubts about the authority of a Bolivian judge to annul the arbitration award, *id.* at 1215 n.8;

- looked outside the record to suggest the 2020 PCT Order was motivated by bias against CIMSA's principal, *id.* at 1214 n.7; and

- viewed the timing of the 2020 PCT Order as suspiciously "serendipitous" given the country's ongoing election, *id.* at 1214-15 n.7.

The *CIMSA I* panel humbly recognized Bolivian foreign proceedings might not "follow an entirely familiar pattern." *CIMSA I*, 970 F.3d at 1296. I agree and thus confess unease with the district court's subjective views on matters of Bolivian law and government. *United States* v. *Caceres*, 440 U.S. 741, 766 (1979) (Marshall, J., dissenting) ("[J]udges do not lightly cast aspersions on the motives of government officials . . . ."); *Chesley* v. *Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991) ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial

system of another sovereign nation.") (citation omitted). It was improper for the district court to so comment, even though it disclaimed any intention of "close review of a foreign sovereign's judicial or political systems." R. vol. V at 1215. The district court's disagreement with substantive determinations of Bolivian law might explain why it gave no deference to the foreign courts where the arbitration took place and whose law the parties chose to govern their dispute.

## V

I end with two practical observations.

*First*, today's decision may create an unwarranted split between our court and the Second and D.C. Circuits. Our sister circuits have unambiguously held the narrow public policy exception in the Convention focuses on the repugnancy of the foreign judgment, not its enforcement, *supra* at *Part III*. Relying on Second Circuit opinions since clarified, the majority tacks in the opposite direction. Maj. Op. at 40. This split frustrates the predictability and administrability of an otherwise successful Convention.

Focusing on procedural posture, the majority claims there is no split because "no other circuit has reviewed a district court's denial of a Rule 60(b)(5) motion to vacate a judgment confirming a foreign arbitral award based on a later foreign annulment order." Maj. Op. at 44 n.24. But our sister circuits have addressed the precise substantive question at issue in this case and have

determined the *foreign judgment* to be the operative focus of potential repugnancy. The question isn't new; the majority's answer is.

*Second*, we undermine the most basic foundation of private arbitration—that the parties are autonomous and may choose the seat and laws of their arbitral proceedings—when the decisions rendered in their chosen seat have no meaning here. We encourage global forum shopping and forum shopping among the circuits. We undermine finality by leaving standing two competing decisions, the Bolivian high court's judgment setting aside an award and the District of Colorado's contrary Confirmation Judgment, and thus encourage every losing party "to pursue its adversary 'with enforcement actions from country to country until a court is found . . . which grants the enforcement.'" *Baker Marine*, 191 F.3d at 197 n.2 (citation omitted).[26]

For these reasons, I would reverse the district court's refusal to vacate its enforcement of a null arbitration award, and I respectfully dissent from the contrary judgment of my colleagues in the majority.

---

[26] There is also, as the majority correctly observes, a Mexican court decision forbidding GCC from complying with any asset turnover requests globally, based on the comity that court afforded to the Bolivian PCT. Reply Br. Addenda 2-4. I note this court in *CIMSA I* (1) observed pending proceedings in Mexico regarding the Awards' validity and (2) believed they were more efficient than those here. *CIMSA I*, 970 F.3d at 1291.